1    Brianna K. Pierce (SBN 336906)
     **BELLATRIX LAW, P.C.**
2    16868 Via Del Campo Ct., Ste 100
     San Diego, California 92127
3    Telephone: (858) 338-5650
     *Email:* bkp@bellatrix-law.com
4

5    *Attorneys for Plaintiffs Abraham Abittan,*
     *Rachel Abittan, Brian Abittan, Jacob Abittan,*
     *Alyssa Portal, Eliana Abittan, Roy Graber,*
6    *and Tova Graber*

7

8               **UNITED STATES DISTRICT COURT**
             **NORTHERN DISTRICT OF CALIFORNIA**
9

10   ABRAHAM ABITTAN, RACHEL ABITTAN,     Case No. 5:25-cv-5427
    BRIAN ABITTAN, JACOB ABITTAN,
11   ALYSSA PORTAL, ELIANA ABITTAN, ROY
    GRABER, and TOVA GRABER,             **COMPLAINT FOR MALICIOUS**
12                               **PROSECUTION**
               Plaintiffs,
13

14       v.

15                                 **DEMAND FOR JURY TRIAL**
    HANSEN LAW FIRM, P.C., CRAIG HANSEN,
16   STEPHEN HOLMES, SAC ATTORNEYS LLP,
    JAMES CAI, BRIAN BARNHORST, PATRICK
17   O'SHAUGNESSY, YE & ASSOCIATES, PLLC,
    JINGJING YE, and DOES 1-20, inclusive
18
               Defendants.
19

20

21

22

23

24

25

26

27

28

Plaintiffs Abraham Abittan, Rachel Abittan, Brian Abittan, Jacob Abittan, Alyssa Portal, Eliana Abittan, Roy Graber, and Tova Graber ("**Plaintiffs**"), by and through undersigned counsel, allege as follows:

## INTRODUCTION

1.      This case implicates the worst parts of the legal professional: lawyers willing to do or say anything for a paying client, including disregard their duties of diligence, file and/or maintain claims that objectively lack probable cause, and cause innocent individuals substantial harm.

2.      As set forth below, Defendants Hansen Law Firm, P.C., Craig Hansen, and Stephen Holmes, acting on behalf of and in concert with Yuting Chen ("**Chen**"), without probable cause and for an improper and malicious purpose, filed claims in the Northern District of California against Ariel Abittan's wife, father, mother, two brothers, sister, father-in-law, and mother-in-law (i.e., Plaintiffs in this case) for, *inter alia*, fraud, unjust enrichment, intentional infliction of emotional distress, and civil conspiracy. *See* Exhibit A (Complaint, *Yuting Chen v. Ariel Abittan et al*., Case No. 4:21-cv-09393 (N.D. Cal.) (the "**Federal Action**") (ECF No. 1)[1]). Hansen Law Firm and its attorneys eventually substituted out and Defendants SAC Attorneys LLP, James Cai, Brian Barnhorst, Patrick O'Shaughnessy, Ye & Associates, PLLC, and Jingjing Ye maintained the case until its conclusion, despite knowing at all times that the Federal Action was legally untenable and brought for an improper purpose.

3.      As a result of Defendants' actions, Plaintiffs suffered extensive damages. Accordingly, Plaintiffs brings this action to recover those damages and to send a message to Defendants that frivolous claims brought with malicious intent and without probable cause will not be tolerated.

## JURISDICTION AND VENUE

4.      This Court possesses diversity jurisdiction pursuant to 28 U.S.C. § 1332.

5.      The amount in controversy between the parties exceeds $75,000.00.

---

[1] All future citations to "ECF No." refer to docket entries made in the Federal Action.

COMPLAINT AND JURY DEMAND

1    6.    Personal jurisdiction is proper as to all Defendants because: (1) Defendants

2    purposefully availed themselves of the benefits of the State of California; (2) the controversy is

3    related to and arises out of Defendants' contacts with the State of California, including their filing

4    and maintenance of the Federal Action in the District Court for the Northern District of California;

5    and (3) the assertion of personal jurisdiction comports with fair play and substantial justice.

6    7.    Venue is proper in this jurisdiction pursuant to 28 U.S. Code § 1391 because a

7    substantial part of the events giving rise to the claims occurred in the Northern District of

8    California.

9    **PARTIES**

10    8.    Plaintiff Abraham Abittan ("**Dr. Abittan**") is an individual residing in Lawrence,

11    New York. As set forth in Dr. Abittan's declaration, filed in the Federal Action and incorporated

12    herein by reference, Dr. Abittan is a dermatologist licensed to practice medicine in the state of New

13    York; owns a practice in Woodmere, New York; and did not and does not conduct business or own

14    any assets in California. Exhibit B (ECF No. 37-2 at ¶ 3). Dr. Abittan is Ariel Abittan's father. *Id.* at

15    ¶ 2. Dr. Abittan has never interacted with Yuting Chen. *Id.* at ¶ 4.

16    9.    Plaintiff Rachel Abittan is an individual residing in Lawrence, New York. As set

17    forth in Rachel Abittan's declaration, filed in the Federal Action and incorporated herein by

18    reference, Rachel Abittan is an office manager in a dermatologist's office in Woodmere, New York

19    who did not and does not conduct business or own any assets in California. Exhibit C (ECF No. 37-

20    3 at ¶ 3). Rachel Abittan is Ariel Abittan's mother. *Id.* at ¶ 2. Rachel Abittan has never interacted

21    with Yuting Chen. *Id.* at ¶ 4.

22    10.    Plaintiff Brian Abittan is an individual residing in Lawrence, New York. As set forth

23    in Brian Abittan's declaration, filed in the Federal Action and incorporated herein by reference,

24    Brian Abittan is a dermatologist in New York who did not and does not conduct business or own

25    any assets in California. Exhibit D (ECF No. 37-4 at ¶ 3). Brian Abittan is Ariel Abittan's brother.

26    *Id.* at ¶ 2. Brian Abittan has never interacted with Yuting Chen. *Id.* at ¶ 5.

27    11.    Plaintiff Jacob Abittan is an individual residing in Lawrence, New York. As set forth

28    in Jacob Abittan's declaration, filed in the Federal Action and incorporated herein by reference, at

1    the time of the Federal Action, Jacob Abittan was a third-year law student in New York who did not

2    and does not conduct business or own any assets in California. Exhibit E (ECF No. 37-5 at ¶ 3).

3    Jacob Abittan is Ariel Abittan's brother. *Id.* at ¶ 2. Jacob Abittan has never interacted with Yuting

4    Chen. *Id.* at ¶ 5.

5        12.    Plaintiff Alyssa Portal (née Abittan) is an individual residing in Lawrence, New

6    York. As set forth in Alyssa Portal's declaration, filed in the Federal Action and incorporated herein

7    by reference, Alyssa Portal is a registered nurse licensed to practice in the state of New York who

8    did not and does not conduct business or own any assets in California. Exhibit F (ECF No. 37-6 at ¶

9    3). Alyssa Portal is Ariel Abittan's sister. *Id.* at ¶ 2. Alyssa Portal has never interacted with Yuting

10   Chen. *Id.* at ¶ 5.

11       13.    Plaintiff Eliana Abittan is an individual residing in Lawrence, New York. As set

12   forth in Eliana Abittan's declaration, filed in the Federal Action and incorporated herein by

13   reference, Eliana Abittan is an office assistant who did not and does not conduct business or own

14   any assets in California. Exhibit G (ECF No. 37-7 at ¶ 3). Eliana Abittan is Ariel Abittan's wife. *Id.*

15   at ¶ 2. Eliana Abittan has never interacted with Yuting Chen. *Id.* at ¶ 5.

16       14.    Plaintiff Roy Graber is an individual residing in Memphis, Tennessee. As set forth in

17   Roy Graber's declaration, filed in the Federal Action and incorporated herein by reference, Roy

18   Graber owns a computer support company formed under the laws of Tennessee with its principal

19   place of business in Memphis, Tennessee. Exhibit H (ECF No. 37-8 at ¶ 3). Roy Graber did not and

20   does not conduct business or own any assets in California. *Id.* at ¶ 3. Roy Graber is Ariel Abittan's

21   father-in-law. *Id.* at ¶ 2. Roy Graber has never interacted with Yuting Chen. *Id.* at ¶ 5.

22       15.    Plaintiff Tova Graber is an individual residing in Memphis, Tennessee. As set forth

23   in Tova Graber's declaration, filed in the Federal Action and incorporated herein by reference, Tova

24   Graber is a retail store clerk who did not and does not conduct business or own any assets in

25   California.  Exhibit I (ECF No. 37-9 at ¶ 3). Tova Graber is Ariel Abittan's mother-in-law. *Id.* at ¶

26   2. Tova Graber has never interacted with Yuting Chen. *Id.* at ¶ 5.

27       16.    Plaintiffs are informed and believe and on that basis allege that Defendant Hansen

28   Law Firm P.C. ("**HLF**") is a California professional corporation engaged in the practice of law with

3

1  its principal offices in San Jose, California. Plaintiffs are informed and believe and on that basis

2  allege that Defendant Craig Hansen and Defendant Stephen Holmes are, and at all times mentioned

3  were, attorneys licensed to practice law in California who practiced law as Hansen Law Firm, P.C.

4  References in this Complaint to "HLF" refer to HLF, Craig Hansen, and Stephen Holmes,

5  individually and collectively.

6       17.   Plaintiffs are informed and believe and on that basis allege that Defendant SAC

7  Attorneys, LLP ("**SAC**") is a California limited liability partnership engaged in the practice of law

8  with its principal offices in San Jose, California. Plaintiffs are informed and believe and on that

9  basis allege that Defendant James Cai, Defendant Brian Barnhorst, and Defendant Patrick

10  O'Shaughnessy are, and at all times mentioned were, attorneys licensed to practice law in California

11  who practiced law as SAC. References in this Complaint to "SAC" refer to SAC, James Cai, Brian

12  Barnhorst, and Patrick O'Shaughnessy, individually and collectively.

13       18.   Plaintiffs are informed and believe and on that basis allege that Defendant Ye &

14  Associates, PLLC ("**Ye**") is a Texas professional limited liability company engaged in the practice

15  of law with its principal offices in Plano, Texas and whose members are each domiciled in and

16  citizens of Texas. Plaintiffs are informed and believe and on that basis allege that Defendant

17  Jingjing Ye is, and at all times mentioned was, an attorney licensed to practice law in Texas who

18  practiced law as Ye and whose application for admission to practice pro hac vice representing

19  Yuting Chen in the Federal Action was granted by this Court on May 6, 2022. References in this

20  Complaint to "Ye" refer to Ye and Jingjing Ye, individually and collectively.

21       19.   Plaintiffs do not know the true names and capacities of those defendants sued as

22  DOES 1 through 20, inclusive, and therefore sues these defendants by such fictitious names.

23  Plaintiffs will amend this complaint to allege their true names and capacities when ascertained.

24  Plaintiffs is informed and believes, and on that basis alleges, that each of defendants DOES 1

25  through 20, inclusive, is in some manner legally responsible for the wrongful conduct described

26  here.

27

28

20.    Plaintiffs are informed and believe and on that basis allege that each of the defendants, in doing the acts alleged, was acting as the agent, employee or authorized representative of each of the other defendants who were representing Yuting Chen at the same time.

**SUBSTANTIVE ALLEGATIONS**

21.    On November 3, 2021, Ariel Abittan filed a cross-complaint in Santa Clara Superior Court against Yuting Chen ("Chen") and several co-conspirators—some of whom are apparently related by blood or marriage to Chen—alleging claims for, inter alia, violations of RICO, fraud, and breach of contract. See <u>Exhibit J</u>, *Temujin Labs Inc., et al. v. Ariel Abittan, et. al.*, Superior Court of California, County of Santa Clara, Case No. 20CV372622 (the "**State Action**").

22.    Just one month later, clearly seeking retaliation for the State Action complaint, HLF filed the Federal Action, bringing claims against Ariel Abittan's parents, siblings, wife, and in-laws. SAC and Ye maintained the Federal Action until its conclusion.

23.    From its inception but no later than May 16, 2022, and always thereafter, HLF knew, and any reasonable attorney would have known, that Chen's claims against Plaintiffs had no merit whatsoever. When SAC and Ye appeared in the Federal Action, they knew, and any reasonable attorney would have known, that the claims against Plaintiffs were untenable, that the allegations against Plaintiffs were fabricated, and that Plaintiffs had never met, interacted with, or transacted business with Chen. Plaintiffs provided credible evidence of those facts to Defendants through, inter alia, informal communications between counsel and sworn declarations filed in the Federal Action. And yet, Defendants persisted without any reasonable cause to believe the allegations against Plaintiffs were true.

24.    Plaintiffs further allege and believe and on that basis state that Defendants did not investigate the truth of the allegations against Plaintiffs, did not confirm that Yuting Chen was more than an agent or strawperson being used by other individuals, but still filed and/or maintained the Federal Action in the face of Plaintiffs' evidence of frivolousness, Defendants did so with malice, Defendants  was not simply a person being used by other individuals to Lily Chao and Damien Ding relied on facts provided by someone other than Yuting Chen, they did so with no reasonable cause to believe the truth of the claims filed against Plaintiffs. Worse still, the claims and allegations

1  against Plaintiffs stood in in direct contrast with arguments and allegations made by Defendants on

2  behalf of individuals in other related actions. Put frankly, Defendants knew and did not care that the

3  claims lacked probable cause.

4      25.    Plaintiffs are further informed and believe and on that basis allege that Defendants

5  did not investigate the allegations of the Federal Action as to Plaintiffs or take steps to ensure that

6  Yuting Chen was not simply being used as an agent or strawperson of other people represented by

7  Defendants. Defendants' lack of investigation is evidence of their subjective malicious intent, as is

8  their initiation and maintenance of the Federal Action despite their knowledge that the claims

9  against Plaintiffs were legally untenable.

10      26.    And yet, Defendants, during each of their respective tenures as counsel of record,

11  maintained Chen's frivolous claims. Until, on the eve of Chen's deposition—where Chen's lack of

12  relationship to or with Plaintiffs would have been on full display—Chen, through counsel,

13  voluntarily dismissed the complaint with prejudice.

14      27.    While judgment was ultimately entered in Plaintiffs' favor, the damage was done.

15  The Federal Action caused Plaintiffs, among other things, to lose more than a year of their lives

16  defending Chen's baseless claims, incur hundreds of thousands of dollars in legal fees, and suffer

17  emotional and reputational damage.

18  **FIRST CAUSE OF ACTION**

19  **(Malicious Prosecution)**

20      28.    Plaintiffs re-allege and incorporate by reference each of the foregoing allegations as

21  though fully set forth herein.

22      29.    Defendants initiated and/or continued to prosecute the Federal Action against

23  Plaintiffs on behalf of and in concert with Yuting Chen. The Federal Action was terminated in favor

24  of Plaintiffs when the complaint was dismissed with prejudice and judgment entered in Plaintiffs'

25  favor on June 30, 2023.

26      30.    The Federal Action was commenced and continued in bad faith, intentionally,

27  maliciously and without probable cause by Defendants, acting on behalf of and in concert with

28  Yuting Chen during their respective tenures as counsel of record, against Plaintiffs, in that

Defendants did not, and could not, reasonably believe that there were valid grounds for filing and/or pursuing the Federal Action claims against Plaintiffs. HLF lacked reasonable or probable cause to initiate and pursue the Federal Action against Plaintiffs at the time that it was filed and at all times thereafter. SAC and Ye lacked reasonable or probable cause to maintain the Federal Action at the time they appeared in the case and at all times thereafter.

31.     By initiating and pursuing the Federal Action without probable cause, Defendants, acting on behalf of and in concert with Yuting Chen during their respective tenures as counsel of record, acted maliciously and intentionally for the improper purpose of retaliating against Ariel Abittan for filing the State Action and/or injuring or damaging Plaintiffs, each of whom is related by blood or marriage to Ariel Abittan. Upon information and belief, the Federal Action was commenced and/or continued against Plaintiffs in bad faith by Defendants, acting on behalf of and in concert with Yuting Chen during their respective tenures as counsel of record, in an effort to impede Ariel Abittan in a related case (the State Action), injure or damage Plaintiffs, and/or for other improper purposes.

32.     During their respective tenures as counsel of record, Defendants were acting within the course and scope of their agency relationship with and at the direction of their client, Yuting Chen. However, no reasonable attorney would have filed or pursued any of the claims raised against Plaintiffs in the Federal Action because no evidence existed to support the claims; the factual bases for the claims were nonexistent; and/or the claims were not legally tenable.

33.     As a direct and proximate result of the aforementioned conduct, Plaintiffs, collectively, have suffered damages in an amount to be proven at trial, including attorneys' fees, costs, out-of-pocket expenditures, general harm to reputation, credibility, social standing and personal relationships, and severe, substantial and enduring emotional distress.

34.     At all times when Defendants filed and/or maintained the Federal Action on behalf of and in concert with Yuting Chen, they, collectively, acted with oppression, fraud, malice and/or without regard to Plaintiffs' rights, and Plaintiffs are therefore entitled to punitive damages.

**WHEREFORE**, Plaintiffs respectfully pray for judgment against Defendants, as follows:

1. An award for compensatory damages according to proof, but in an amount no less than the jurisdictional minimum for this Court;

2. An award for punitive damages to the maximum extent permitted by law;

3. An award of all costs and fees in this action, including attorneys' fees and pre- and post-judgment interest; and

4. All other such relief as this Court deems just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiffs demand a trial by jury on all jury triable claims and issues in this action.

DATED: June 27, 2025

Respectfully submitted,

**BELLATRIX LAW, P.C.**

By: _____
Brianna K. Pierce
Attorneys for Ariel Abittan

# EXHIBIT A

Craig A. Hansen (SBN 209622)
  Email: craig@hansenlawfirm.net
Stephen C. Holmes (SBN 200727)
  Email: steve@hansenlawfirm.net
Sarah Wager (SBN 209277)
  Email: sarah@hansenlawfirm.net
HANSEN LAW FIRM, P.C.
75 E. Santa Clara Street, Suite 1250
San Jose, CA 95113-1837
Telephone: (408) 715 7980
Facsimile: (408) 715 7001

Attorneys for Plaintiff
Yuting Chen

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| YUTING CHEN,<br><br>                    Plaintiff,<br><br>         v.<br><br>ARIEL ABITTAN, ABRAHAM ABITTAN, RACHEL ABITTAN, BRIAN ABITTAN, JACOB ABITTAN,  ALYSSA ABITTAN, ELIANA ABITTAN, ROY GRABER, TOVA GRABER, REALTIME NY LLC, a New York Limited Liability Company, and DOES 1-20, inclusive.<br><br>                    Defendants. | Case No.:<br><br>**COMPLAINT FOR:**<br><br>1. **BREACH OF CONTRACT**<br>2. **BREACH OF CONTRACT**<br>3. **BREACH OF FIDUCIARY DUTY**<br>4. **AIDING AND ABETTING BREACH OF FIDUCIARY DUTY**<br>5. **FRAUD**<br>6. **CONVERSION**<br>7. **UNJUST ENRICHMENT**<br>8. **IMPOSITION OF CONSTRUCTIVE TRUST**<br>9. **DECLARATORY RELIEF**<br>10. **ACCOUNTING**<br>11. **INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**<br>12. **CIVIL CONSPIRACY**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Yuting Chen ("Chen" or "Plaintiff") hereby alleges for her Complaint against defendants Ariel Abittan, Abraham Abittan, Rachel Abittan, Brian Abittan, Jacob Abittan, Alyssa Abittan, Eliana Abittan, Roy Graber, Tova Graber, RealTime NY LLC, a New York limited liability company, and Does 1 through 20, as follows, upon information and belief:

## NATURE OF THE CASE

1.      Plaintiff Yuting Chen is a wealthy Chinese immigrant with a limited command of the English language and of American culture.

2.      All named defendants, which include Ariel Abittan and his family, learned of Chen's financial status and lack of business sophistication and dubbed her as a prime target for a calculated scheme to defraud Chen, and later her friends, for millions of dollars.

3.      With defendant Ariel Abittan as the front man, the defendants concocted countless fabricated stories in order to gain and maintain Chen's confidence in his family's wealth and their exclusive connections in the form of celebrities, politicians and the business elite.  The sole purpose of their web of lies was to entice Chen into conducting business with Ariel Abittan so that defendants could infiltrate her life and rip her off. That's exactly what happened.

4.      Defendants lured Chen into business dealings with Ariel Abittan that were financially disastrous for Chen and specifically designed to cheat her. When Chen figured out that Ariel Abittan was a con artist she cut ties with him, so defendants tried to extort her.  The defendants demanded that Chen immediately pay $4.5 million, threatening that failure to comply would result in grave harm to Chen and her family, as well as a lawsuit against Chen personally. Chen refused and Ariel Abittan sued her the next day, wrongfully and maliciously slinging her name through the mud. Chen also has constant fear for the safety of her and her family given her refusal to pay the extortion demand.

5.      Chen seeks recovery in this action for her tremendous financial losses resulting from her business relationship with Ariel Abittan, induced and maintained with the assistance of the remining co-conspirator defendants who are believed to have financially benefitted from the business transactions, and mental/emotional anguish resulting from their deceitful and malicious conduct.

---

COMPLAINT AND DEMAND FOR JURY TRIAL

1

CASE NO.

## THE PARTIES

6.     Plaintiff Yuting Chen is and all times herein was an individual residing in Atherton, California.

7.     Defendant Ariel Abittan is an individual residing in Lawrence, New York.

8.     Defendant Abraham Abittan is an individual residing in Lawrence, New York.

9.     Defendant Rachel Abittan is an individual residing in Lawrence, New York.

10.     Defendant Brian Abittan is an individual residing in Lawrence, New York.

11.     Defendant Jacob Abittan is an individual residing in Lawrence, New York.

12.     Defendant Alyssa Abittan is an individual residing in Lawrence, New York.

13.     Defendant Eliana Abittan is an individual residing in Lawrence, New York.

14.     Defendant Roy Graber is an individual residing in Memphis, Tennessee.

15.     Defendant Tova Graber is an individual residing in Memphis, Tennessee.

16.     Defendant RealTime NY LLC is a New York limited liability company with its principal place of business in Lawrence, New York. RealTime NY is owned by defendant Ariel Abittan.

17.     Chen presently does not know the true names and capacities of the Defendants sued herein as DOES 1-20, inclusive, and therefore sues those defendants by such fictitious names.  Chen will amend this complaint to allege such defendants' true names and capacities when they are ascertained.  Chen is informed and believes, and based thereon alleges, that each of the fictitiously designated defendants was acting as the agent, partner or joint venturer of all other defendants and is joint and severally responsible for the acts and omissions alleged herein.

18.     Chen is informed and believes, and thereon alleges, that the defendants, and each of them, were the agents, servants, employees, and co-conspirators of their co-defendants and each of them, and in doing the things alleged herein were acting within the course and scope of their authority as such agents, servants, employees, and co-conspirators and with the permission and consent of their co-defendants, and each of them (collectively referred to herein as "Defendants").

/ / /

**JURISDICTION AND VENUE**

19.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) because there is compete diversity between Plaintiff and Defendants and the amount in controversy exceeds $75,000.

20.     Personal jurisdiction is proper as to each Defendant because: (1) each Defendant purposefully availed themselves the benefits of the State of California; (2) the controversy is related to and arises out of their contacts with the State of California; and (3) the assertion of personal jurisdiction comports with fair play and substantial justice.

21.     A substantial part of the events giving rise to the claims alleged in this Complaint occurred in or were directed to the County of San Mateo. Venue therefore lies in the United States District Court for the Northern District of California pursuant to 28 U.S.C. §§ 1391(b)(2).

**DIVISIONAL ASSIGNMENT**

22.     A substantial part of the events giving rise to the claims alleged in this Complaint occurred in or were directed to the County of San Mateo. For the purposes of intra-district assignment under Civil Local Rules 3-2(c) and 3-5(b), this Action should be assigned to the San Francisco or Oakland Divisions.

**FACTUAL ALLEGATIONS**

23.     Chen is an immigrant. About a decade ago, she emigrated to the U.S. and settled in California. As a new immigrant, the cultural, language and other social barriers for Chen have remained challenging for years. Nevertheless, blessed with supportive family and friends, she has been thriving in the U.S.

24.     In or around 2015, Chen developed an interest in luxury watches and discovered that they had a good resale value in secondary markets. Initially as a hobby, Chen started trading extremely high-end, exclusive and highly sought-after luxury watches. Among the luxury brands that she had handled, Chen was mostly interested in Patek Phillippe watches. Chen was from a well-to-do family and has solid personal wealth to support her interest in those watches.

25.     Gradually, the casual trade became more frequent. As the volume increased, her hobby morphed into a side business. Chen used a simple business model - she would purchase the

3

luxury watches from retailers that she believed to be good investments, then resell them in the secondary market. She found interested buyers through personal connections and online platforms.

26. The purchase price for the watches Chen invested in typically ranged from thirty thousand dollars to one hundred thousand dollars. Sometimes the price was substantially higher. Despite the fact that she was not a trained businessperson and the high retail price tags, Chen's financial ability to accumulate and maintain a sizeable inventory of a few million dollars, combined with the very hot luxury watch resale market, made her business lucrative and successful.

27. From time to time, Chen's family and friends who had similar interests helped her with various aspects of the watch business, such as recommending good investments, tracking inventories, sorting records, and the like. Chen did not need and was not looking to build a consistent business relationship with someone outside of her circle of family and friends.

28. However, through deception and lies, Ariel Abittan conned his way into forming and maintaining a regular business relationship with Chen in connection with her watch business. Through this business relationship, defendants perpetrated fraud to gain Chen's trust and infiltrated her life, taking advantage of her lifestyle, tricking her into bad business deals, and cheating her out of millions. Ariel Abittan also used Chen to get to her friends for the sole purpose of defrauding them too.

29. In 2016, Ariel Abittan responded to one of Chen's online listings for a particular high-end watch. Ariel Abittan first conversed with Chen's friend about the listing and made an impression on her friend, who then involved Chen. The conversation went well and the discussions went off-line.

30. When Chen and Ariel Abittan first interacted, he was a financial advisor. He was trained and well-versed in financial issues and had held Series 7 and Series 66 licenses, which allow selling securities and acting as wealth managers for his clients.

31. Around the time Ariel Abittan met Chen or soon after, Ariel Abittan had started to accumulate a substantial amount of credit card debt, both in his own name and in the name of

4

businesses he controls. In that regard, he did not have the financial resources requiring a substantial amount of liquid asset to follow Chen's business model for her watch business, which involved not only paying up front for inventory, but also uncertainty about when each particular watch would sell.

32.     During their initial discussions, Ariel Abittan quickly found out that Chen was wealthy.  Moreover, it was evident that Chen had limited command in English, was an immigrant and lacked social experiences and contacts outside of her circle of family and friends in California. Realizing that Chen was a vulnerable target, Ariel Abittan and his co-defendant family members formulated a detailed plan to defraud Chen in connection with her watch business and later in other areas.

33.     In connection with the initial watch business and their continuous fraud on Chen over several years, the defendants weaved extensive lies designed to lure her into a business relationship with Ariel Abittan and keep her there.

34.     During the initial discussions over the watch business and continuously thereafter, the individual defendants marketed Ariel Abittan to Chen as the scion of a wealthy family and well-connected to other families of similar socioeconomic status around the U.S. Ariel Abittan told Chen that he had access to exclusive clientele in the form of celebrities, politicians, and the business elite, and that because of his intimate connections with these individuals, Ariel Abittan would be an invaluable business partner.

35.     In one instance, Ariel Abittan told Chen that he could get Chen invited to the White House and other lavish political and celebrity events to gain access to the rich and famous. Ariel Abittan also told Chen that Ariel Abittan's father, Abraham Abittan, was a famous plastic surgeon in New York City with a barrage of celebrity clients and other powerful connections, perfect for purchasing luxury watches. To further lure her, Ariel Abittan stated that Chen and her friends could have free plastic surgeries, touting it as a huge favor since Dr. Abittan was so acclaimed.

36.     To support the Abittan family's story of running with the rich and famous and other lies, defendants are believed to have doctored photographs, forged records such as text

5

messages and financial documents, all to con Chen into forming and maintaining a business relationship with Ariel Abittan. The doctored photos include, but are not limited to former President Donald Trump, Trump's son-in-law Jared Kushner, and the leaders of multi-billion-dollar companies. Ariel Abittan particularly told Chen that he personally knew Jared Kushner and he would recruit Kushner in the watch business.

37.     Ultimately, none of Ariel Abittan's representations regarding his lavish lifestyle and the luxuries Chen would experience if she had a business arrangement with him ever came to fruition. Chen was never invited to attend and did not attend a single event, exclusive or otherwise, at Abittan's behest.

38.     Chen never met or interacted with any of Ariel Abittan or his family's supposed affluent, powerful or famous friends even though Chen and Ariel Abittan did business together for years. Chen also later came to learn that defendant Abraham Abittan is not a plastic surgeon, let alone a famous one with a New York City-based practice. He is a dermatologist.

39.     Later on, when Ariel Abittan traveled to California to visit Chen, he and the co-defendant family members would stage elaborate scenes designed to deceive and impress Chen and reenforce the fraudulent representations regarding Ariel Abittan and his family. For instance, during a "family" conversation with Ariel Abittan when Chen and her friends present in or around 2018, Rachel Abittan, mother of Ariel Abittan, would team up with Abraham Abittan stating that they were developing some miracle high-end cosmetics for skincare to be marketed at high-end department stores and that they planned to open spas in such department stores.

40.     Ariel Abittan's wife Elaina Abittan together with her parents, Roy and Tova Graber, represented to Chen and her friends that they owned big real-estate development businesses and had developed properties over billions of dollars. They represented to Chen and her friends that they owned numerous premier properties and the famed department store Saks Fifth Avenue was their tenant. Ariel Abittan's brothers, Brian and Jacob Abittan, also represented to Chen and her friends that they were famous and well-connected lawyers, whereas Ariel Abittan's sister, Alyssa Abittan, represented to Chen and her friends that her husband was a wealthy businessman.

41.     None of the representations were actually true and were, instead, part of the Abittan family's (including his in-laws, the Graber family's) broader scheme to convince Chen that doing business with Ariel Abittan would bring access to some of the most elite business people in the county in terms of his family members directly, and their personal multi-millionaire connections.

42.     In addition to the co-defendant family members helping Ariel Abittan defraud Chen, they also defrauded Chen's friends directly.  For instance, when Chen and her friends were visiting New York, Abraham Abittan lured Chen's friend into a supposedly "free" facial treatment, but actually charged Chen's friend over $10,000 for a facial that lasted for 2 hours.

43.     While Chen and her friends were visiting New York, the co-defendants family members also asked Chen and her friends to meet people within the defendants' Jewish community to make them believe that Chen and her friends were very wealthy foreign investors, willing to invest in the defendants' businesses. Chen and her friends declined their invitation.

44.     Back in 2016, after being bombarded by Ariel Abittan and other individual defendants' extensive and continuous lies, Chen was induced into believing Ariel Abittan would be valuable in her watch business and maintained business relationship with him. Chen welcomed Ariel Abittan into her inner circle with trust, confidence and generosity.

45.     Chen started Ariel Abittan with a 20% commission based on each watch he sold, the percentage of which increased over time.  Pursuant to their business relationship, Chen would procure the watches and Ariel Abittan was primarily responsible for locating buyers. Even though Chen had no difficulty selling the watches on her own given their exclusivity and highly-sought after nature, Ariel Abittan and his co-defendant family's representations about their elite societal connections made the most sense for their respective roles.

46.     Through their business relationship Chen and Ariel Abittan became what she thought were personal friends and a great deal of their business was conducted in person. Ariel Abittan would regularly fly to California and meet Chen in her residential city of Atherton. Believing that he was a trustworthy person at that point, Chen unsuspectingly introduced Ariel Abittan to her friends and they began to engage in business dealings unrelated to watches.

47.     Ariel Abittan convinced Chen that, in order for him to sell the watches, Chen needed to give the watches to him to show to potential buyers.  Throughout the relationship of the watch business, Ariel Abittan took a large collection of highly valuable and sought-after watches from Chen, many of them are Patek Phillipe rare watches. The watches were either mailed to Ariel Abittan or picked up by him in person without complete payment or sometimes without any payment.

48.     The watches taken by Ariel Abittan include the coveted Patek 5711/1A, Patek 5712/1A, Patek 5711/1R, Patek 5726/1A, Patek 5980/1R, Patek 5230G New Yor Skyline Special Edition, Patek 5131/1P World time Enamel Dial (Application Piece), just to name a few. Especially, Ariel Abittan managed to take from Chen the extremely rare Patek Tiffany Stamped 5712/1A and 5980R, which are near impossible to get anywhere now.  Ariel Abittan also lied to Chen that he had to sell the watches at under the MSRP because the market was not good at that time, which was far from true.

49.     In connection with the watch business and subsequent business events, Ariel Abittan had used Realtime NY LLC, believed to be an entity he created and controls, in transactions, sending and receiving funds using via bank account in its name to defraud Chen.

50.     The watches bought and sold in connection with the business are worth millions of dollars and are highly sought after by investors and collectors. To hide his fraudulent acts while still keeping their business relations ongoing, Ariel Abittan did not steal Chen's watches or their sales proceeds outright. Instead, taking advantage of her trust, he made serial and gradual lies to her.

51.     Initially, to substantiate the lies on having an elite clientele base, Ariel Abittan claimed that he had sold the watches with great margins. He would wire some portions of some sale proceeds back to her, but not in full. Many times he only paid two thirds of the acquisition cost by Chen.  When Chen demanded complete payment and an accurate accounting of the profits, he would come up with some excuses as to why he could not pay the total amount back to Chen. For example, Ariel Abittan told Chen that some customers required financing, hence he could only send her partial payments. But Ariel Abittan did not follow up with any arrears from

8

the people who supposedly financed or documentation on the investment he did for Chen.  At other times, Ariel Abittan told Chen that he had held onto and invested the money for her in other ventures based on his financial background and she would get it back plus additional investment income. Chen, however,  never received a dime from Ariel Abittan for any such purported investment.  Further, there are 12 watches Ariel Abittan took from Chen for which Chen has received zero payment and no confirmation as to the status of the watches – whether they remain in Ariel Abittan's possession or have been sold.

52.     In sum, through various lies, Ariel Abittan underpaid Chen not only for the profit that she deserved, but even the out-of-pocket acquisition costs she paid. Taking advantage of her inexperience in business finance, he steadily bled her business and embezzled the proceeds.

53.     In or around 2018, seeing a very hot luxury watch resale market Ariel Abittan was no longer satisfied with being essentially a sales agent for Chen's watch business. He proposed to revamp their business relationship that would give him more financial interest in Chen's watch business. To convince Chen to accept the proposed business structure, he stated he would pay some of the acquisition costs. Ariel Abittan's proposal regarding the proposed partnership changed from conversation to conversation. At one time he proposed he would pay 50% of the acquisition cost, at other times 90%.  He repeatedly changed his words, walking back and forth on what he offered and what he could contribute. Nevertheless, none of the terms materialized or were put into writing although the basic structure of their agreement remained unchanged – Ariel Abittan was to sell the watches, accurately account to Chen for the sales proceeds, and pay Chen her share of the proceeds.

54.     At times, when Chen followed up on the proposals, asking if Arial Abittan would pay some of the acquisition costs he promised, he would use the funds that he had acquired from a prior watch sale that he had underreported to Chen and misrepresent the source of the funds in order to deceive her. Later on, he would use delay tactics, stating he had no money at the particular time.

55.     The defendants' fraud on Chen did not stop at the watch business. Prior to the fallout of their business relationship and friendship, Ariel Abittan became accustomed to the

lavish Atherton lifestyle where Chen resides and conned Chen into purchasing luxury items that Abittan would not otherwise be able to pay for himself.

56.     For example, in 2018 while visiting California, Ariel Abittan told Chen that he wanted a Ferrari for use while he was in town but he had no cash. Ariel Abittan presented Chen with what is now believed to be a forged document showing that Abittan had over $10 million tied up in a business investment, for which he soon expected some return.  Abittan told Chen that, because he did not have enough credit and his money was tied up in investments, he needed a signatory for the car.  He asked Chen the tremendous favor of being that person and swore that he would pay her back. Believing him to be a good friend and trusted business associate at that point, Chen entered into a loan agreement for a Ferrari 488, which was approximately $400,000.

57.     Ariel Abittan took possession of the car while in California but never paid Chen back for the down payment or for the remainder of the loan. Using what Chen later determined to be Ariel Abittan's typical delay tactics he made the excuse that his money did not come through so he could not pay for the car after all.  Chen therefore got stuck with a loan for a car she did not need or want and had to pay it off.

58.     Defendants also defrauded Chen in relation to the payment of credit card debt. In or around 2018 Ariel Abittan told Chen that he had a credit card with around $50,000 credit line. He stated that he wanted to have a higher credit line on the credit cards and asked Chen and her friends to use those cards on his behalf. He stated that those cards came with premium points and he could give some of the points to Chen and her friends to use.

59.     Believing his words, Chen and her friends started using and repaying his credit card. As expected, the credit line for the cards quickly increased to $300,000. However, after a few billing cycles, Chen and her friends started to find that they might not be the only persons using the card. From month to month, they would be paying more to the credit cards than they would be able to use. For over a year, Chen paid back on Ariel Abittan's credit cards for over a million dollars. However, she was not able to use all the credit that she paid off. Essentially, Chen unwittingly paid off Ariel Abittan's credit card debt. The overall discrepancy between the amount Chen used on the card and the amount she paid out was over $400,000.

60.     In or around late 2019, defendant Abraham and Rachel Abittan flew to California in an attempt to further their fraudulent scheme on Chen and her friends. They asked Chen and her friends to continue to pay for Ariel Abittan's credit card debt and said that they would repay her.  They did not.

61.     After her financial losses accumulated to a greater degree, in and around late 2019 and early 2020, Chen started to suspect that Ariel Abittan was actually a fraud and been defrauding her and her friends all along. When she asked Ariel Abittan to pay her back the extra amount that she paid to the credit cards, Ariel Abittan threatened to report her to authorities for unauthorized use of the credit cards. Similarly, when Chen asked Ariel Abittan to account for the sales proceeds for the watches and return the watches that he hadn't sold, he threatened to report Chen's resale watch business to Patek Phillipe, which although was legal, would cause Patek Phillipe to no longer sell their rare watches to her as a VIP.

62.     No longer being able to justify Ariel Abittan's dubious behavior in her mind, Chen cut business and personal ties with him in early 2020.

63.     Realizing that Chen could no longer be a victim to defendants' fraudulent scheme in the form of a direct relationship, defendants went to even greater lengths to target Chen by attempting to extort her, threatening the safety and well-being of Chen and her family.

64.     Specifically, on December 23, 2020 Chen received a threatening phone call from an anonymous number. The unidentified caller made it abundantly clear that he was associated with the Abittan family.  The caller instructed Chen to pay $4.5 million within a few hours or suffer grave consequences. The caller told Chen that failure to pay would result in her suffering great damages, including being personally named in a lawsuit, not being able to return to her home country, and the ruining of her and her family's reputation.  The most horrific of the caller's threats involved the security of her children's futures.

65.     Chen did not pay the ransom and immediately called the Atherton police.

66.     Not coincidentally, Chen was personally named and misidentified in a lawsuit filed by Ariel Abittan the next day.  In the lawsuit Abittan fraudulently identifies Chen as Lily Chao, knowing that in fact, they are not the same person since they have done in-person business

1  together for years and frequently met with Ariel Abittan together.

2       67.    Because of Defendants threats and unsuccessful extortion, Chen has suffered

3  immense damages, including constant fear for the safety of her family and the tarnishing of her

4  family's good name.

5  ## CAUSES OF ACTION

6  ## FIRST CAUSE OF ACTION

7  ### Breach of Contract- Watch Business

8  **(Against Ariel Abittan)**

9       68.    Plaintiff incorporates by reference the allegations in the preceding paragraphs of

10  this Complaint as if fully set forth herein.

11       69.    In 2016 Plaintiff and Ariel Abittan entered into a business agreement in connection

12  with Chen's luxury watch business. The details of the business agreement morphed between 2016

13  and 2019 but the basic terms were the same: Chen provided Ariel Abittan with luxury watches to

14  sell, Ariel Abittan was required to account to Chen for the sales profits and Ariel Abittan was to

15  receive and agreed-upon percentage of the sales proceeds. All unsold watches were exclusively

16  owned by Chen regardless of whether they were in Chen's or Ariel Abittan's possession.

17       70.    Ariel Abittan breached the business agreement with Chen by failing and refusing

18  to pay Chen her fair share of the sales proceeds, claiming instead that Abittan invested it on her

19  behalf even though he did not have permission to do so; lying to Chen about the sales margins in

20  order to take a greater percentage of the profit for himself; paying acquisitions costs with money

21  that was unaccounted for to Chen and belonged to her; and taking personal possession of watches

22  without accounting for their sales and/or misappropriating and converting them to his personal

23  property without Chen's permission and without compensating her.

24       71.    Plaintiff performed or substantially performed all of her obligations under the

25  agreement except those which were excused by Ariel Abittan's breaches.

26       72.    As a direct and proximate result of Ariel Abittan's breaches of the agreement

27  Plaintiff has suffered damages in an amount to be proven at trial.

28      / / /

---

COMPLAINT AND DEMAND FOR JURY TRIAL          12          CASE NO.

**SECOND CAUSE OF ACTION**

**Breach of Contract – Payment of Credit Card Debt**

**(Against Ariel Abittan)**

73.     Plaintiff incorporates by reference the allegations in the preceding paragraphs of this Complaint as if fully set forth herein.

74.     Beginning in 2018 Plaintiff and Ariel Abittan entered into a business arrangement wherein Chen agreed to pay off Abittan's credit card debt, in exchange for Ariel Abittan's promise that Chen could recoup her entire loan amount by making purchases on the card after the balance had been paid off and that she could personally use the credit card points earned through the transactions.

75.     Pursuant to the terms of their agreement Chen continually paid down the entire credit card debt on full.

76.     Ariel Abittan breached the parties' agreement by giving multiple people use of the same card such that Chen was unable to use it when she tried and therefore unable to recoup her costs or receive the bargained for benefit of the credit card points.

77.     Plaintiff performed or substantially performed all of her obligations under the agreement except those which were excused by Ariel Abittan's breaches.

78.     As a direct and proximate result of Ariel Abittan's breaches of the parties' agreement in relation to the payment of credit card debt Plaintiff has suffered damages in an amount to be proven at trial.

**THIRD CAUSE OF ACTION**

**Breach of Fiduciary Duty**

**(Against Ariel Abittan)**

79.     Plaintiff incorporates by reference the allegations in the preceding paragraphs of this Complaint as if fully set forth herein.

80.     Based on their business arrangement Ariel Abittan owed Chen a fiduciary duty to act with the utmost good faith, loyalty and in the best interests of Chen.

81.     Abittan breached his fiduciary duties to Chen by failing and refusing to pay Chen

COMPLAINT AND DEMAND FOR JURY TRIAL

13

CASE NO.

her fair share of the sales proceeds, claiming instead that Abittan invested it on her behalf even though he did not have permission to do so; lying to Chen about the sales margins in order to take a greater percentage of the profit for himself; paying acquisitions costs with money that was unaccounted for to Chen and belonged to her; and taking personal possession of watches without accounting for their sales and/or misappropriating and converting them to his personal property without Chen's permission and without compensating her.

82.    Ariel Abittan's breaches of his fiduciary duties caused Chen to suffer tremendous financial losses in an amount to be proven at trial.

83.    Because Ariel Abittan's breaches of his fiduciary duties to Chen were committed through fraud and with oppression and malice, Chen is entitled to punitive damages in an amount to be proven at trial.

### FOURTH CAUSE OF ACTION

### Aiding and Abetting Breach of Fiduciary Duty

### (Against the Co-Defendant Family Members)

84.    Plaintiff incorporates by reference the allegations in the preceding paragraphs of this Complaint as if fully set forth herein.

85.    As set forth above Ariel Abittan owed Chen fiduciary duties stemming from their business relationship.  As also set forth above Ariel Abittan breached those duties.

86.    The co-defendant family members knew that Ariel Abittan owed Chen fiduciary duties. As Ariel Abittan's family members, they were aware of Ariel Abittan and Chen's arrangements relating to the watch business, and took affirmative steps to help secure and maintain that business relationship.

87.    The co-defendant family members aided and abetted Ariel Abittan's breaches of his fiduciary duties by concocting and participating in lies designed to defraud Chen in her watch business, stemming from Ariel Abittan's breaches.

88.    The co-defendant family members' conduct in connection with aiding and abetting Ariel Abittan's breaches of fiduciary duties was a substantial factor in causing Chen's harm. Chen relied on the defendants' representations in deciding to do and continuing to do business with

1    Ariel Abittan.

2        89.    Because the co-defendant family members' aiding and abetting Ariel Abittan's

3    breaches of his fiduciary duties to Chen were committed through fraud and with oppression and

4    malice, Chen is entitled to punitive damages in an amount to be proven at trial.

5                            **FIFTH CAUSE OF ACTION**

6                                    **Fraud**

7                            **(Against All Defendants)**

8        90.    Plaintiff incorporates by reference the allegations in the preceding paragraphs of

9    this Complaint as if fully set forth herein.

10       91.    As detailed herein Ariel Abittan has made repeated false and fraudulent

11   misrepresentations and omissions to Plaintiff regarding his financial status and abilities, personal

12   connections, family connections, his family's businesses, the amount of money he sold each

13   watch for, the source of his funds for his watch contributions, what he did with the watch sales

14   proceeds, the location of the watches and his need to take personal possession of them in order to

15   sell them, his credit card debt and Chen's ability to recoup her payments of his credit card debt

16   and the incentives she would receive for doing so.

17       92.    As detailed herein, the co-defendant family members made representations to

18   Chen in order to induce and maintain Chen's business relationship with Ariel Abittan. These

19   representations concerned Ariel Abittan's socio-economic status and personal connections as well

20   as their own wealth, businesses and personal connections.

21       93.    These representations were false when made.

22       94.    When defendants made these representations and omissions, they knew that they

23   were false.

24       95.    These representations and omissions were made with the intent to defraud and

25   deceive Chen into initially doing and continuing to do business with Ariel Abittan and bailing

26   him out of his purported credit card debt.

27       96.    Plaintiff relied on defendants' misrepresentations to her detriment by entering into

28   and maintaining a business relationship with Ariel Abittan, entrusting him with her property and

COMPLAINT AND DEMAND FOR JURY
TRIAL                                           15                    CASE NO.

1    helping him financially.

2         97.    Plaintiff's reliance on defendants' misrepresentations and omissions was

3    reasonable given the great lengths that the defendants collectively went through to defraud her

4    though various in person and telephonic/video "family" meetings. The family collectively was so

5    nice, welcoming and convincing, Chen believed their stories, which turned out to be flat out lies.

6         98.    As a result of the defendants' fraudulent misrepresentations and omissions,

7    Plaintiff has been damaged in an amount to be proven at trial.

8         99.    In doing the acts alleged herein, defendants acted with oppression, fraud, and

9    malice, and Plaintiff is entitled to punitive damages.

10    **SIXTH CAUSE OF ACTION**

11    **Conversion**

12    **(Against Ariel Abittan)**

13         100.    Plaintiff incorporates by reference the allegations in the preceding paragraphs of

14    this Complaint as if fully set forth herein.

15         101.    Chen had a right to possess the luxury watches belonging to her and her share of

16    income generated from the watches that have been sold, plus the amount paid to acquire each

17    watch. She also has a right to possess the money she used to pay off Ariel Abittan's credit card

18    debt that was supposed to be able to recoup and did not.

19         102.    Ariel Abittan intentionally and substantially interfered with Chen's property

20    interest by refusing their return.

21         103.    As a direct and proximate result of Ariel Abittan's conversion of Chen's assets and

22    interests, Chen has incurred damages in an amount to be proven at trial.

23         104.    Ariel Abittan's actions as alleged herein were oppressive, fraudulent, and

24    malicious.  As a result, Plaintiff is entitled to an award of punitive damages in an amount to be

25    proven at trial.

26    / / /

27    / / /

28    / / /

COMPLAINT AND DEMAND FOR JURY TRIAL      16     CASE NO.

**SEVENTH CAUSE OF ACTION**

**Unjust Enrichment**

**(Against All Defendants)**

105.    Plaintiff incorporates by reference the allegations in the preceding paragraphs of this Complaint as if fully set forth herein.

106.    Defendant Ariel Abittan received a benefit from his business dealings with Chen in the form of luxury watches, sales income from the luxury watches and money in the form of paid down credit card debt.

107.    Despite Chen's demands that Ariel Abittan return the unsold watches, pay her share of income from the sales of the watches that have been sold and reimburse her for paying off Abittan's credit card debt, Abittan has refused, causing him to become unjustly enriched.

108.    The remaining defendants received a benefit from Ariel Abittan's unjust enrichment by receiving funds and/or property from Ariel Abittan, resulting in the remaining defendants also becoming unjustly enriched.

109.    As a result of the defendants' conduct, Chen is entitled to receive an award in the amount to be proven at trial.

**EIGHTH CAUSE OF ACTION**

**Imposition of Constructive Trust**

**(Against All Defendants)**

110.    Plaintiff incorporates by reference the allegations in the preceding paragraphs of this Complaint as if fully set forth herein.

111.    Ariel Abittan, his business and his co-defendant family members are in in possession of watches and money that belong to Chen.

112.    As the owner of the property, Chen has a right to possess it.

113.    Chen has asked Ariel Abittan to return her property that is in his or his family members possession and he has refused.

114.    As a result, Chen's property should be placed in constructive trust until such a time that it can be safely returned to her.

COMPLAINT AND DEMAND FOR JURY TRIAL                    17                    CASE NO.

# NINTH CAUSE OF ACTION

## Declaratory Relief

### (Against Ariel Abittan)

115.    Plaintiff incorporates by reference the allegations in the preceding paragraphs of this Complaint as if fully set forth herein.

116.    A real and existing controversy exists as to ownership of any remaining watches from Chen's luxury watch business and related sales proceeds, in that Ariel Abittan claims he owns them, even though they belong to Chen.

117.    As such, Chen requests a Court declaration that the watches and related sales income belongs exclusively to her.

# TENTH CAUSE OF ACTION

## Accounting

### (Against Ariel Abittan)

118.    Plaintiff incorporates by reference the allegations in the preceding paragraphs of this Complaint as if fully set forth herein.

119.    Chen and Ariel Abittan had a business arrangement in connection with Chen's luxury watch business wherein Ariel Abittan took physical possession of several luxury watches that he either sold or still has. Ariel Abittan has not reported or accurately accounted to Chen for these watches, whether in his custody or sold, and has not accurately accounted to Chen for other watch sales.

120.    Because the specific inventory and sales-related information is exclusively within Ariel Abittan's possession, Chen cannot determine the true amounts due and owing to her without an accounting.

# ELEVENTH  CAUSE OF ACTION

## Intentional Infliction of Emotional Distress

### (Against All Defendants)

121.    Plaintiff incorporates by reference the allegations in the preceding paragraphs of

this Complaint as if fully set forth herein.

122.    On December 23, 2020 defendants brazenly attempted to extort $4.5 million from Chen through a terrifying phone call. The phone call itself and threats made during the call constituted extreme and outrageous conduct on the part of defendants.

123.    Because the caller threatened Chen and her family's safety, security and reputation, defendants intended to cause, or had reckless disregard of the possibility of causing emotional distress.

124.    As an actual and proximate cause of the horrifying phone call and attempted extortion Chen has suffered extreme and severe emotional distress, constantly fearing for her and her family's safety and security, and worrying about the of tarnishing her family's good name. She has also suffered monetary damages in the form of purchasing security equipment and paying for security guards, which continue to this day.

125.    As an actual and proximate cause of her not complying with defendants' heinous and criminal extortion demand Chen has also suffered extreme and severe emotional distress by her name being smeared in Ariel Abittan's lawsuit misidentifying her as Lily Chao, when Ariel Abittan knows for a fact that Plaintiff is not Lily Chao.

126.    Based on defendants' outrageous extortionist conduct Chen is entitled to compensatory damages in amount to be proven at trial.

127.    Because defendants' conduct was oppressive and malicious Chen is also entitled to punitive damages in an amount to be proven at trial.

### **TWELVTH CAUSE OF ACTION**

### **Civil Conspiracy**

### **(Against All Defendants)**

128.    Plaintiff incorporates by reference the allegations in the preceding paragraphs of this Complaint as if fully set forth herein.

129.    Through the above-described actions, defendants, acting in concert through knowing and mutual agreement, formed a conspiracy and conspired.

130.    The purpose of the conspiracy was, in sum, to defraud Chen financially.

COMPLAINT AND DEMAND FOR JURY TRIAL                    19                    CASE NO.

131.     Defendants' operation of the conspiracy, through acts such as: the making of repeated false and fraudulent misrepresentations and omissions to Plaintiff regarding their financial status and abilities, personal connections, family connections and businesses, have damaged and continue to damage Chen.

132.     As such, each defendant is liable to Chen on the basis of civil conspiracy, as a joint tortfeasor for all damages ensuing from the wrong, irrespective of whether or not they were a direct actor and regardless of the degree of their activities.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests entry of judgment in her favor against Defendants as follows:

1.     For declaratory relief, stating and confirming that all unsold luxury watches and income from watch sales belong exclusively to Chen.

2.     For preliminary and permanent injunctive relief, restraining Ariel Abittan from selling, gifting or otherwise disposing of the luxury watches that came to him through his business dealings with Chen.

3.     For an accounting.

4.     For imposition of a constructive trust over all Chen's watches and money currently in the possession of any defendant.

5.     For compensatory, special, incidental and consequential damages according to proof.

6.     For exemplary and punitive damages to the extent permitted by law.

7.     For recovery of the unjust enrichment obtained by Defendants as a result of their wrongful conduct.

8.     For an award of prejudgment interest, cost of suit, and reasonable attorneys' fees to the extent permitted by contract or by operation of law.

9.     For such other and further relief as the Court may deem just and proper.

DATED:  December 3, 2021                HANSEN LAW FIRM, P.C.


                                        By: _____/s/ Craig A. Hansen_____
                                                   Craig A. Hansen

                                        Attorneys for Plaintiff
                                        Yuting Chen

## **DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all jury triable claims and issues in this action.

DATED:  December 3, 2021                    HANSEN LAW FIRM, P.C.


By: _____/s/ Craig A. Hansen_____
                    Craig A. Hansen

Attorneys for Plaintiff
Yuting Chen

# EXHIBIT B

# Exhibit B

Constantine P. Economides (*pro hac vice forthcoming*)
(Florida Bar No. 118177)
Brianna K. Pierce (CA Bar No. 336906)
ROCHE FREEDMAN LLP
1 SE 3rd Avenue, Suite 1240
Miami, FL 33131
Tel: (305) 851-5997
Email:  ceconomides@rochefreedman.com
            bpierce@rochefreedman.com

*Counsel for Defendants*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| YUTING CHEN,<br><br>PLAINTIFF,<br><br>v.<br><br>ARIEL ABITTAN, ABRAHAM ABITTAN, RACHEL ABITTAN, BRIAN ABITTAN, JACOB ABITTAN, ALYSSA ABITTAN, ELIANA ABITTAN, ROY GRABER, TOVA GRABER, REALTIME NY LLC, a New York Limited Liability Company, and DOES 1-20, inclusive<br><br>DEFENDANTS. | Case No. 21-cv-09393-YGR |

# DECLARATION OF ABRAHAM ABITTAN

I, Abraham Abittan, declare as follows:

1.    I am a resident of Lawrence, New York.

2.    I am Ariel Abittan's father.

3.    I am a dermatologist licensed to practice medicine in the state of New York. I own a practice located in Woodmere, New York. I do not conduct any business or own any assets in California.

4.    I have never interacted with a woman who introduced herself to me as Yuting Chen. I did, however, meet a woman who was engaged in a watch business with my son, Ariel Abittan ("Ariel"). This woman introduced herself to me as Tiffany Chen ("Tiffany"). I eventually learned that Tiffany used the name Lily Chao, but I always referred to her as Tiffany.

5.    I first met Tiffany on December 10, 2017, at my son, Jacob Abittan's ("Jacob") wedding in Rye, New York. Tiffany's husband, who introduced himself to me as Damien, was the only person who accompanied Tiffany to the wedding.

6.    While at the wedding, Tiffany, Damien, and I spoke for a brief period. We introduced ourselves. Tiffany and Damien congratulated me on Jacob's wedding and spoke highly of Ariel. We did not engage in a substantive conversation about Ariel, Tiffany, and Damien's business relationship. Nor did we discuss Tiffany's or Damien's finances or family backgrounds.

7.    I met Tiffany on at least two other occasions in New York. Neither of those meetings were related to the watch business.

8.    I saw Tiffany in March of 2019 when Tiffany flew to New York for a meeting with Ariel and investors in a cryptocurrency business, known at the time as Eian Labs Inc. ("Eian"). My wife and I also attended the meeting because the investors were family friends. At the meeting, Tiffany persuaded the investors to forego their rights to demand the return of their investments in Eian by presenting paperwork showing a huge incoming investment and a high valuation of Eian. At no point during the meeting did we discuss the watch business or luxury watches.

9.    On or about May 13, 2019 and June 27, 2019, I flew to California to meet with Tiffany and Damien. At both meetings, we discussed the return of funds to investors in a

cryptocurrency business, known at the time as Eian Labs Inc. We also discussed a huge debt incurred by Tiffany, Damien, and their agents on Ariel's company, RealTime NY, LLC's credit card. Tiffany promised to pay off her debt, which she incurred on items such as a piano, school tuition, and lavish family vacations. I never offered to reimburse her for satisfying her own debt. Nor would there have been anything to reimburse, given that Tiffany never paid off the credit card.

10.     Aside from these two meetings, which lasted a total of about two hours, I have had no other contact with Tiffany within the state of California. It is my understanding that Ariel and Tiffany did not purchase any watches together after our meeting.

11.     I did not influence Tiffany's decision to conduct business with Ariel. Indeed, Tiffany had been engaged in a watch business with Ariel for more than a year before we were introduced at Jacob's wedding. And, by the time I met Tiffany in California, the business relationship between Ariel and Tiffany had already begun to deteriorate.

12.     Other than being Ariel's father, I have no relationship to any luxury watch business, including the one related to Ariel, Tiffany, and Damien. I have never sold a luxury watch. I have never purchased a luxury watch. I have never received a luxury watch as a gift. I have never shared in the proceeds of a luxury watch sale or benefited from the sale of a luxury watch in any way.

13.     I did not make an anonymous call to Tiffany (or anyone else) on December 23, 2020. I have never threatened Tiffany, her family, or her children. I did not (anonymously or otherwise) instruct Tiffany to "pay $4.5 million [to Ariel] within a few hours or suffer grave consequences." Compl. ¶64. To the contrary, it is my understanding that Tiffany, through counsel, **offered** to pay Ariel $4.5 million to settle their dispute related to the luxury watch and cryptocurrency businesses.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: May 16, 2022

Abraham Abittan

# EXHIBIT C

# Exhibit C

1   Constantine P. Economides (*pro hac vice forthcoming*)
    (Florida Bar No. 118177)
2   Brianna K. Pierce (CA Bar No. 336906)
    ROCHE FREEDMAN LLP
3   1 SE 3rd Avenue, Suite 1240
    Miami, FL 33131
4   Tel: (305) 851-5997
    Email:  ceconomides@rochefreedman.com
5            bpierce@rochefreedman.com

6   *Counsel for Defendants*

7

8                   **UNITED STATES DISTRICT COURT**

9                  **NORTHERN DISTRICT OF CALIFORNIA**

10                     **SAN FRANCISCO DIVISION**

11

12  YUTING CHEN,                          | Case No. 21-cv-09393-YGR

13                  PLAINTIFF,

14          v.

15

16  ARIEL ABITTAN, ABRAHAM ABITTAN,
    RACHEL ABITTAN, BRIAN ABITTAN,
17  JACOB ABITTAN, ALYSSA ABITTAN,
    ELIANA ABITTAN, ROY GRABER, TOVA
18  GRABER, REALTIME NY LLC, a New York
    Limited Liability Company, and DOES 1-20,
19  inclusive

20                  DEFENDANTS.

21

22

23

24

25

26

27

28

---

DECLARATION OF RACHEL ABITTAN                    CASE NO. 21-cv-09393-YGR

**DECLARATION OF RACHEL ABITTAN**

I, Rachel Abittan, declare as follows:

1. I am a resident of Lawrence, New York.

2. I am Ariel Abittan's mother.

3. I am an office manager in a dermatologist's office. I do not conduct any business or own any assets in California.

4. I have never interacted with a woman who introduced herself to me as Yuting Chen. I did, however, meet a woman who was engaged in a watch business with my son, Ariel Abittan ("Ariel"). This woman introduced herself to me as Tiffany Chen ("Tiffany"). I eventually learned that Tiffany used the name Lily Chao, but I always referred to her as Tiffany.

5. I first met Tiffany on December 10, 2017, at my son, Jacob Abittan's ("Jacob") wedding in Rye, New York. Tiffany's husband, who introduced himself to me as Damien, was the only person who accompanied Tiffany to the wedding.

6. While at the wedding, Tiffany, Damien, and I spoke for a brief period. We introduced ourselves. Tiffany and Damien congratulated me on Jacob's wedding and spoke highly of Ariel. We did not engage in a substantive conversation about Ariel's business relationship with Tiffany and Damien. Nor did we discuss Tiffany's or Damien's finances or family backgrounds.

7. After the wedding, Tiffany and I exchanged pleasantries via text message on rare occasions. For example, we would wish each other a happy birthday or say thank you for a gift.

8. The second time I met Tiffany was in March of 2019 when Tiffany flew to New York for a meeting with Ariel and investors in a cryptocurrency business, known at the time as Eian Labs Inc. ("Eian"). My husband and I attended the meeting because the investors are family friends. At the meeting, Tiffany persuaded the investors to forego their rights to demand the return of their investments in Eian by presenting paperwork showing a huge incoming investment and a high valuation of Eian. At no point during the meeting did we discuss the watch business or luxury watches.

9. The third and final time that I met Tiffany was on or about June 27, 2019, when I flew to California with my husband. At this meeting, we continued to discuss the return of Eian's

- 2 -

investors' funds. We also discussed a huge debt incurred by Tiffany, Damien, and their agents on Ariel's company, RealTime NY, LLC's credit card. My husband and I asked Tiffany to pay off her debt, which she incurred on items such as a piano, school tuition, and lavish family vacations. I did not promise to reimburse her for satisfying her own debt. Nor would there have been anything to reimburse, given that Tiffany never paid off the credit card debt. Aside from this meeting, which lasted approximately two hours, I have had no other contact with Tiffany within the state of California. It is my understanding that Ariel and Tiffany did not purchase any watches together after our meeting.

10. I have never staged an elaborate scheme to deceive or impress Tiffany (or anyone else) into conducting business with Ariel. Indeed, Tiffany had been engaged in a business relationship with Ariel for over a year before we met at Jacob's wedding. And, by the time I met Tiffany in California, the business relationship between Ariel and Tiffany had already begun to deteriorate.

11. Other than being Ariel's mother, I have no relationship to any luxury watch business, including the one related to Ariel, Tiffany, and Damien. I have never sold a luxury watch. I have never purchased a luxury watch. I have never received a luxury watch as a gift. I have never shared in the proceeds of a luxury watch sale or benefited from the sale of a luxury watch in any way.

12. I did not make an anonymous call to Tiffany (or anyone else) on December 23, 2020. I have never threatened Tiffany, her family, or her children. I did not (anonymously or otherwise) instruct Tiffany to "pay $4.5 million [to Ariel] within a few hours or suffer grave consequences." Compl. ¶64. To the contrary, it is my understanding that Tiffany, through counsel, **offered** to pay Ariel $4.5 million to settle their dispute related to the luxury watch and cryptocurrency businesses.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: May 16, 2022

_Rachel Abittan_

Rachel Abittan

# EXHIBIT D

# Exhibit D

Constantine P. Economides (*pro hac vice forthcoming*)
(Florida Bar No. 118177)
Brianna K. Pierce (CA Bar No. 336906)
ROCHE FREEDMAN LLP
1 SE 3rd Avenue, Suite 1240
Miami, FL 33131
Tel: (305) 851-5997
Email: ceconomides@rochefreedman.com
        bpierce@rochefreedman.com

*Counsel for Defendants*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| YUTING CHEN, | Case No. 21-cv-09393-YGR |
| PLAINTIFF, | |
| v. | |
| ARIEL ABITTAN, ABRAHAM ABITTAN, RACHEL ABITTAN, BRIAN ABITTAN, JACOB ABITTAN, ALYSSA ABITTAN, ELIANA ABITTAN, ROY GRABER, TOVA GRABER, REALTIME NY LLC, a New York Limited Liability Company, and DOES 1-20, inclusive | |
| DEFENDANTS. | |

# DECLARATION OF BRIAN ABITTAN

I, Brian Abittan, declare as follows:

1.    I am a resident of Lawrence, New York.

2.    I am Ariel Abittan's brother.

3.    I am a board-certified dermatologist licensed to practice in the state of New York. I do not conduct any business or own any assets in California.

4.    I have only traveled to California twice in my life. In 2006 and 2008, I traveled to California for vacation. I have not been to California since 2008.

5.    I have never interacted with a person known to me as Yuting Chen. I did, however, meet a woman who was engaged in a watch business with my brother, Ariel Abittan ("Ariel"). This woman introduced herself to me as Tiffany Chen ("Tiffany").

6.    I met Tiffany on December 10, 2017 at my brother, Jacob Abittan's ("Jacob") wedding in New York. Tiffany's husband, who introduced himself to me as Damien, was the only person who accompanied Tiffany to the wedding. Jacob's wedding is the only time I ever met, spoke, saw, or interacted with Tiffany or Damien in any way.

7.    While at the wedding, in New York, Tiffany, Damien, and I spoke for approximately five (5) minutes. I told Tiffany and Damien that I had recently graduated medical school and was entering my residency program. I never told Tiffany or Damien (or anyone else) that I was a famous, well-connected lawyer.

8.    I have not spoken with Tiffany or Damien since Jacob's wedding. I have never called, emailed, or texted Tiffany or Damien. I have never traveled to California to meet with Tiffany or Damien. I have never spoken with Tiffany or Damien about their business with Ariel.

9.    I do not own any luxury watches. I have never purchased, received, or sold a luxury watch. I have never shared in the proceeds of a luxury watch sale or benefited from the sale of a luxury watch in any way. Other than being Ariel's brother, I have no relationship to any luxury watch business.

10.    I did not make an anonymous call to Tiffany (or anyone else) on December 23, 2020. I have never threatened Tiffany, her family, or her children. I did not (anonymously or otherwise)

- 2 -

DECLARATION OF BRIAN ABITTAN                  CASE NO. 21-CV-09393-YGR

1  instruct Tiffany to "pay \$4.5 million [to Ariel] within a few hours or suffer grave consequences."

2  Compl. ¶64. To the contrary, it is my understanding that Tiffany, through counsel, **offered** to pay

3  Ariel \$4.5 million to settle their dispute related to the luxury watch and cryptocurrency businesses.

4      I declare under penalty of perjury that the foregoing is true and correct.

5  Dated: May 16, 2022

6                                        Brian Abittan

- 3 -

DECLARATION OF BRIAN ABITTAN                          CASE NO. 21-CV-09393-YGR

# EXHIBIT E

# Exhibit E

1    Constantine P. Economides (*pro hac vice forthcoming*)
     (Florida Bar No. 118177)
2    Brianna K. Pierce (CA Bar No. 336906)
     ROCHE FREEDMAN LLP
3    1 SE 3rd Avenue, Suite 1240
     Miami, FL 33131
4    Tel: (305) 851-5997
     Email: ceconomides@rochefreedman.com
5            bpierce@rochefreedman.com

6    *Counsel for Defendants*

7

8                 **UNITED STATES DISTRICT COURT**

9                 **NORTHERN DISTRICT OF CALIFORNIA**

10                    **SAN FRANCISCO DIVISION**

11

12   YUTING CHEN,                          Case No. 21-cv-09393-YGR

13                 PLAINTIFF,

14        v.

15

16   ARIEL ABITTAN, ABRAHAM ABITTAN,
     RACHEL ABITTAN, BRIAN ABITTAN,
17   JACOB ABITTAN, ALYSSA ABITTAN,
     ELIANA ABITTAN, ROY GRABER, TOVA
18   GRABER, REALTIME NY LLC, a New York
     Limited Liability Company, and DOES 1-20,
19   inclusive

20                 DEFENDANTS.

21

22

23

24

25

26

27

28

     DECLARATION OF JACOB ABITTAN                    CASE NO. 21-CV-09393-YGR

1 **DECLARATION OF JACOB ABITTAN**

2 I, Jacob Abittan, declare as follows:

3     1.    I am a resident of Lawrence, New York.

4     2.    I am Ariel Abittan's brother.

5     3.    I am a third-year law student at Cardozo School of Law in New York, New York. I
6 do not conduct any business or own any assets in California.

7     4.    About fifteen (15) years ago, I traveled to California for a family vacation. It was
8 the first and only time I have ever been to California.

9     5.    I have never interacted with a person known to me as Yuting Chen. I did, however,
10 meet a woman who was engaged in a watch business with my brother, Ariel Abittan ("Ariel"). This
11 woman introduced herself to me as Tiffany Chen ("Tiffany").

12     6.    I met Tiffany on December 10, 2017 at my wedding in Rye, New York. Tiffany's
13 husband, who introduced himself to me as Damien, was the only person who accompanied Tiffany
14 to the wedding. My wedding is the only time I ever met, spoke, saw, or interacted with Tiffany or
15 Damien in any way.

16     7.    While at my wedding, in New York, Tiffany, Damien, and I spoke for approximately
17 one (1) minute. Tiffany and Damien introduced themselves to me and offered their congratulations
18 for my nuptials. We quickly parted ways so that I could speak with the other approximately 500
19 guests attending my wedding.

20     8.    I never told Tiffany or Damien (or anyone else) that I was a famous, well-connected
21 lawyer. Indeed, I was 22 years old when I met Tiffany and Damien and had not even applied to law
22 school at the time.

23     9.    I have never spoken with Tiffany or Damien about their business with Ariel, their
24 finances, or their families. I have not spoken with Tiffany or Damien since my wedding. I have
25 never called, emailed, or texted Tiffany or Damien. I have never traveled to California to meet with
26 Tiffany or Damien.

27     10.    Other than being Ariel's brother, I have no relationship to any luxury watch business,
28 including the one related to Ariel, Tiffany, and Damien. I have never sold a luxury watch. I have

- 2 -

never purchased a luxury watch for the purpose of reselling it. I have never received a luxury watch as a gift. I have never shared in the proceeds of a luxury watch sale or benefited from the sale of a luxury watch in any way.

11.     I did not make an anonymous call to Tiffany (or anyone else) on December 23, 2020. I have never threatened Tiffany, her family, or her children. I did not (anonymously or otherwise) instruct Tiffany to "pay $4.5 million [to Ariel] within a few hours or suffer grave consequences." Compl. ¶64. To the contrary, it is my understanding that Tiffany, through counsel, **offered** to pay Ariel $4.5 million to settle their dispute related to the luxury watch and cryptocurrency businesses.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: May 16, 2022

Jacob Abittan

- 3 -

# EXHIBIT F

# Exhibit F

1  Constantine P. Economides (*pro hac vice forthcoming*)
   (Florida Bar No. 118177)
2  Brianna K. Pierce (CA Bar No. 336906)
   ROCHE FREEDMAN LLP
3  1 SE 3rd Avenue, Suite 1240
   Miami, FL 33131
4  Tel: (305) 851-5997
   Email:  ceconomides@rochefreedman.com
5          bpierce@rochefreedman.com

6  *Counsel for Defendants*

7

8              **UNITED STATES DISTRICT COURT**

9            **NORTHERN DISTRICT OF CALIFORNIA**

10               **SAN FRANCISCO DIVISION**

11

12  YUTING CHEN,                          Case No. 21-cv-09393-YGR

13                  PLAINTIFF,

14          v.

15

16  ARIEL ABITTAN, ABRAHAM ABITTAN,
    RACHEL ABITTAN, BRIAN ABITTAN,
17  JACOB ABITTAN, ALYSSA ABITTAN,
    ELIANA ABITTAN, ROY GRABER, TOVA
18  GRABER, REALTIME NY LLC, a New York
    Limited Liability Company, and DOES 1-20,
19  inclusive

20                  DEFENDANTS.

21

22

23

24

25

26

27

28

---

DECLARATION OF ALYSSA PORTAL                    CASE NO. 21-cv-09393-YGR

**DECLARATION OF ALYSSA PORTAL**

I, Alyssa Portal (née Abittan), declare as follows:

1.     I am a resident of Lawrence, New York.

2.     I am Ariel Abittan's sister.

3.     I am a registered nurse licensed to practice in the state of New York. I do not conduct any business or own any assets in California.

4.     About fifteen (15) years ago, I traveled to California for a family vacation. It was the first and only time I have ever been to California.

5.     I have never interacted with a person known to me as Yuting Chen. I did, however, meet a woman who was engaged in a watch business with my brother, Ariel Abittan ("Ariel"). This woman introduced herself to me as Tiffany Chen ("Tiffany").

6.     I met Tiffany on December 10, 2017 at my brother, Jacob Abittan's ("Jacob") wedding in Rye, New York. Tiffany's husband, who introduced himself to me as Damien, was the only person who accompanied Tiffany to the wedding. Jacob's wedding is the only time I ever met, spoke, saw, or interacted with Tiffany or Damien in any way.

7.     While at the wedding, in New York, Tiffany, Damien, and I spoke for approximately one (1) minute. We introduced ourselves, then parted ways. We did not have a substantive conversation.

8.     I never told Tiffany or Damien (or anyone else) that my husband was a "wealthy businessman." My husband is an anesthesiologist.

9.     I have never spoken with Tiffany or Damien about their business with Ariel, their finances, or their families.

10.     I have not spoken with Tiffany or Damien since Jacob's wedding. I have never called, emailed, or texted Tiffany or Damien. I have never traveled to California to meet with Tiffany or Damien.

11.     Other than being Ariel's sister, I have no relationship to any luxury watch business, including the one related to Ariel, Tiffany, and Damien. I have never sold a luxury watch. I have

- 2 -

1   never purchased a luxury watch. I have never received a luxury watch as a gift. I have never shared

2   in the proceeds of a luxury watch sale or benefited from the sale of a luxury watch in any way.

3          12.     I did not make an anonymous call to Tiffany (or anyone else) on December 23, 2020.

4   I have never threatened Tiffany, her family, or her children. I did not (anonymously or otherwise)

5   instruct Tiffany to "pay $4.5 million [to Ariel] within a few hours or suffer grave consequences."

6   Compl. ¶64. To the contrary, it is my understanding that Tiffany, through counsel, **offered** to pay

7   Ariel $4.5 million to settle their dispute related to the luxury watch and cryptocurrency businesses.

8          I declare under penalty of perjury that the foregoing is true and correct.

9   Dated: May 16, 2022

10                              Alyssa Portal

# EXHIBIT G

Exhibit G

1   Constantine P. Economides (*pro hac vice forthcoming*)
    (Florida Bar No. 118177)
2   Brianna K. Pierce (CA Bar No. 336906)
    ROCHE FREEDMAN LLP
3   1 SE 3rd Avenue, Suite 1240
    Miami, FL 33131
4   Tel: (305) 851-5997
    Email:  ceconomides@rochefreedman.com
5           bpierce@rochefreedman.com

6   *Counsel for Defendants*

7

8                       **UNITED STATES DISTRICT COURT**

9                     **NORTHERN DISTRICT OF CALIFORNIA**

10                        **SAN FRANCISCO DIVISION**

11

12  YUTING CHEN,                          | Case No. 21-cv-09393-YGR

13                  PLAINTIFF,

14          v.

15

16  ARIEL ABITTAN, ABRAHAM ABITTAN,
    RACHEL ABITTAN, BRIAN ABITTAN,
17  JACOB ABITTAN, ALYSSA ABITTAN,
    ELIANA ABITTAN, ROY GRABER, TOVA
18  GRABER, REALTIME NY LLC, a New York
    Limited Liability Company, and DOES 1-20,
19  inclusive

20                  DEFENDANTS.

21

22

23

24

25

26

27

28

---

DECLARATION OF ELIANA ABITTAN                    CASE NO. 21-cv-09393-YGR

# DECLARATION OF ELIANA ABITTAN

I, Eliana Abittan, declare as follows:

1.  I am a resident of Lawrence, New York.

2.  I am married to Ariel Abittan.

3.  I am an office assistant. I do not conduct any business or own any assets in California.

4.  I have never interacted with a woman who introduced herself to me as Yuting Chen.

5.  On December 10, 2017, I attended my brother-in-law, Jacob Abittan's ("Jacob") wedding in Rye, New York. I did, however, meet a woman who was engaged in a watch business with my husband, Ariel Abittan ("Ariel"). This woman introduced herself to me as Tiffany Chen ("Tiffany"). Tiffany attended Jacob's wedding with her husband, Damien. Later on, Tiffany started using the name Lily Chao.

6.  In April of 2018, my children and I stayed at Tiffany Chen's house in California. I did not conduct any business while staying at Tiffany's house. It is my understanding that Ariel and Tiffany purchased only one watch together after my visit.

7.  In July of 2018, I began helping Ariel, Tiffany, and Damien with payroll for their cryptocurrency business. My role did not have any relationship to the watch business.

8.  I never told Tiffany or Damien (or anyone else) that I owned a big real-estate development business or that I had developed properties over billions of dollars. I never told Tiffany or Damien (or anyone else) that I owned numerous premier properties or that Saks Fifth Avenue was my tenant.

9.  Other than being married to Ariel, I have no relationship to any luxury watch business, including the one related to Ariel, Tiffany, and Damien. I have never sold a luxury watch. I have never purchased a luxury watch. I have never received a luxury watch as a gift. I have never shared in the proceeds of a luxury watch sale or directly benefited from the sale of a luxury watch.

10. I did not make an anonymous call to Tiffany (or anyone else) on December 23, 2020. I have never threatened Tiffany, her family, or her children. I did not (anonymously or otherwise) instruct Tiffany to "pay $4.5 million [to Ariel] within a few hours or suffer grave consequences."

    

1    Compl. ¶64. To the contrary, it is my understanding that Tiffany, through counsel, **offered** to pay

2    Ariel $4.5 million to settle their dispute related to the luxury watch and cryptocurrency businesses.

3         I declare under penalty of perjury that the foregoing is true and correct.

4    Dated: May 16, 2022

5                                                    Eliana Abittan

- 3 -

EXHIBIT H

# Exhibit H

Constantine P. Economides (*pro hac vice forthcoming*)
(Florida Bar No. 118177)
Brianna K. Pierce (CA Bar No. 336906)
ROCHE FREEDMAN LLP
1 SE 3rd Avenue, Suite 1240
Miami, FL 33131
Tel: (305) 851-5997
Email:  ceconomides@rochefreedman.com
        bpierce@rochefreedman.com

*Counsel for Defendants*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

|  |  |
|---|---|
| YUTING CHEN,<br><br>PLAINTIFF,<br><br>v.<br><br>ARIEL ABITTAN, ABRAHAM ABITTAN, RACHEL ABITTAN, BRIAN ABITTAN, JACOB ABITTAN, ALYSSA ABITTAN, ELIANA ABITTAN, ROY GRABER, TOVA GRABER, REALTIME NY LLC, a New York Limited Liability Company, and DOES 1-20, inclusive<br><br>DEFENDANTS. | Case No. 21-cv-09393-YGR |

# DECLARATION OF ROY GRABER

I, Roy Graber, declare as follows:

      1.      I am a resident of Memphis, Tennessee.

      2.      Ariel Abittan is married to my daughter, Eliana Abittan.

      3.      I am the owner of GTS Technologies LLC, a computer support company formed under the laws of Tennessee with its principal place of business located in Memphis, Tennessee. I do not conduct any business or own any assets in California.

      4.      About twenty (20) years ago, I traveled to California for a family vacation. It was the first and only time I have ever been to California.

      5.      I have never interacted with a woman who introduced herself to me as Yuting Chen.

      6.      I have never interacted with a person (by any name or gender) engaged in a watch business with my son-in-law, Ariel Abittan ("Ariel").

      7.      I have never told anyone that I owned a big real-estate development business or that I had developed properties over billions of dollars. I have never told anyone that I owned numerous premier properties or that Saks Fifth Avenue was my tenant.

      8.      Other than being Ariel's father-in-law, I have no relationship to any luxury watch business. I have never sold a luxury watch. I have never purchased a luxury watch for resale. I have never received a luxury watch as a gift. I have never shared in the proceeds of a luxury watch sale or benefited from the sale of a luxury watch in any way.

      9.      I did not make an anonymous call to anyone on December 23, 2020. I have never (anonymously or otherwise) threatened or instructed anyone to "pay $4.5 million [to Ariel] within a few hours or suffer grave consequences." Compl. ¶64.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: May 16, 2022

_____
Roy Graber

# EXHIBIT I

# EXHIBIT I

1   Constantine P. Economides (*pro hac vice forthcoming*)
    (Florida Bar No. 118177)
2   Brianna K. Pierce (CA Bar No. 336906)
    ROCHE FREEDMAN LLP
3   1 SE 3rd Avenue, Suite 1240
    Miami, FL 33131
4   Tel: (305) 851-5997
    Email: ceconomides@rochefreedman.com
5           bpierce@rochefreedman.com

6   *Counsel for Defendants*

7

8                  **UNITED STATES DISTRICT COURT**

9                 **NORTHERN DISTRICT OF CALIFORNIA**

10                   **SAN FRANCISCO DIVISION**

11

12   YUTING CHEN,                          Case No. 21-cv-09393-YGR

13                    PLAINTIFF,

14          v.

15

16   ARIEL ABITTAN, ABRAHAM ABITTAN,
     RACHEL ABITTAN, BRIAN ABITTAN,
17   JACOB ABITTAN, ALYSSA ABITTAN,
     ELIANA ABITTAN, ROY GRABER, TOVA
18   GRABER, REALTIME NY LLC, a New York
     Limited Liability Company, and DOES 1-20,
19   inclusive

20                    DEFENDANTS.

21

22

23

24

25

26

27

28

DECLARATION OF TOVA GRABER                    CASE NO. 21-CV-09393-YGR

# DECLARATION OF TOVA GRABER

I, Tova Graber, declare as follows:

1.      I am a resident of Memphis, Tennessee.

2.      Ariel Abittan is married to my daughter, Eliana Abittan.

3.      I am a retail store clerk. I do not conduct any business or own any assets in California.

4.      About twenty (20) years ago, I traveled to California for a family vacation. It was the first and only time I have ever been to California.

5.      I have never interacted with a woman who introduced herself to me as Yuting Chen.

6.      I have never interacted with a person (by any name or gender) engaged in a watch business with my son-in-law, Ariel Abittan ("Ariel").

7.      I have never told anyone that I owned a big real-estate development business or that I had developed properties over billions of dollars. I have never told anyone that I owned numerous premier properties or that Saks Fifth Avenue was my tenant.

8.      Other than being Ariel's mother-in-law, I have no relationship to any luxury watch business. I have never sold a luxury watch. I have never purchased a luxury watch. I have never received a luxury watch as a gift. I have never shared in the proceeds of a luxury watch sale or benefited from the sale of a luxury watch in any way.

9.      I did not make an anonymous call to anyone on December 23, 2020. I have never (anonymously or otherwise) threatened or instructed anyone to "pay $4.5 million [to Ariel] within a few hours or suffer grave consequences." Compl. ¶64.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: May 16, 2022

Tova Graber

- 2 -

DECLARATION OF TOVA GRABER      CASE NO. 21-CV-09393-YGR

# EXHIBIT J

1  Constantine P. Economides (*pro hac vice*)

2  Brianna K. Pierce (CBN 336906)
   ROCHE FREEDMAN LLP

3  1 SE Third Avenue, Suite 250
   Miami, Florida 33131

4  Tel: (305) 971-5943

5  Email: ceconomides@rochefreedman.com
         bpierce@rochefreedman.com

6
   Joseph M. Delich (*pro hac vice*)
7  ROCHE FREEDMAN LLP
   99 Park Avenue, Suite 1910
8  New York, NY 10016
   Tel: (646) 970-7541
9  Email: jdelich@rochefreedman.com

10
   *Counsel for Abittan,*
11 *Ariel Abittan*

12          SUPERIOR COURT OF THE STATE OF CALIFORNIA
13                  COUNTY OF SANTA CLARA

14 TEMUJIN LABS, INC.,                    CASE NO. 20CV372622
                        Plaintiff,
15          vs.                          Judge:      Hon. Sunil R. Kulkarni
                                         Action Filed:   November 6, 2020
16 ARIEL ABITTAN, BENJAMIN FISCH,
   CHARLES LU, and Does 1-10, inclusive,
                        Defendants.      **CROSS-COMPLAINT FOR**
17 _____       **DECLARATORY JUDGMENT,**
                                         **BREACH OF PARTNERSHIP**
18 –                                      **AGREEMENT, CONVERSION,**
                                         **BREACH OF FIDUCIARY DUTY,**
19 ARIEL ABITTAN,                         **AIDING AND ABETTING,**
                        Cross-Complainant, **FRAUDULENT INDUCEMENT,**
20          vs.                          **UNJUST ENRICHMENT,**
                                         **ACCOUNTING, RICO**
21 YUTING CHEN (A/K/A TIFFANY CHEN,       **VIOLATION (18 U.S.C. § 1962(c)),**
   A/K/A LILY CHAO), TAO DING (A/K/A      **CONSPIRACY TO COMMIT**
22 DAMIEN DING A/K/A DAMIEN LEUNG),       **RICO VIOLATION (18 U.S.C. §**
   GUANGHUA LIANG, YANG YANG, ALEX        **1962(d)), FRAUD, BREACH OF**
23 WANG,  SELENA CHEN, JIANRONG           **CONTRACT, AND DEFAMATION**
   WANG, XILEI WANG, YI CHUNG YANG,
24 JUNIPER VENTURES INCORPORATED,
   PROJECT REVOLUTION FUND INC.,
25 JUNIPER VENTURE HOLDINGS LLC,
   JUNIPER VENTURE PARTNERS LLC, EIAN
26 LABS INC. (F/K/A POREPSUS INC.),
   FOURHAIR LLC, LAKESIDE GARDEN
27 HERITAGE LLC,  POWERSCALE CAPITAL
28

Electronically Filed
by Superior Court of CA,
County of Santa Clara,
on 11/3/2021 10:49 PM
Reviewed By: R. Walker
Case #20CV372622
Envelope: 7599686

1 | MANAGEMENT LLC, POWERSCALE
2 | CAPITAL FUND LP, BLACK COBBLE
  | RIDESHARE FUNDING LLC, TEMUJIN
3 | LABS INC. (DELAWARE), TEMUJIN LABS
  | INC. (CAYMAN), NESSCO INVESTMENTS,
4 | LLC, FINDORA FOUNDATION LTD.,
  | DISCREET LABS LTD., and Does 1-100,
5 | inclusive,

6 |                         Cross-Defendants.

7

8    Abittan ARIEL ABITTAN ("Cross-Complainant" or "Abittan"), by and through the

9 undersigned counsel, alleges as follows:

10    1.    Temujin Labs Inc. (Delaware) ("Temujin DE") filed a complaint against Abittan

11 seeking declaratory relief and damages for civil conspiracy, tortious interference with contract, and

12 trade secret misappropriation. A copy of the complaint is attached as Exhibit A.

13    2.    Abittan has demurred to the complaint and, though no answer has been filed, denies

14 any liability to Temujin DE.

15    3.    This cross-complaint arises from a multi-year fraudulent conspiracy orchestrated by

16 Yuting Chen (a/k/a Tiffany Chen, a/k/a Lily Chao) ("Chen"); her husband Tao Ding (a/k/a Damien

17 Ding, a/k/a Damien Leung) ("Ding"); the numerous entities they control, including Juniper

18 Ventures Incorporated, Project Revolution Fund Inc., Juniper Venture Holdings LLC, Juniper

19 Venture Partners LLC, Eian Labs Inc. (f/k/a Porepsus Inc.), Fourhair LLC, Lakeside Garden

20 Heritage LLC, Powerscale Capital Management LLC, Powerscale Capital Fund LP, Black Cobble

21 Rideshare Funding LLC, Temujin Labs Inc. (Delaware), Temujin Labs Inc. (Cayman), Nessco

22 Investments, LLC, Findora Foundation Ltd., and Discreet Labs Ltd.; and a coterie of Chinese

23 nationals that played straw-person roles in Chen and Ding's unlawful conduct, including Guanghua

24 Liang, Yang Yang, Alex Wang, Selena Chen, Jianrong Wang, Xilei Wang, and Yi Chung Yang

25 (collectively, "Cross-Defendants").

26    4.    Cross-Defendants' conspiracy flies under the banner of a cryptocurrency and

27

28                                      - 2 -

blockchain project currently known to the public as Findora.[1] Findora was founded by Abittan, Chen, and Ding as part of an oral and/or implied partnership formed in 2018 (the "Partnership").

5.      Prior to and throughout the Partnership, Chen and Ding inspired both Abittan's loyalty and his deference, first through a watch business that required Abittan to wire millions of dollars to Chen and Ding without any written contracts and, second, through promises of unicorn-like success if Abittan followed Chen and Ding's business advice without question. And once Chen and Ding knew they had Abittan's full trust, they weaponized it to steal the Partnership's novel blockchain project—Findora—and millions of dollars from investors and Abittan. In the process, Ding and Chen defamed Abittan to countless individuals, incurred over $600,000 of debt on Abittan's personal credit, converted millions of dollars' worth of watches, and stole an additional $1,200,000 from Abittan's friends and family.

6.      As part of their fraudulent scheme, Chen and Ding relied on misdirection and anonymity. While reassuring Abittan that he had an interest in all aspects of Findora, Chen and Ding fraudulently formed at least thirteen (13) entities through a series of forged contracts, false filings, and misrepresentations about ownership. They created a web of shell companies that become so unwieldy that Chen and Ding had to back date documents so that the chronology of entities would make temporal sense. They repeatedly lied about the purposes, functions, and compositions of discrete entities in their corporate web.

7.      Then, in a final attempt to coopt Findora, Chen and Ding fraudulently induced Abittan to sign a single-page document that, at the time, Chen and Ding falsely claimed was a corporate formality to preserve the rights of Findora's shareholders.  Chen and Ding now contend that this single-page document represents Abittan's consent to transfer the Findora name and intellectual property from Eian Labs Inc.—the corporate entity of which Abittan believed he was at least a 39.6% beneficial owner—to a newly-created Cayman Islands entity, Temujin Labs Inc.

---

[1] The intellectual property underlying Findora was previously known as Eian. For simplicity (and because there is also an entity named Eian Labs Inc.), all references to the intellectual property itself (also referred to as "blockchain technology" or the "coin") will use the current "Findora" name.

- 3 -

(Cayman)—in which Abittan has no stake. In essence, Chen and Ding claim that Abittan knowingly consented to the sale of his entire technology company—believed to be valued at over $50,000,000—via a one-page document in exchange for **absolutely nothing**.

8.      In reality, however, Chen and Ding had concocted the document as a poorly conceived attempt to legitimize their theft of Abittan's ownership interest in Findora. But Chen and Ding were ultimately hoisted by their own petard. After years of misdirection and corporate tricks, Chen and Ding's tactics began to surface when they pushed Abittan out of Findora and denied the existence of the Partnership.

9.      Critically, Findora's employees, consultants, and advisors subsequently observed, and responded to, Chen's and Ding's obvious misconduct. In late 2020, Stanford cryptographers, including Findora CEO Charles Lu ("Lu"), CTO/Chief Scientist Benjamin Fisch ("Fisch"), globally renowned consultant Franklin Fu ("Fu"), and numerous other employees from the engineering team (essentially the entire company) resigned. Another well-known cryptologist, Paul Scherer, went so far as to send a cease-and-desist letter to Findora, warning them not to associate his name with the project.

10.     In sum, and as detailed below, Chen and Ding are con artists. Using charisma and lavish displays of wealth, they lure in optimistic individuals who are acting in good faith. Chen and Ding then misrepresent, misdirect, and deceive. They say whatever is necessary to induce others to provide money or other resources. To cover their tracks, they use fake names, straw-persons, and other lies about their relationships and identities. They hide their assets, even their home, using shell corporations. They have even refused to include their names on court filings. They undertake these manipulative actions to prevent accountability to their victims, including Abittan.

11.     Abittan files this lawsuit in order to: (a) recover Abittan's direct damages due to Cross-Defendants' fraudulent and unlawful conduct; (b) obtain a declaration of Abittan's rights in Findora; (c) prevent Cross-Defendants from destroying, disposing of, or unlawfully using Findora's valuable intellectual property; and (d) prevent Cross-Defendants from continuing to harm Abittan.

- 4 -

12.    Abittan's investigation into the matters, identities, and entities discussed in this complaint is ongoing. Abittan reserves the right to update these allegations as additional facts become known.

**PARTIES**

13.    Cross-Complainant Ariel Abittan is an individual residing in Lawrence, New York. In addition to—or in the alternative to—the discrete roles and interests set forth below, Abittan has a 50% interest in the Partnership formed with Ding and Chen in January 2018 and has an ownership interest of up to 50% in Findora.[2] According to corporate formation documents created by or on behalf of Ding and Chen—purportedly for the purpose of effectuating the Partnership's interests— Abittan is a shareholder of, and continuously has been a shareholder of, Juniper Ventures Incorporated since January 24, 2018. Abittan is the President and a director of Project Revolution Inc. Abittan is also a member of Juniper Venture Partners, LLC, which is a shareholder of Eian Labs Inc (f/k/a Porepsus Inc.). Upon information and belief, as a shareholder of JVI, Abittan is also a manager of Fourhair LLC, which is a member of Juniper Venture Partners LLC, which (as detailed above) is a shareholder of Eian. Abittan is also a member of Juniper Venture Holdings LLC, which was formed for the purpose of creating Powerscale Capital Management LLC with John Powers. Abittan is also a partner in an oral and/or implied partnership with Chen and Ding formed for the purpose of reselling ultra-luxury watches (the "Watch Partnership"). Abittan is the co-founder of Findora.

14.    Cross-Complainant is informed and believes and, on that basis, alleges that Cross-Defendant Chen is an individual residing in Atherton, California. Since 2016, Chen has been known to Abittan by at least three names (Yuting Chen, Tiffany Chen, and Lily Chao), but Abittan is informed and believes and, on that basis, alleges that Yuting Chen is Cross-Defendant Chen's true name. Chen is the coleader of a fraudulent association-in-fact enterprise that has used Juniper Ventures Incorporated, Project Revolution Fund Inc., Juniper Venture Holdings LLC, Juniper

---

[2] *See* Corp. Code § 16202.

- 5 -

Venture Partners LLC, Eian Labs Inc. (f/k/a Porepsus Inc.), Fourhair LLC, Lakeside Garden Heritage LLC,  Powerscale Capital Management LLC, Powerscale Capital Fund LP, Black Cobble Rideshare Funding LLC, Temujin Labs Inc. (Delaware), Temujin Labs Inc. (Cayman), Nessco Investments, LLC, Findora Foundation Ltd., Discreet Labs Ltd., Guanghua Liang, Yang Yang, Alex Wang,  Selena Chen, Jianrong Wang, Xilei Wang, and Yi Chung Yang to commit numerous unlawful acts, including stealing Findora and embezzling millions from Abittan and other Findora investors.

15.     Cross-Complainant is informed and believes and, on that basis, alleges that Cross-Defendant Ding is an individual residing in Atherton, California. Since 2016, Ding has been known to Abittan by at least three names (Tao Ding, Damien Ding, and Damien Leung) but Cross-Complainant is informed and believes and, on that basis, alleges that Damien Ding is Cross-Defendant Ding's true name. Ding is the coleader of a fraudulent association-in-fact enterprise that has used Juniper Ventures Incorporated, Project Revolution Fund Inc., Juniper Venture Holdings LLC, Juniper Venture Partners LLC, Eian Labs Inc. (f/k/a Porepsus Inc.), Fourhair LLC, Lakeside Garden Heritage LLC,  Powerscale Capital Management LLC, Powerscale Capital Fund LP, Black Cobble Rideshare Funding LLC, Temujin Labs Inc. (Delaware), Temujin Labs Inc. (Cayman), Nessco Investments, LLC, Findora Foundation Ltd., Discreet Labs Ltd., and the agents known as Guanghua Liang, Yang Yang, Alex Wang,  Selena Chen, Jianrong Wang and Yi Chung Yang, to commit numerous unlawful acts, including stealing Findora and embezzling millions from Abittan and other Findora investors.

16.     Cross-Defendant Juniper Ventures Incorporated ("JVI") is a Delaware Corporation doing business in California. Abittan is informed and believes and, on that basis, alleges that JVI is controlled by Ding and Chen and that JVI is a culpable member of Ding and Chen's fraudulent association-in-fact enterprise.

17.     Cross-Defendant Project Revolution Fund Inc. ("Project Revolution") is a Delaware Corporation doing business in California. Abittan is informed and believes and, on that basis,

- 6 -

1   alleges that Project Revolution is controlled by Ding and Chen and that Project Revolution is a

2   culpable member of Ding and Chen's fraudulent association-in-fact enterprise.

3           18.     Cross-Defendant Juniper Venture Holdings LLC ("JV Holdings") is a limited

4   liability company formed under the laws of Delaware. Abittan is informed and believes and, on that

5   basis, alleges that JV Holdings is controlled by Ding and Chen and that JV Holdings is a culpable

6   member of Ding and Chen's fraudulent association-in-fact enterprise.

7           19.     Cross-Defendant Juniper Venture Partners LLC ("JV Partners") is a limited liability

8   company formed under the laws of Delaware. Abittan is informed and believes and, on that basis,

9   alleges that JV Partners is controlled by Ding and Chen and that JV Partners is a culpable member

10  of Ding and Chen's fraudulent association-in-fact enterprise.

11          20.     Cross-Defendant Eian Labs Inc. (f/k/a Porepsus Labs Inc.) ("Eian") is a Delaware

12  Corporation doing business in California. Abittan is informed and believes and, on that basis,

13  alleges that Eian is controlled by Ding and Chen and that Eian a culpable member of Ding and

14  Chen's fraudulent association-in-fact enterprise.

15          21.     Cross-Defendant Fourhair LLC ("Fourhair") is a limited liability company formed

16  under the laws of Nevada. Abittan is informed and believes and, on that basis, alleges that Fourhair

17  is controlled by Ding and Chen and that Fourhair is a culpable member of Ding and Chen's

18  fraudulent association-in-fact enterprise.

19          22.     Cross-Defendant Lakeside Garden Heritage LLC ("Lakeside") is a limited liability

20  company formed under the laws of Delaware. Abittan is informed and believes and, on that basis,

21  alleges that Lakeside is controlled by Ding and Chen and that Lakeside is a culpable member of

22  Ding and Chen's fraudulent association-in-fact enterprise.

23          23.     Cross-Defendant Powerscale Capital Management LLC ("Powerscale Capital") is a

24  limited liability company formed under the laws of Delaware. Abittan is informed and believes and,

25  on that basis, alleges that Powerscale Capital is controlled by Ding and Chen and that Powerscale

26  Capital is a culpable member of Ding and Chen's fraudulent association-in-fact enterprise.

27

28                                              - 7 -

24.     Cross-Defendant Powerscale Capital Fund LP ("Powerscale Fund") is a foreign company organized under the laws of the Cayman Islands. Abittan is informed and believes and, on that basis, alleges that Powerscale Fund is controlled by Ding and Chen and that Powerscale Fund is a culpable member of Ding and Chen's fraudulent association-in-fact enterprise.

25.     Cross-Defendant Powerscale Black Cobble Rideshare Funding LLC ("Black Cobble") is a limited liability company formed under the laws of Delaware. Abittan is informed and believes and, on that basis, alleges that Black Cobble is controlled by Ding and Chen and that Black Cobble is a culpable member of Ding and Chen's fraudulent association-in-fact enterprise.

26.     Cross-Defendant Temujin Labs Inc. (Delaware) ("Temujin DE") is a corporation organized and existing under the laws of Delaware with its principal place of business in Santa Clara County, California that purports to do business under the stolen name "Findora." Abittan is informed and believes and, on that basis, alleges that Temujin DE is controlled by Ding and Chen and that Temujin DE is a culpable member of Ding and Chen's fraudulent association-in-fact enterprise.

27.     Cross-Defendant Temujin Labs Inc. (Cayman) is a foreign company organized under the laws of the Cayman Islands with its principal place of business in Santa Clara County, California that purports to do business under the stolen name "Findora." Abittan is informed and believes and, on that basis, alleges that Temujin Cayman is controlled by Ding and Chen and that Temujin Cayman is a culpable member of Ding and Chen's fraudulent association-in-fact enterprise.

28.     Cross-Defendant Nessco Investments, LLC ("Nessco") is a limited liability company formed under the laws of Delaware. Abittan is informed and believes and, on that basis, alleges that Nessco is controlled by Ding and Chen and that Nessco is a culpable member of Ding and Chen's fraudulent association-in-fact enterprise. Abittan is informed and believes and, on that basis, alleges that Nessco is the shell company that holds 69 Isabella Ave.—the house in which Ding and Chen's criminal enterprise operated.

29.     Cross-Defendant Findora Foundation Ltd. ("Findora Foundation") is a foreign company organized under the laws of the Cayman Islands with its principal place of business in

- 8 -

Santa Clara County, California that purports to do business under the stolen name "Findora." Abittan is informed and believes and, on that basis, alleges that Findora Foundation is controlled by Ding and Chen and that Findora Foundation is a culpable member of Ding and Chen's fraudulent association-in-fact enterprise.

30.    Cross-Defendant Discreet Labs Ltd. ("Discreet Labs") is a limited partnership formed under the laws of Delaware. Abittan is informed and believes and, on that basis, alleges that Discreet Labs is controlled by Ding and Chen and that Discreet Labs is a culpable member of Ding and Chen's fraudulent association-in-fact enterprise.

31.    Abittan is informed and believes and, on that basis, alleges that Cross-Defendant Guanghua Liang is a resident of China. Abittan is informed and believes and, on that basis, alleges that Guanghua Liang is the agent of Ding and Chen and that Guanghua Liang is a culpable member of Ding and Chen's fraudulent association-in-fact enterprise.

32.    Abittan is informed and believes and, on that basis, alleges that Cross-Defendant Yang Yang is a resident of China. Abittan is informed and believes and, on that basis, alleges that Yang Yang is the agent of Ding and Chen and that Yang Yang is a culpable member of Ding and Chen's fraudulent association-in-fact enterprise.

33.    Abittan is informed and believes and, on that basis, alleges that Cross-Defendant Alex Wang is a resident of China. Abittan is informed and believes and, on that basis, alleges that Alex Wang is the agent of Ding and Chen and that Alex Wang is a culpable member of Ding and Chen's fraudulent association-in-fact enterprise.

34.    Abittan is informed and believes and, on that basis, alleges that Cross-Defendant Selena Chen is an individual residing in Atherton, California. Abittan is informed and believes and, on that basis, alleges that Selena Chen is the agent of Ding and Chen and that Selena Chen is a culpable member of Ding and Chen's fraudulent association-in-fact enterprise. Abittan is informed and believes and, on that basis, alleges that Selena Chen is the sister of Yuting Chen and executed many documents as part of the criminal scheme.

- 9 -

35.    Abittan is informed and believes and, on that basis, alleges that Cross-Defendant Jianrong Wang is an individual residing in Atherton, California. Abittan is informed and believes and, on that basis, alleges that Jianrong Wang is the agent of Ding and Chen and that Jianrong Wang is a culpable member of Ding and Chen's fraudulent association-in-fact enterprise. Abittan is informed and believes and, on that basis, alleges that Jianrong Wang is the driver of Chen and Ding, that he lives at 69 Isabella Ave—the house in which Ding and Chen's criminal enterprise operated—and that he has executed many corporate documents as part of the criminal scheme.

36.    Abittan is informed and believes and, on that basis, alleges that Cross-Defendant Xilei Wang is an individual residing in China. Abittan is informed and believes and, on that basis, alleges that Xilei Wang is the agent of Ding and Chen and that Xilei Wang is a culpable member of Ding and Chen's fraudulent association-in-fact enterprise. Abittan is informed and believes and, on that basis, alleges that Xilei Wang has executed many corporate documents as part of the criminal scheme.

37.    Abittan is informed and believes and, on that basis, alleges that Cross-Defendant Yi Chung Yang is an individual residing in Hong Kong with a home in Atherton, CA. Abittan is informed and believes and, on that basis, alleges that Yi Chung Yang is the owner of Nessco Investments LLC. Abittan is informed and believes that Yi Chung Yang is the agent of Ding and Chen and that Yi Chung Yang is a culpable member of Ding and Chen's fraudulent association-in-fact enterprise.

38.    Cross-Complainant does not know the true names and capacities of cross-defendants sued in this Cross-Complaint as Doe 1 through Doe 100, inclusive, and therefore sues these cross-defendants by fictitious names under Section 474 of the California Code of Civil Procedure. To the extent that Tiffany Chen, Yuting Chen, Lily Chao, Damien Ding, Tao Ding, Damien Leung, Guanghua Liang, Yang Yang, Alex Wang, Selena Chen, Jianrong Wang, Xilei Wang, and Yi Chung Yang are not the people Abittan interacted with as fully described in this cross-complaint, or to the extent any such name(s) refer to multiple persons, then such person(s) are included in Does 1 through Does 100, inclusive, sued herein. Cross-Complainant will amend

- 10 -

this Cross-Complaint to allege the true names and capacities of Doe 1 through Doe 100, inclusive, when ascertained. Cross-Complainant is informed and believes, and on that basis alleges, that each of the cross-defendants named herein as Doe 1 through Doe 100, inclusive, is responsible in some manner for the occurrence, injury, and other damages alleged in this Cross-Complaint.

**SUBSTANTIVE ALLEGATIONS**

**A.  Abittan Meets Ding and Chen Online Through a Shared Interest in High-End Luxury Watches, Which Leads to a Business Partnership**

39.    In or around May of 2016, Abittan was looking online for a particular high-end luxury watch and came across a listing that Ding, under the username "oneplustwo," had posted for the watch on The Rolex Forums. Abittan then began discussions with Ding regarding the watch.

40.    Abittan, Ding, and Chen (who claimed to be married to Ding and who at that time was going by the name Tiffany Chen) then began transacting in watches on a regular basis between 2016 and 2019.

41.    The watches consisted of high-end models of brands like Patek Philippe and Richard Mille, which can currently sell for as much as $2,500,000.

42.    The parties reached an oral partnership agreement that would work as follows. First, either Abittan or Ding or Chen would identify a high-end watch that could be acquired from retailers and then resold at a higher price. Then Abittan would contribute 50% of the cost of the watch and Ding/Chen would contribute the other 50%. Finally, Abittan and Ding would work together to resell the watch at a profit. Abittan and Ding/Chen operated as 50/50 partners in the watch business.

43.    To purchase the watches, Abittan would wire money from his business entity, RealTime NY, LLC ("RealTime"), to Wells Fargo bank accounts in the name of Yuting Chen and Tao Ding. Sometimes, Ding and Chen would pay for their portion of the watches, but as detailed further below, on other occasions, Ding and Chen misused Abittan's own credit cards to pay their share. As a result of these transactions, Abittan currently co-owns twenty-four luxury watches with Ding and Chen. The total amount of principal that Abittan invested in these watches was $1,139,270.

- 11 -

44.     The present value of the unsold watches is nearly eight times greater than the principal value of those watches. Accordingly, Abittan's 50% interest in these watches exceeds $8,000,000.

**B.  <u>Ding and Chen Lure Abittan into a Relationship of Trust</u>**

45.     Through the watch business, Abittan developed a relationship of trust with Ding and Chen. Starting in January 2017, Abittan began traveling to Atherton, California to meet with Ding and Chen. During these trips, Abittan stayed in what Ding and Chen consistently claimed to be their primary residence at 69 Isabella Ave. Atherton, CA 94027 ("69 Isabella Ave.").

46.     During this time period—between May 2016 and December 2017—the parties wired millions of dollars to one another without incident.

47.     Ding and Chen routinely claimed to have access to significant familial wealth and made great displays of their money. In one instance, Chen brought Abittan car shopping and purchased two high-end luxury vehicles, one of which was a Rolls-Royce. There were approximately five such vehicles in the driveway of 69 Isabella Ave. at any given time, including multiple Bentleys, a Ferrari, and Mercedes.

48.     Chen even had a chauffeur, whose name Chen said was Jianrong Wang. On various occasions, Chen had Wang drive Abittan to destinations in and around Atherton. Because Wang did not speak English, Abittan would communicate with him through a translation application on Abittan's mobile phone.

49.     Chen repeatedly touted her supposed connections with the Chinese business elite. She claimed to be friends with Zhang Ying—the wife of Chinese billionaire and Alibaba founder, Jack Ma. Chen also claimed to have a close personal and professional relationship with Ma Huateng, founder of the seventh most valuable company in the world, Tencent. Chen bragged about meeting Mr. Huateng while he was "still a poor guy." Chen also made regular references to lavish trips with other celebrities and "famous people" in the blockchain industry.

50.     Chen told Abittan that Ding had attended Harvard as an undergraduate but that he had been kicked out for getting into a fist-fight.

- 12 -

51.     Chen further cultivated a special relationship of apparent trust and confidence with Abittan by disclosing highly personal details in text messages, including details relating to her health, marital issues, and prior romantic relationships. On information and belief, many of these personal revelations were not true and were made solely to make Abittan believe that he and Chen had a close personal relationship that extended beyond business.

52.     In retrospect, Chen's and Ding's stories and displays of grandeur were an integral part of Cross-Defendants' fraudulent scheme.

### C. **The Abittan-Ding/Chen Partnership is Formed While Ding and Chen Lay the Foundation for Misidentification**

53.     By December 2017, Ding and Abittan were speaking several times a day for hours. These conversations included discussions regarding the potential use of blockchain for secure and anonymous watch transactions, as well as (ironically) fraud prevention.

54.     By January 2018, the discussions between Abittan, Ding, and Chen had expanded to a wider use case aimed at creating reliable blockchain financial infrastructure with privacy protecting transparency for use across myriad industries. From these discussions, Abittan, Ding and Chen formed the oral and/or implied Partnership to create blockchain technology.

55.     On January 22, 2018, the Partnership formed Juniper Ventures Incorporated ("JVI") to spearhead that business. Ding and Chen, however, refused to identify themselves on the incorporation documents; instead, Chen and Ding presented Abittan with an investment agreement, naming Abittan and Guanghua Liang ("Liang")—a strawman appointed by Ding and Chen to help hide their involvement—as "Founders" of JVI. Abittan and Liang were required to make a $50,000 capital contribution in exchange for 1,000,000 shares in JVI. Abittan thereafter wired $50,000 to a Chase bank account in the name of JVI.

56.     Ding and Chen always represented that JVI was their venture with Abittan as equal partners. They did not explain what role Liang was to play or why he was listed as co-founder. Abittan has never met, seen, or spoken with Liang.

- 13 -

57.     Chen obviously understood the inconsistency between, on the one hand, claiming to Abittan that she and Ding were Abittan's business partners while, on the other hand, making sure that her name did not appear on any of the governing documents for the entities that she and Ding created for the blockchain business. Chen's explanation to Abittan was that, to project a certain image and identity that fit with her view of Silicon Valley culture, she needed to maintain her own privacy and to keep her true identity and connection to their businesses a secret.

58.     Chen also insisted that Abittan hold himself out to the public as "Mark Graber." Chen explained to Abittan that it was "too early" for investors and employees to know their true identities. Chen also asked Abittan to change his name on his LinkedIn profile to Mark Graber and to conceal his true identity in public forums. When Abittan protested, Chen told him that this was how things worked in Silicon Valley and that, to succeed, Abittan needed to follow her instructions.

59.     Chen and Ding's use of hidden identities persisted throughout their partnership with Abittan (and still to this day). Chen routinely lied to Findora investors and employees about her relationship with Ding, claiming that Ding was her brother-in-law and not her husband. Chen told Abittan that this subterfuge was necessary due to Silicon Valley culture frowning on husband/wife relationships at work. Because Abittan's wife also worked for Findora, Chen wanted Abittan to hide his relationship with his wife.

60.     Abittan ultimately demanded to go by his real name at Findora and revealed his marital relationship with his wife to Findora employees. Ding and Chen would not do the same.

61.     Chen and Ding told Abittan that it was important to project an image of success. Accordingly, Chen leased a Ferrari for Abittan to drive when visiting Silicon Valley and told him that he needed to live in one of her luxury properties.

62.     Ding and Chen also provided Abittan with a removable subscriber identity module (commonly known as a "SIM card") and required Abittan to use a phone with that SIM card for business purposes. Upon information and belief, Ding and Chen provided the SIM card to Abittan as another test of their control.

- 14 -

**D. Ding and Chen Create Two Public-Facing Entities to Act for the Partnership**

63.     In January and February of 2018, Abittan began hiring employees for the Findora project. Abittan heavily recruited Stanford Ph.Ds., particularly those affiliated with the Stanford cryptography department.

64.     Just before Abittan's most important recruit—Stanford's John Powers—agreed to join the Partnership's blockchain project, Ding and Chen convinced Abittan that, to limit potential liability, they needed to keep the business separate from the tech (often juxtaposed as "the fund" and "the coin").

65.     Consequently, on April 13, 2018, Abittan incorporated Project Revolution as incorporator. From incorporation, and at all times, Abittan served as President and Chief Executive Officer ("CEO") of Project Revolution.

66.     Ding and Chen referred to Project Revolution as the "fund" because it was the public-facing entity of the Partnership that, *inter alia*, paid salaries, entered employee contracts, and executed leases related to Findora.

67.     Shortly after creating the fund, on July 19, 2018, Ding formed a second public-facing entity called Eian. Although the articles of incorporation reflect Abittan as the incorporator, Abittan did not sign or receive copies of that document. After the fact, Ding eventually informed Abittan that Ding had formed Eian to act as the public-facing "coin side" of the Partnership.

68.     Chen confirmed that this dual fund/coin structure would allow Abittan, Ding, and Chen to retain 100% ownership of the Findora tech, while giving employees equity in the business.

**E. Findora is Developed by the Cryptologists Consulting with Project Revolution**

69.     Once Project Revolution and Eian were in place, Ding and Chen required high-level employees to sign two separate but seemingly related agreements.

70.     The first was a consulting agreement with the "fund"—Project Revolution—under which the consultant earned a reasonable salary in exchange for specific services rendered, such as the development of the cryptography library or creation of Findora's open-source component. Project Revolution retained exclusive ownership of all work product arising from the consulting

- 15 -

agreements, which included pre-signed and undated Assignment of Copyright and Assignment of Patent Application exhibits.

71.    The second agreement was an advisor agreement with Eian, under which the same consultant (now called an advisor) would receive equity in "the coin" as compensation for the unspecific service of advising the company from time to time.

72.    On information and belief, Ding and Chen used this two-agreement system to facilitate their fraud. When it behooved them, they could attempt to structure one entity as effectively insolvent, with the other entity owning Findora's lucrative technology. Therefore, they could induce sophisticated cryptologists into creating multi-million-dollar blockchain technology (Findora) in exchange for modest salaries and the promise of equity, yet they could also ensure that the equity was in a company worth nothing and owning nothing.

**F.    Abittan Devotes Time, Energy, and Money into Attracting Investors**

73.    While unaware of Chen and Ding's fraudulent corporate structure and overall unlawful scheme, Abittan continued to work on Findora.

74.    Abittan would fly from his New York home to Atherton multiple times per month to work on the venture.

75.    In addition to spearheading the recruitment of an elite team of cryptologists, Abittan also had operational responsibilities and was involved in the creation of at least one white paper, which is a common component of blockchain companies. Abittan also was involved in fundraising and investor pitches.

76.    During the same period, Ding and Chen consistently represented that they had secured or were securing investments in Findora from major players in China. For example, Chen touted a potential investment from Jack Ma's wife, going so far as to claim that Ma's wife was concerned with Abittan's availability on weekends given that Abittan observes the Sabbath.

77.    Chen also spent $70,000 on a lavish investor trip for the early investors in TRON Foundation (an entity dedicated to building infrastructure for a decentralized Internet). Chen

- 16 -

claimed that, as a result of the trip, the investors were going to invest $230,000,000 in tokens and that it was a "done deal." However, Chen refused to show Abittan the paperwork.

78.    Chen also claimed to be close to closing a deal with Tencent CEO Ma Huateng to lead an investment round.

79.    Later, Chen touted her progress on a $50,000,000 investment.

80.    Nonetheless, in July 2018, relying on Chen's representation that she had already raised substantial amounts of money, Abittan sought to raise funds from his own network of family and friends. Abittan ultimately secured $1,200,000 in investments for Findora from five private investors. These investments took the form of Simple Agreements for Future Tokens ("SAFTs") between the investor and JVI.

81.    Pursuant to the SAFTs, the investors wired $1,200,000 into JVI's Chase bank account. In exchange for investing in JVI, the investors were promised that, if Eian—the company everyone believed held the rights to Findora's blockchain technology—had an initial coin offering ("ICO"), then their money would be converted to coins at a 70% discount to the token price. If Eian did not have an ICO, then they would receive their money back within 90 days.

82.    Findora did not issue a token within 90 days, but each of the investors decided to roll their investments into future equity or token offerings. Of course, the investors were not willing to wait forever. Eventually, the investors demanded their money back.

83.    In March 2019, responding to investor pressure, Chen flew to New York to appease the investors. She and Abittan met with three of the investors, and in an effort to buy time, Chen offered them a new deal, including a promise to return their investment with a 25% annualized return if Eian did not issue a token. To convince the investors to hold out for an equity or token offering, Chen presented the investors with a term sheet showing a $10,000,000 incoming investment from China Orient Group, at a $60,000,000 valuation for Findora.

84.    By that time, Abittan and Chen could point to concrete accomplishments related to Findora. The consultants under contract with Project Revolution had built an operating demo, were actively pitching Findora to funds as use cases, and had completed several white papers. Findora

- 17 -

was just six months away from a test net. Abittan was involved in much of those accomplishments, getting weekly and sometimes daily summaries on the engineering team's progress.

**G.  As Abittan Diligently Works to Make Findora a Success, Ding and Chen Take Advantage of Abittan's Trust**

85.    Starting in early 2018, Chen directed Abittan to open multiple credit card accounts, with multiple cards issued to her and other individuals, to be used for Findora. At the outset, Chen promised Abittan that the cards would be used only for business purposes, and therefore, all expenses would be reimbursed by the Partnership.

86.    As a result of her promises, Chen obtained a credit card linked to Abittan's business account for RealTime, which was the entity previously used to wire money back and forth between Abittan, Ding, and Chen during the watch transactions.

87.    Chen soon thereafter demanded that Abittan open a Chase credit card for JVI and an American Express credit card for Project Revolution—both of which Chen promised would be used exclusively in connection with Findora. Upon information and belief, Chen and Ding then used Abittan's personal information to obtain individual credit cards in the names of Chen, Lu, Fisch, John Powers, Xu Fen Xe, Selina Chen, Ravi Chiruvolu, Eliana Abittan, and Fiona Zhang. Chen and Ding ultimately linked these cards to Abittan's personal credit.

88.    Chen represented to Abittan that the cards in Lu, Fisch, and others' names would be distributed to those individuals for business use. However, on information and belief, Chen kept and used each of the cards many times without informing these employees of the charges incurred in their names.

89.    Eventually, Chen (and her agents) began using the cards for her and Ding's personal benefit. Chen explained this—as she did in connection with corporate paperwork—by telling Abittan that, for privacy reasons, she did not want to give out her own personal identifying information to credit card companies. She also stated that needed the card because she and Ding used to have an American Express Black Card but were cutoff when they refused to disclose certain

- 18 -

financials in response to a financial review request from American Express. Chen promised that she would pay the personal expenses off each month.

90.    Chen, Ding, and their agents, racked up hundreds of thousands of dollars in credit card charges, the vast majority of which were not for Findora business. The charges included, but were not limited to:

• A piano for her children;

• School tuition;

• Gifts from Saks Fifth Avenue and other designer shops;

• A trip to Las Vegas;

• Fine wines;

• Doctors' offices;

• High-end restaurants;

• Taobao.com (a Chinese online shopping website);

• Costco;

• Airline tickets;

• Luxury hotels; and

• Ding and Chen's half of the investments for certain watches.

91.    On one occasion, Ding called American Express, fraudulently claiming to be Abittan, and requested that American Express increase the account's credit limit. Ding provided financial documents to support his request, which Abittan has demanded but has never seen.

92.    Ding and Chen also attempted to have Abittan open an American Express Black Card with a limitless credit line for their use. This effort entailed attempting to engage in transactions at a high enough volume on Abittan's credit cards, and making enough payments to that account, to receive an invitation from American Express Black. Chen even suggested such extreme measures as buying a house with a credit card (which turned out to be impossible). Fortunately, Ding and Chen's attempt failed; otherwise, they likely would have incurred additional millions in debt under Abittan's name before being caught.

- 19 -

CASE NO. 20CV09340-NC

**H. Abittan Demands the Return of Investor Funds and Chen Stops Paying the Credit Cards**

93.      In April 2019, Abittan demanded that Ding and Chen return money to the investors. At first, Chen agreed and requested that Abittan send her wiring information. But Chen never sent the money. Instead, Ding questioned Abittan's loyalty, asking Abittan whether he represented Findora or the investors.

94.      Ding and Chen later told Abittan that he didn't have "the stomach" to be the cofounder of a successful company if he could not handle investor complaints. Ding and Chen also stated that, if the investors wanted to sue, let them sue. According to Ding, "by the time they get through in court, we'll be so big it won't matter." Abittan understood through conversations with Ding and Chen that their glib approach to litigation was driven in part by the security and insulation they felt as a result of omitting their true names on corporate documents and in conjunction with owning assets.

95.      At the same time that Abittan demanded investor repayment, Chen stopped paying the bills for the credit cards that she had obtained in Abittan's name. The outstanding balance on the cards was approximately $637,000. Chen had not previously been late on those credit card payments, and she assured Abittan that she would make the payments soon.

96.      On May 13, 2019, Abittan and his father (on behalf of investors), flew to California to meet with Ding and Chen and resolve the investor and credit card issues. Ding and Chen blew them off. Knowing that Abittan and his father were flying back to New York the same day, Chen did not show up to meet with them as scheduled. Instead—and in what would become a pattern—Chen met them for ten minutes on the sidewalk outside of a restaurant, before they had to leave for their flight home. Chen assured Abittan and his father that she would take care of everything and purported to make a payment toward the credit card balance. However, the payment was rejected.

- 20 -

**I.   As a Ruse to Coopt Findora, Ding and Chen Tell Abittan They Must Transfer Eian's Assets to a Cayman Entity to Protect Investors**

97.     On July 2, 2019, Abittan again flew from New York to California. The following day, July 3, 2019, Abittan met with Chen and/or Ding twice.

98.     The first meeting was in the early afternoon. Abittan asked to meet with Chen at 11:00 a.m. Chen agreed. Although the meeting concerned Findora business and happened on a workday, Chen asked Abittan to meet her in the parking lot of a Menlo Park Safeway grocery store, explaining that she did not want to talk in the Findora office because "Charles [Lu, Findora's then-CEO] is a gossipe [sic]." Chen did not arrive at the parking lot until approximately 12:15 p.m.

99.     Chen told Abittan that Eian needed to be converted to a Cayman entity, explaining that the conversion would minimize any potential liability to investors in connection with Eian's anticipated coin sale. However, Chen did not provide Abittan with any paperwork at that time.

100.     Instead, Chen asked what time Abittan needed to go to the airport. Since Abittan had a flight back to New York scheduled for 9:45 p.m. out of San Francisco International Airport, he informed Chen that he would need to leave between 7:30 p.m. and 8:00 p.m. Accordingly, Chen said she would meet him again at about 7:00 p.m.

101.     Ding and Chen did not meet with Abittan until approximately 7:45 p.m. In a detached garage that was used as an office conference room, Chen gave Abittan a document and insisted that he sign it. Chen represented that the paperwork would not change Abittan's equity interest as a founder and owner of Findora. She also represented that the interests of the other Findora investors would not change.

102.     Abittan asked questions about the documents, but Chen created a hostile environment and got upset at the questions. Chen insisted that Abittan take her at her word that this document was to consummate a transaction that would maintain his equity interest as a founder and owner. She insisted that he sign the documents and contended that anything less would be a "betrayal of trust." Believing Chen's representations, Abittan signed the paperwork.

103.    The paperwork had signature lines for Lu, Fisch, and others. However, Chen instructed Abittan not to discuss the agreement with Lu or Fisch under any circumstances.

104.    Chen assured Abittan that Chen would send Abittan electronic copies of the documents. She did not do so.

105.    Following this fraudulent transaction, Chen repeatedly represented to Abittan in phone calls, emails, and texts, that he continued to have a significant equity interest in Findora. For example, she continued to agree in writing that he was a major owner and co-founder of Findora.

**J.    Ding and Chen Quietly Shut Abittan Out of His Own Company, While Defrauding Abittan as to the Credit Card Debt**

106.    After fraudulently inducing Abittan into signing the July 3, 2019 paperwork, Ding and Chen set to work shutting Abittan out of his own company.

107.    In or about the first week of July 2019, Ding and Chen caused Temujin Cayman to enter into a written employment contract with Lu to serve as Temujin Cayman's (rather than Eian's) Chief Executive Officer. At around the same time, they caused Fisch to enter into a written consulting agreement with Temujin Cayman.

108.    In mid-July 2019, Ding and Chen caused a new Findora website to be put up. Abittan noticed that he was not on the new website, and asked Chen more than once to fix the issue. Chen brushed him off by insisting it was just a draft website that would be updated in due time.

109.    At about the same time, Ding and Chen cut off Abittan's access to his Eian email account. Again, Abittan informed Chen, and Chen brushed him off.

110.    As the Temujin Cayman transactions were happening, Abittan continued to demand payment of his credit debt, but Chen continued to string him along.

111.    On July 10, 2019, Chen promised in a text message that her sister Selena would make an $85,000 payment that same day. No payment ever came.

112.    On July 28, 2019, Chen promised again that she would transmit money that same day. Again, no payment ever came.

- 22 -

113.    In August 2019, Abittan learned of a lawsuit in New York relating to the $365,622.60 outstanding credit card debt on the Project Revolution Fund American Express account. Abittan texted Chen immediately. Chen responded that it was her priority and that she would make things right. Abittan sent Chen his bank account wiring information and a screenshot showing his credit rating dropping by more than 150 points. Chen brushed Abittan off and told him not to bother her.

114.    Abittan continued to demand payment on the credit card debt through December 2019. Chen promised Abittan that she would arrange to have the debt paid by December 31, 2019. Relying on those representations, Abittan agreed to make full payment to American Express by that date. Specifically, Abittan hired Chesky Monk to negotiate a payment agreement with American Express to dispose of the debt and resolve the lawsuit against Abittan pertaining to that debt.

115.    Chen, however, had no intention of honoring her promise. Instead, she asked Abittan to fly to California to meet with her and a "rich" and "powerful" friend who was supposedly an experienced investor worth hundreds of millions of dollars. According to Chen, that friend was going to somehow take care of the credit card debt in conjunction with an investment into Findora.

116.    On December 29, 2019, Abittan flew to the Bay Area and was instructed to meet Chen at a restaurant called Dim Sum King in Daly City. Ding and Chen's whole family were there, including Selena Chen, and the supposedly powerful businessman, named Yang Yang. Chen presented Abittan with a separation agreement whereby Abittan would be paid $190,000 in exchange for separating from Eian. The counter-signatory on the separation agreement was to be Xilei Wang—a strawperson whom Chen and Ding had previously entrusted to act as their agent. Abittan refused to sign the agreement and told Chen to pay him back the credit card debt either using some of the money from the $50,000,000 investment she claimed she had secured or by taking out a loan.

117.    Ultimately, Chen did not pay the American Express debt by December 31, 2019 as promised. Abittan was forced to make a payment of $183,982.21 so that his ongoing business RealTime would remain in good standing. Abittan was later served with a New York complaint by

- 23 -

American Express regarding a $365,622.60 outstanding balance on the Project Revolution account. That action remains pending. Likewise, the $85,552.31 debt on the Chase credit card for JVI remains unresolved. In addition, Abittan incurred approximately $23,000 in business expenditures (like Abittan's flights and hotel stays for Findora work) that have not been reimbursed as promised.

118.    Chen and Ding also eliminated Abittan's rightful access to the business, while lying to Findora's executives and employees about Abittan's absence. Defaming Abittan, Chen told Lu and Fisch that Abittan had made false promises to investors and that his departure from Findora and sporadic subsequent appearances were no cause for alarm. Chen falsely told investors and employees that Abittan was not a major owner of Findora and that Abittan was lying when he claimed to be a founder.

119.    Meanwhile—in text messages with Abittan and his father from January through June 2020—Ding and Chen made additional misrepresentations. They repeatedly admonished Abittan not to share information with anyone at Findora, particularly with Lu and Fisch. On information and belief, Ding and Chen knew that they had made materially misleading and inconsistent statements to Abittan, on the one hand, and to Lu and Fisch on the other hand. Therefore, communications between Abittan, Lu, and Fisch were likely to reveal Ding and Chen's misconduct and fraud. Chen ultimately blocked messages from Abittan but continued to take messages and have phone calls with Abittan's father.

120.    By September 2020, employee dissatisfaction at Findora had escalated due to concerns over a lack of transparency and (accurate) beliefs that Ding and Chen were engaging in misconduct.

121.    Ultimately, as a result of concerns about how Findora was being run, the majority of the Findora engineering team, including its Chief Executive Officer and Chief Technology Officer, resigned.

122.    At the same time, Abittan's father called Chen and demanded that she call Abittan to work things out. Abittan's father suggested that, if she did not, Abittan would have no recourse aside from litigation.

- 24 -

——

**K. Abittan Begins to Discover the Extent of the Fraudulent and Illicit Conduct by Chen, Ding, and Their Co-Conspirators**

123.    Abittan subsequently discovered that Chen, Ding, and their Co-Conspirators had engaged in ongoing illicit, fraudulent, and racketeering conduct, ultimately harming Abittan. Abittan discovered these facts through an ongoing investigation into Chen and Ding, speaking with former Findora executives and employees, and reviewing documents filed in this litigation and the related federal litigation.[3]

i.    Fraudulent Documents

124.    Chen had fraudulently induced Abittan to sign documents that Chen and Ding (and their co-conspirators) then used to purportedly transfer Eian's assets—which are not identified with specificity, but which Chen and Ding led everyone to believe meant Findora's name and blockchain technology—to a new company called Temujin Labs Inc. But—in addition to the fraudulent inducement—the documents were sloppy and inconsistent. On July 2, 2019, Chen and Ding created two entities with identical names: (1) Temujin Labs Inc. in Delaware ("Temujin DE"); and (2) Temujin Labs Inc. in the Cayman Islands ("Temujin Cayman").

125.    Chen and Ding have now produced a "Unanimous Action of Members" ("UAM"), dated July 3, 2019, stating that Eian owed $300,000 to Temujin Labs Inc. but lacked "sufficient assets" to repay that debt. The document then purports to authorize Eian to sell its assets to Temujin Labs Inc. for $1 and a discharge of the $300,000 debt. Cross-Defendants have not explained the following inconsistencies:

- In federal filings, the defendants have repeatedly stated that Temujin Delaware and Temujin Cayman are distinct entities (*see* Temujin DE's Motion to Dismiss at 12) yet the UAM does not specify which Temujin Labs Inc. was owed the $300,000 debt from Eian.

---

[3] The related federal litigation was filed by Abittan against Chen, Ding, Temujin DE and Temujin Cayman in the Northern District of California, 5:20-CV-09340-NC (the "Federal Action").

- 25 -

- It is unclear how or why, on July 3, 2019, Eian owed $300,000 to an entity formed one day prior on July 2, 2019.

- It is unclear why Temujin Labs Inc. would pay consideration of $300,001 to purchase Eian's assets, where the UAM states that Eian "has no sufficient assets to repay the [$300,000] Debt" to Temujin Labs Inc. Nor does the UAM identify the assets being sold with any specificity. In other words, the UAM states that Temujin Labs Inc. is providing $300,001 in exchange for nothing.

- On its face, the UAM purports to be signed by 2 members of Juniper Venture Partners LLC (Eian Labs' majority owner): (1) Fourhair LLC; and (2) Ariel M. Abittan. The signatory for Fourhair LLC was Guanghua Liang as CEO. But Ding and Chen have never introduced Abittan to Guanghua Liang or otherwise confirmed that person's identity;

- There is no text showing that the first page with substantive provisions was actually affixed to the signature page. Both pages lack page numbers, and the signature page lacks any text other than the date and signature blocks.

- Cross-Defendants have not produced an original copy of the UAM.

- The UAM states that "Eian Labs is authorized to enter into a settlement and mutual release agreement as well as asset purchase agreement with the Creditor, the forms of which are set forth on Exhibit A attached here to." However, counsel for Temujin Cayman, Temujin DE, Chen, and Ding filed with the federal court a copy excluding the referenced "Exhibit A" and have never produced another copy with the Exhibit A.

- On its face—and without the missing "Exhibit A"—the UAM is not a sales agreement and does not effect a transaction between Temujin Labs Inc. and Eian. Rather, it authorizes a transaction pursuant to other papers.

126.    Furthermore, in lieu of the missing "Exhibit A"—which should be a settlement and mutual release agreement and asset purchase agreement—Temujin DE filed in the Federal Action

- 26 -

an "Intellectual Property Sale Agreement" ("IPSA") between Eian as seller and Temujin Cayman as purchaser. That document contradicts the "UAM" in multiple ways:

- The IPSA is dated August 12, 2019, without any explanation as to why it was not attached to the UAM or as to the inconsistent dates.

- The metadata of the IPSA indicates that it was actually drafted on December 17, 2020, more than one year **after** it was purportedly executed.

- The IPSA lists assets that Eian is selling, whereas the UAM stated that Eian lacked sufficient assets to pay a $300,000 debt to Temujin Cayman.

- Contrary to the UAM, the IPSA does not refer to any debt owed by Eian to Temujin Cayman (or Temujin DE); instead it states that Temujin Cayman would pay $300,000 to Eian in exchange for Eian's assets, contrary to the UAM's statement that Eian lacked assets.

    ii.  <u>Obfuscating True Identities, Concealing Assets, and Evading Service of Process</u>

127.    Throughout this multi-year scheme, Plaintiff was lulled into trusting Chen and Ding by their grandiose displays of wealth and plausible (but likely false) relationships with China's most elite businesspeople.

128.    Since litigation began, however, Plaintiff continues to uncover the extent of Chen and Ding's malfeasance, including their intentional use of false names to purportedly avoid detection by the Chinese government and service of process. In the related federal litigation, for example, Chen and Ding have attempted to restrict their counsel from using their names in any filings (even in routine stipulations), and they have suggested that Plaintiff has confusion as to their identities.

129.    But this case is **not** one of mistaken identity. Plaintiff spent thousands of hours working alongside Defendants to buy and sell high-value watches, seek and obtain millions of dollars from investors, recruit prestigious cryptographers, and build a successful fintech company. Hundreds of these hours were spent face-to-face—most frequently at Defendants' house located at

- 27 -

1    69 Isabella Ave.—with numerous witnesses present, including employees and Defendants' own

2    children.

3        130.    Until their relationship soured in 2020, Ding and Chao frequently invited Abittan to

4    their home, 69 Isabella Ave—a house worth nearly $25,000,000. On approximately twenty (20)

5    separate occasions, Abittan spent the night at 69 Isabella Ave., and sometimes brought his wife and

6    children. Each time Abittan visited, Ding and Chen were present at their home, which they shared

7    with their two young children; Chen's sister, Selena Chen; and their long-time driver, Jianrong

8    Wang. Ding and Chen's children attended Sacred Hearts Schools, Atherton, located just one mile

9    from 69 Isabella Ave. At all times, Ding and Chen held 69 Isabella Ave. out as their primary

10    residence, always referring to it as their house when speaking with Abittan.

11        131.    Ding and Chen frequently hosted work sessions at their house, during which time

12    Chen referred to 69 Isabella Ave. as "the Clubhouse." In reality, the Clubhouse was just another

13    display of wealth that lured Abittan and others into trusting in Chen and Ding's representations of

14    business acumen and connections. The Clubhouse was a central tool in their fraudulent scheme to

15    convince numerous sophisticated people into working for substantially less than they bargained for

16    and signing away rights to Findora in exchange for equity in an empty company, Eian.

17        132.    Despite Abittan's close relationship with Chen and Ding, they have since contended

18    in the Federal Action that he suffers from a confusion of identities—a confusion that exists, if at

19    all, as a direct result of Ding and Chen's misidentification tactics. And yet, while hiding from

20    litigation by Abittan, Chen and Ding acted as the "principal client representatives" of Temujin DE

21    to file specious litigation against Abittan and others in this court. Upon information and belief,

22    Temujin DE serves no other purpose, other than acting as the plaintiff in this meritless litigation.

23    Specifically, Abittan has never entered into any contracts with Temujin DE and, by their own

24    admission, Temujin DE has never had any interest in Findora.

25        133.    Abittan has subsequently discovered that 69 Isabella Ave. is owned by Nessco,

26    which is managed by Yi Chung Yang. Chen and Ding have attempted to evade service of process

27    in the Federal Action by arguing that 69 Isabella Ave. is owned by Nessco, and therefore, cannot

28    - 28 -

be their primary residence. But this argument only highlights the central role that 69 Isabella Ave. and Nessco play in Chen and Ding's fraudulent scheme. In short, Nessco provides Chen and Ding cover to run their criminal enterprise out of a mansion that is a manifestation of their purported business success. By bringing employees and investors to 69 Isabella Ave., Chen and Ding were able to immediately elicit trust from good faith investors and employees who reasonably believed that anyone with a $25,000,000 home has the wherewithal and connections to make Findora a success. Now that Chen and Ding face liability for their fraud, they have refused to acknowledge that they have ever lived at or had a connection to that property.

134.    For the avoidance of doubt, the following is a picture of Chen, with whom Abittan interacted in person for hundreds of hours:



135.    For the avoidance of doubt, the following is a picture of Ding, with whom Abittan interacted in person for hundreds of hours:



iii.    Creating Sham Entities to Fake Investors and Aid in the Fraudulent Scheme

136.    On September 18, 2018, Ding created at least four new entities to aid in his and Chen's theft of Findora: JV Partners, JV Holdings, Fourhair and Lakeside.

137.    Specifically, upon information and belief, Ding simultaneously created Fourhair to co-own JV Partners with Abittan, and then used JV Partners and Lakeside to further remove Abittan from Eian by backdating share purchase agreements so that Abittan was not a direct shareholder in Eian, despite the Partnership terms of co-ownership. Ding told Abittan that Lakeside was Jack Ma's

- 30 -

1    wife's entity and that Fourhair was owned by a Chinese investor. In reality, Fourhair, Lakeside, JV

2    Partners, and JV Holdings were created by Ding and Chen to serve as shell companies in their

3    criminal enterprise.

4        138.    Upon information and belief, JV Holdings was also used to retroactively legitimize

5    Powerscale Capital. The mission of Powerscale Capital—which was formed on August 2, 2018 and

6    thereafter registered with the Securities Exchange Commission ("SEC") —was to serve Findora as

7    an investment adviser, focusing on an endowment style investment program. The "owners" of

8    Powerscale Capital, according to the fund formation documents filed with the SEC, are John

9    Powers and JV Holdings. And yet, the term sheet with John Powers says that his co-owner is

10   JuniperVC—a reference to the Partnership between Abittan and Ding/Chen. The term sheet also

11   references the cancellation of an employee contract with JuniperVC, but, upon information and

12   belief, John Powers only had an employee contract with Project Revolution. The interchanging use

13   of entity names further highlights the fraudulent tactics of Ding and Chen.

14       139.    Abittan also discovered that Ding and Chen tried to alter the ownership interests in

15   JV Partners in order to finalize pushing Abittan out of Findora. Upon information and belief, Ding

16   and Chen forged Abittan's signature on a document titled "Amendment No. 1 to Operating

17   Agreement" ("Amendment"). The Amendment purported to admit a new majority member to JV

18   Partners—Yang Yang—for a $4,000 capital contribution. In essence, Abittan was purportedly

19   diluting his interest in JV Partners from 50% to 33.3%, in exchange for nothing.

20       140.    Upon information and belief, there are at least three other entities that Ding and

21   Chen formed, which have been used as part of Ding and Chen's scheme, specifically: (1) Black

22   Cobble Rideshare Funding LLC, which Ding had Abittan form as the sole member; (2) Powerscale

23   Capital Fund LP, which was formed in the Cayman Islands in connection with Powerscale Capital

24   Management LLC; and (3) Smart Investment Fund LLC, which was purportedly formed in

25   connection with a trademark application by Ding and Chen's driver, Jianrong Wang using an Eian

26   email address. Upon information and belief, these entities were formed and utilized by Ding and

27

28                                              - 31 -

Chen as shells created for the purpose of hiding Ding and Chen's identities and assets to avoid the consequences of their fraud.

iv.   Lying to Investors and Current and Former Findora Employees While Denying Abittan's Role in Findora

141.    Ding and Chen lied to anyone and everyone in order to continue and hide their fraud. After they shut Abittan out of Findora, took away his access to his emails, and removed him from the Findora website, Ding and Chen (or one of their agents) reported Abittan's LinkedIn profile—which identified Abittan as the Founder and President of Findora—for containing "inaccurate information." As a result of Ding and Chen's false report, LinkedIn removed the Findora information and titles from Abittan's profile.

142.    As Abittan's hires began leaving in droves, investors started asking questions.

143.    One potential investor asked: "What about the resignation of Findora's three Stanford founders." The operator of the @findoraen account replied: "We don't have 3 Stanford founders on resignation." In reality, more than a dozen members of the engineering team (including the Stanford co-founders) had departed Findora.

144.    Another potential investor responded: "someone claims that they have left the team." The owner of @findoraen replied: "Two cofounders Stanford phd students." Of course, as Cross-Defendants' own judicial admissions reveal, these individuals were not just students, but were in fact the CEO and CTO/Chief Scientist of the company. The response does not mention the fact that the vast majority of Findora employees, including these co-founders and the majority of the engineering team had quit because of Chen and Ding's obvious fraudulent conduct.

145.    A potential investor replied: "student? lol." The owner of @findoraen replied: "John Powers, Stanford MBA and former CEO SMS, passed away this year unfortunately. He is a class act and we remember him for ever! [sic] We have Paul Scherer, Stanford MBA and executive on iNDORA [sic] FOUNDATION. He is active and healthy." This was a non-sequitur meant to deceive investors into thinking that despite the departures of the most essential Findora employees, the truly important individuals from Stanford remained.

- 32 -

146.    A potential investor responded: "I suggest official announcement from the team to calm investors down as many are claiming now core members of FINDORA quite [sic] the project." A Findora representative responded: "Not true. And we will. We don't really want to make an announcement too soon. Let's have this rumor fly for a while [sic]: it's a strong PR to draw attention." This was blatantly false given that the CEO, CTO and Chief Scientist, and engineering team had departed, yet Findora representatives have repeatedly told investors that these individuals were not part of the "core" team.

147.    The owner of @findoraen then reminded investors that the two Stanford Ph.D.'s previously mentioned were just students, before stating: "We have real engineering teams of engineers and cryptographers and application developers"—as if to cast the departure of the most important Findora employees as two summer interns leaving while the remainder of the team remained intact.

148.    In another mid-December 2020 Telegram thread, one potential investor stated: "I am ready to purchase option D but you have no [sic] clarified who the co founders [sic] are?" A Findora representative responded by pointing the investor to info.findora.org. The potential investor responded: "But when looking at other findora sources [d]ifferent co founders [sic] come up which is very confusing[.] I am interest [sic] in the project just wanted to clarify this before buying. Findora co-founders (and Stanford cryptographers), Ben Fisch and Benedikt Bunz, together with Alan." A Findora representative responded: "thanks for your concerning [sic] our team and our team have [sic] been updating and re-construction [sic]." As described above, this response was false and misleading.

149.    The potential investor responded: "So the other guys are they still there in the team or not[,] Ben F and Benedikt[?]" Chen responded directly: "I think if you want to build the best projects,you [sic] need to find the best person and the best team members.so [sic] team members upgrade [sic] to the best one. They [referring to Ben and Benedikt] are PHD students.their [sic] priority should be their research.J they are not with Findora." This was false and misleading for the same reason that the Findora representative's statements above were false and misleading.

150.    At no point have the operators of the Findora Telegram account made any mention of the reason why Lu, Fisch, Bunz, and others left. Instead, they sought to create a false narrative that the reason these employees left was to focus on their studies at Stanford. They have also allowed another false (and inconsistent) narrative to propagate the feed, which is that the real reason Lu, Fisch, and others left Findora was to found a competing company, as detailed in the specious complaint Defendant Temujin filed against Abittan, Lu, and Fisch in Santa Clara County.

151.    Many other potential investors have also been concerned. One asked: "What happened to the stanford crypto guys like Ben en [sic] benedict?" Another asked: "What has changed since the Stanford people left[?]" And these are just a small sampling of a continuing dialogue on the @findoraen telegram account.[4] Findora never revealed the truth to these potential investors either and simply sought to perpetuate the falsehood that Findora was a legitimate company with an all-star team of highly respected and honest cryptographers.

152.    Anytime any person questioned why Abittan or other employees left Findora, Ding and Chen (or one of their agents) deleted the question and blocked the user from the Telegram channel.

153.    In addition to lying to investors, Chen and Ding embezzled investor money.

154.    On information and belief, Chen directed members of Findora's team in China to wire significant sums of money to an e-commerce company called Xipin Group ("Xipin"). U.S. management that they were not aware of any legitimate purpose for these transactions. Neither Abittan nor anyone else to Abittan's knowledge was aware of any legitimate purpose for these transfers.

155.    On information and belief Chen controls Xipin either directly or indirectly. The Xipin website contains some overlap with prior Findora employees, including Paul Scherer – who is listed as Chief Strategy Officer under the alias Paul Xie.[5]

---

[4] Defendants' fraud has become apparent to the outside world, as a recent Chinese-language exposé revealed. See https://fdhdtcuzqg5elz7fa3omssakmq-adwhj77lcyoafdy-zhuanlan-zhihucom.translate.goog/p/337834014.
[5] https://mp.weixin.qq.com/s/k6XLrUAY4G_GWi0xCz6eBQ

- 34 -

156.   Abittan is informed and believes and thereon alleges that Chen raised millions of dollars on behalf of Findora in private financings, which she then transferred to a personal Binance account. Chen did not seek authorization from Temujin's CEO or from Abittan for the unauthorized transfer.

157.   Abittan is informed and believes and thereon alleges that Chen also directed Powerscale to invest $5,000,000 in Xipin. Although JV Holdings (or JuniperVC) is the majority owner of Powerscale, Chen and Powerscale never informed Abittan of this transaction, which he learned about from third parties. Abittan never authorized this transaction and is not aware of JVI, JV Holdings, or Juniper VC having authorized it.

v.   Obtaining a Covid PPP Loan for Temujin DE

158.   Chen and Ding also used their sham entities to steal money from the government during the Covid 19 crisis by improperly and fraudulently applying for a Paycheck Protection Program ("PPP") loan.

159.   On April 11, 2020, Temujin DE applied for and received a PPP loan in the amount of $383,637.

160.   On March 31, 2021, Temujin DE applied for and received a PPP loan in the amount of $208,370.

161.   Upon information and belief, Temujin DE did not and could not have legitimately qualified for either PPP loan. Upon information and belief, Temujin DE did not have any employees and did not have a 25% reduction in gross receipts. Therefore, the money was not necessary for Temujin DE's continued operation.

**ALTER EGO / COMMON ENTERPRISE LIABILITY**

162.   As detailed above, Chen and Ding created at least the following entities as part of their fraudulent scheme to steal Findora and embezzle millions from Abittan and other investors (referred to hereafter as the "Common Enterprise Entities"):

a.   JVI

b.   Project Revolution

- 35 -

CASE NO. 20CV09340-NC

c.  Eian

d.  Powerscale

e.  JV Holdings

f.  JV Partners

g.  Lakeside Garden

h.  Fourhair

i.  Temujin DE

j.  Temujin Cayman

k.  Smart Investment Fund

l.  Powerscale Capital Fund

m.  Black Cobble Rideshare Funding

n.  Nessco

163.    Despite using strawpersons, including, but not limited to, Guanghua Liang, Yang Yang, Jianrong Wang, Xilei Wang,  Selena Chen, Yi Chung Yang, and Alex Wang (who Ding even admitted to Abittan was not a real person) (the "Common Enterprise Agents") to effectuate their fraud, Ding and Chen controlled the Common Enterprise Entities.

164.    Upon information and belief, Chen and Ding's common enterprise used only one bank account in the name of JVI and two credit cards in JVI's and Project Revolution's names. The entities all commingled employees, officers, directors, and office space, including use of 69 Isabelle Ave. Investors sent money only to JVI, which was used to pay salaries of Project Revolution employees, in exchange for equity in Eian. None of the Common Enterprise Entities maintained corporate formalities, and upon information and belief, nearly all failed to take any steps to finalize corporate formation, such as issuing shares or executing an operating agreement. Ding and Chen repeatedly asked employees to sign contracts with multiple organizations and would often identify one entity in a contract that gave rights to a second, seemingly unrelated, entity. Ding once told Abittan that the various entities were for "internal" use only, and that no one would ever know

- 36 -

1  about the formation of the shells. The Common Enterprise Entities that were known, however, were

2  all referred to colloquially as Findora. And above all, Chen and Ding controlled everything.

3      165.    The Common Enterprise Entities identified herein have such a unity of interest with

4  the Partnership that their separateness has ceased and holding only the Common Enterprise Entities

5  liable will result in injustice. The Common Enterprise Entities were a mere tool or business conduit

6  of Chen and Ding while acting as Abittan's partners. Specifically, co-mingling of funds occurred;

7  diversion of partnership profits to individuals or other entities occurred. The Common Enterprise

8  Entities were inadequately capitalized. There was a failure to keep appropriate corporate records.

9  And there was a failure to keep personal or other entity assets separate. There were representations

10 made that the Common Enterprise Entities and the Partnership were one and the same and that they

11 were all backed by Ding and Chen as partners with Abittan.

12     166.    In sum, the Common Enterprise Entities and the Partnership are a single business

13 enterprise because they are not operated as separate entities but instead they pool their resources to

14 achieve common goals—Findora. The Common Enterprise Entities and the Partnership had

15 common employees, offices, centralized accounting, payment for the wages of the other entity's

16 employees and the use of the same business name. In addition, employees of one entity provided

17 services to the other entities, funds were transferred between the companies without sufficient

18 documentation and profits and losses were shifted between the companies in a manner that is not

19 properly documented.

20     167.    Moreover, Ding and Chen used the Common Enterprise Entities as a sham to

21 perpetrate fraud. The Common Enterprise Entities existed simply to defraud Abittan, employees,

22 investors, and other people by inducing them into contracts where misrepresentations were made

23 which were material, which caused that person to enter into the contract on the basis of the

24 misrepresentation, and which caused damage to that person.

25     168.    Chen and Ding caused the Common Enterprise Agents to form the Common

26 Enterprise Entities for the express purpose of defrauding Abittan and others. At all times material

27 to this cause of action, the Common Enterprise Agents were a principal, agent, and/or employee of

28

1    Chen and Ding, and were at such times, acting within the full course, scope, and authority of their

2    positions with Chen and Ding, therefore imputing liability for their negligent and wrongful acts and

3    resulting damages as outlined herein under, *inter alia*, the principles of respondeat superior, the law

4    of agency, and/or the law of California.

5         169.    To treat each of these entities as separate—and to treat the Common Enterprise

6    Agents separate from Chen and Ding—would result in injustice. Moreover, to allow Chen and Ding

7    to use the corporate structure that they put into place for the precise reason of obfuscating their

8    identities and avoiding the consequences of their fraud would be rewarding Chen and Ding's

9    wrongdoing and bad faith conduct.

10        170.    Accordingly, the Common Enterprise Agents and the Common Enterprise Entities

11   acting in concert with Ding and Chen should be held jointly and severally liable with Ding and

12   Chen for the damages occasioned by Ding and Chen's fraudulent activities as general partners of

13   the Abittan/Ding-Chen Partnership.

14                        **FIRST CAUSE OF ACTION – Declaratory Judgment**

15                              **(Against All Cross-Defendants)**

16        171.    Abittan hereby incorporates the allegations of paragraphs 1 through 170 of this

17   Cross-Complaint as though fully set forth herein and alleges the following cause of action.

18        172.    An actual controversy has arisen and now exists between Abittan and Cross-

19   Defendants concerning their respective rights to Findora.

20        173.    Abittan contends that each and every contract relating to Findora from January 2018

21   through present is the result of fraud, that all such contracts are void, and that Findora—both the

22   business and the technology—is the property of a general partnership between Abittan, Ding and

23   Chen, in which Abittan has a fifty-percent (50%) interest.

24        174.    Alternatively, and to the extent any other valid and binding corporate structures and

25   entities were created, exist, and own rights to Findora, Abittan has a 50% interest.

26        175.    Cross-Defendants dispute these contentions and contend that Abittan has no interest

27   in Findora.

28                                         - 38 -

CASE NO. 20CV09340-NC

1    176.    A judicial declaration is necessary and appropriate at this time under the

2    circumstances to establish all parties' respective rights to Findora.

3    **SECOND CAUSE OF ACTION – Breach of Partnership Agreement**

4    **(Against All Cross-Defendants)**

5    177.    Abittan hereby incorporates the allegations of paragraphs 1 through 170 of this

6    Cross-Complaint as though fully set forth herein and alleges the following cause of action.

7    178.    At all times mentioned in this complaint, Abittan, Ding, and Chen entered into an

8    oral partnership for the purpose of creating the fintech company and blockchain technology

9    currently known as Findora. *See* Corp. Code § 16202.

10   179.    Pursuant to the terms of that partnership agreement, Abittan, on the one hand, and

11   Ding/Chen, on the other hand, were respectively entitled to a 50% interest in the business and

12   technology known as Findora.

13   180.    Abittan performed all conditions, covenants, and promises required to be performed

14   by him in accordance with the partnership agreement except those excused by the actions of Cross-

15   Defendants.

16   181.    Ding and Chen materially breached the partnership agreement by repudiating the

17   existence of the partnership, denying Abittan's interest in the partnership, using the assets acquired

18   by the partnership for their own use, and funneling the technology and business of Findora away

19   from the partnership and into the Common Enterprise Entities using the Common Enterprise Agents.

20   182.    As a direct and proximate result of Cross-Defendants breaches and defaults, Abittan

21   has been damaged in a sum according to proof at trial.

22   **THIRD CAUSE OF ACTION – Conversion**

23   **(Against All Cross-Defendants)**

24   183.    Abittan hereby incorporates the allegations of paragraphs 1 through 170 of this

25   Cross-Complaint as though fully set forth herein and alleges the following cause of action.

26

27

28                                          - 39 -

184.    Findora is an asset of the Partnership formed by Abittan and Ding/Chen. Alternatively, and to the extent any other valid and binding corporate structures and entities were created, exist, and own rights to Findora, Abittan has a 50% interest.

185.    Abittan was a partner and/or otherwise maintained a 50% interest at the time Findora began, and he was instrumental in the retainment of the cryptologists who turned the idea into the blockchain technology it is today. As such, he was in possession or had the right to immediate possession of an interest in Findora.

186.    Plaintiff is informed and believes and, on that basis, alleges that Findora has a value greater than $50,000,000.

187.    On or about July 3, 2019, Cross-Defendants' fraudulent UAM and IPSA purported to transfer Findora away from the Partnership—and/or from any other entities that were validly created and owned rights to Findora—to Temujin Cayman, one of the Common Enterprise Entities outside the reach of Abittan, for the sole purpose of converting Abittan's ownership and possessory interests in Findora and converting the property to Cross-Defendants' own use.

188.    Moreover, Ding and Chen substantially interfered with Abittan's property interest in twenty-four luxury watches for their own use and benefit by selling certain watches without Abittan's consent and by depriving him of access to the remainder of the watch business inventory.

189.    Ding and Chen also substantially interfered with Abittan's property interest in the sum of $637,000 by using that money for their own use and benefit without repaying Abittan and without his consent.

190.    Ding and Chen also substantially interfered with Abittan's property interest in $50,000 that he invested in JVI by using that money for their own use and benefit without Abittan's consent.

191.    As a direct and proximate result of Ding and Chen's conversion of Abittan's assets and interests, Abittan has incurred damages in an amount to be proven at trial.

192.    In engaging in the foregoing conduct, Ding and Chen acted with malice, oppression and fraud, warranting an award of punitive damages in an amount to be proven at trial.

- 40 -

193.    By reason of the unlawful conversion of Abittan's property and interests, Abittan is entitled to recover the value of the property at the time of the conversion, with interest, and a fair compensation for the time and money properly expended to recover the property pursuant to California Civil Code § 3336, in an amount to be proven at trial.

### FOURTH CAUSE OF ACTION – Breach of Fiduciary Duty

### (Against Chen and Ding)

194.    Abittan hereby incorporates the allegations of paragraphs 1 through 170 of this Cross-Complaint as though fully set forth herein and alleges the following cause of action.

195.    At all relevant times, Chen and Ding, by virtue of their partnership and their conduct, had a fiduciary relationship with Abittan; owed Abittan the highest fiduciary obligations of fidelity, trust, loyalty, and due care; were required to control and operate their activities with Abittan in a fair, just, and equitable manner; and had duties to act in furtherance of Abittan's interests.

196.    To discharge these duties, Chen and Ding were required to act lawfully in conducting activities with Abittan, to act with the utmost integrity as to the dissemination of information to Abittan, and to refrain from committing acts of waste or conversion, mismanagement, self-dealing, and/or gross negligence and causing damages to Abittan or otherwise harming, impeding, or violating Abittan's interests or rights.

197.    Chen and Ding breached their fiduciary duties by, among other things, engaging in self-dealing and the conversion of corporate assets for their own personal benefit, and for the benefit of the Common Enterprise Entities that they controlled and by acting with disloyalty and faithlessness, as set forth in the allegations above, causing damages to Abittan.

198.    As a direct and proximate result of Chen's and Ding's breaches of fiduciary duty described herein, Abittan sustained serious injury and damages for which relief is sought herein, according to proof.

199.    In engaging in the foregoing conduct, Chen and Ding acted with malice, oppression, and fraud, warranting an award of punitive damages in an amount to be proven at trial.

- 41 -

**FIFT CAUSE OF ACTION - Aiding and Abetting Breach of Fiduciary Duty**

**(Against the Common Enterprise Agents and Common Enterprise Entities)**

200.    Abittan hereby incorporates the allegations of paragraphs 1 through 170 of this Cross-Complaint as though fully set forth herein and alleges the following cause of action.

201.    At all relevant times, the Common Enterprise Agents and Common Enterprise Entities knew that Ding and Chen were fiduciaries of Abittan and, therefore, that Ding and Chen owed Abittan fiduciary duties.

202.    Despite such knowledge, the Common Enterprise Agents and Common Enterprise Entities nevertheless aided and abetted, induced, encouraged, and assisted Ding and Chen in breaching their fiduciary duties to Abittan, by, among other things, conspiring and actively working with Ding and Chen to obtain Abittan's rights and interests in Findora in exchange for no or inadequate consideration.

203.    The Common Enterprise Agents and Common Enterprise Entities understood that these activities involved undisclosed (by Ding and Chen) self-interested transactions, in violation of Ding's and Chen's fiduciary duties owed to Abittan.

204.    As a direct and proximate result of the Common Enterprise Agents' and Common Enterprise Entities' aiding and abetting of the foregoing breaches of fiduciary duties, Abittan has been harmed in an amount to be determined at trial and will continue to be harmed until appropriate injunctive relief is granted.

**SIXTH CAUSE OF ACTION - Fraudulent Inducement**

**(Against All Cross-Defendants)**

205.    Abittan hereby incorporates the allegations of paragraphs 1 through 170 of this Complaint as though fully set forth herein and alleges the following cause of action.

206.    As detailed above, Cross-Defendants Ding and Chen, acting directly and through the Common Enterprise Agents and Common Enterprise Entities and/or other agents, made repeated false and fraudulent misrepresentations and omissions to Abittan regarding the contents and legal effect of the paperwork they insisted he sign on behalf of the Common Enterprise Entities

- 42 -

to form multiple corporate entities. They then used those entities to steal Findora and millions of dollars from Abittan. Specifically, Ding and Chen represented that all corporate entities formed after the partnership began would preserve the 50/50 interests of the Partnership, and that the Common Enterprise Entities were merely being used as conduits for the Partnership. Ding and Chen represented that they were not undertaking activities that would diminish Abittan's 50% interest in Findora and that they were not asking Abittan to sign documents or undertake activities that would diminish Abittan's 50% interest in Findora. Accordingly, in reliance on Chen and Ding's false representations, Abittan signed corporate documents.

207.   Ding and Chen's representations were false. In reality, the purpose of the sham companies and asset transfer documents and agreements was to divest Abittan of millions of dollars in valuable intellectual property, in exchange for zero consideration.

208.   When Ding and Chen made these material representations and omissions, they knew that the representations were false or misleading and that they had a duty to disclose the omissions and the truth to Abittan. These representations and omissions were made with the intent to defraud and deceive.

209.   Abittan reasonably relied on the material misrepresentations and omissions by his partners Chen and Ding, and such reliance was justifiable.

210.   As a result of Ding and Chen's fraudulent misrepresentations and omissions, Abittan has been damaged in an amount to be proven at trial.

211.   Further, as a result of Cross-Defendants' fraudulent misrepresentations and Ding's and Chen's fraudulent misrepresentations and omissions, Abittan—on his own behalf and/or as partner in the Partnership—is entitled to rescission of the purported corporate documents executed in furtherance of Chen and Ding's fraudulent scheme, including the purported sale of Eian's intellectual property and other assets to Temujin Cayman.

212.   In doing the acts alleged herein, Cross-Defendants acted with oppression, fraud, and malice, and Abittan is entitled to punitive damages.

- 43 -

1        **SEVENTH CAUSE OF ACTION - Unjust Enrichment**

2                    **(Against All Cross-Defendants)**

3        213.    Abittan hereby incorporates the allegations of paragraphs 1 through 170 of this

4    Complaint as though fully set forth herein and alleges the following cause of action.

5        214.    As a result of their wrongful conduct, Cross-Defendants have been unjustly enriched

6    at the expense of Abittan, in the form of unjustified benefits, payments, and transfers of Abittan's

7    assets and property including, but not limited to:

8        a. $50,000 in assets that Abittan invested in JVI;

9        b. $637,000 in assets as a result of unreimbursed credit card expenditures; and

10        c. Twenty-four luxury watches worth approximately $8,000,000 (Abittan's 50% interest).

11        d. the business and technology known as Findora

12        215.    As a result of these unjustified payments and transfers of Abittan's assets and

13    property, Cross-Defendants are thereby required to make restitution.

14        216.    Accordingly, Abittan is entitled to disgorgement by Cross-Defendants of all monies

15    assets and benefits obtained directly or indirectly through their wrongful conduct as alleged herein.

16                **EIGHTH CAUSE OF ACTION - Accounting**

17                    **(Against All Cross-Defendants)**

18        217.    Abittan hereby incorporates the allegations of paragraphs 1 through 170 of this

19    Complaint as though fully set forth herein and alleges the following cause of action.

20        218.    Abittan's partnership with Ding and Chen both through the watch business

21    (including the Watch Agreement) and through the Common Enterprise Entities entitle Abittan to

22    complete information regarding the status of his interests in those partnerships and entities.

23        219.    As described throughout this complaint, Cross-Defendants have committed various

24    fraudulent and tortious acts and breaches of fiduciary duties. These acts have damaged Abittan and

25    unlawfully enriched Cross-Defendants.

26        220.    Abittan cannot determine the amount he is owed without an accounting, however,

27    because Cross-Defendants have exclusive custody over the books, records, and accounts that show

28                                - 44 -

1    the status of all of the remaining and sold watch inventory and the assets and profits derived from

2    the intellectual property that Cross-Defendants misappropriated from Abittan and/or the

3    Partnership. Accordingly, Abittan is entitled to an accounting.

4              **NINTH CAUSE OF ACTION - Civil Violations of the**

5              **Racketeer Influenced and Corrupt Organization Act**

6                         **(18 U.S.C. § 1962(c))**

7                    **(Against All Cross-Defendants)**

8         221.    Abittan hereby incorporates the allegations of paragraphs 1 through 170 of this

9    Complaint as though fully set forth herein and alleges the following cause of action.

10        222.    Each Cross-Defendant is a "person" within the meaning of 18 U.S.C. §§ 1961(3)

11   and 1964(c).

12        223.    Cross-Defendants Ding, Chen, JVI, Project Revolution, JV Holdings, JV Partners,

13   Eian, Fourhair, Lakeside, Powerscale Capital, Powerscale Fund, Black Cobble, Temujin DE,

14   Temujin Cayman, Nessco, Findora Foundation, Discreet Labs, Guanghua Liang, Yang Yang, Alex

15   Wang,  Selena Chen, Jianrong Wang, Xilei Wang, and Yi Chung Yang, formed an association-in-

16   fact, whose joint and common purpose was to defraud investors, business partners, Findora's

17   executives and employees, and third parties. All Cross-Defendants received misappropriated

18   monies and intellectual property, including but in no way limited to those referenced in paragraphs

19   42-44, 55, 72,77, 80, 81, 86, 90, 113, 117, 124-26, 153-57, and 159-60.

20        224.    Cross-Defendants exercised control over the numerous related individuals and

21   entities that their enterprise consists of. Ding and Chen ultimately controlled and managed the

22   operations of the entire association-in-fact and personally directed the day-to-day operations of its

23   related entities as described above.

24        225.    This association-in-fact is an "enterprise" within the meaning of 18 U.S.C. §§

25   1961(4) and 1962(c). The enterprise was at all times engaged in interstate commerce and its

26   activities affected and continue to affect interstate commerce. The interstate nexus includes but is

27

28                                    - 45 -

1   not limited to the transfer of funds to multiple persons and entities in New York, California, and

2   elsewhere.

3          226.    Cross-Defendants Ding, Chen, JVI, Project Revolution, JV Holdings, JV Partners,

4   Eian, Fourhair, Lakeside,  Powerscale Capital, Powerscale Fund, Black Cobble, Temujin DE,

5   Temujin Cayman, Nessco, Findora Foundation, Discreet Labs, Guanghua Liang, Yang Yang, Alex

6   Wang,  Selena Chen, Jianrong Wang, Xilei Wang, and Yi Chung Yang were each associated with

7   the association-in-fact enterprise and conducted or participated, directly or indirectly, in the conduct

8   of the affairs of this enterprise through a pattern of racketeering activity within the meaning of 18

9   U.S.C. §§ 1961(l)(B), 1961(5) and 1962(c).

10         227.    Ding and Chen formed a scheme to defraud Abittan of his assets whereby they

11  induced Abittan to invest money in JVI, sign documents purporting to transfer intellectual property

12  from Eian to Temujin for inadequate consideration, invest in transactions for high-end luxury

13  watches, and solicit investments from Abittan's family and friends.

14         228.    In furtherance of this scheme, Ding and Chen used or caused to be used interstate

15  wire communications in violation of 18 U.S.C. § 1343. Cross-Defendants initiated and received

16  multiple transfers of Abittan and investor funds across state lines via the use of wires including but

17  in no way limited to the transfers referenced in paragraphs 42-44, 55, 72,77, 80, 81, 86, 90, 113,

18  117, 124-26, 153-57, and 159-60. Ding and Chen, and others, also communicated materially false

19  statements and deceitfully omitted material facts to Abittan and others via the use of wires including

20  but in no way limited to the communications and omissions referenced in paragraphs 42- 44, 49,

21  55, 67, 72, 77, 79, 83, 89, 92, 95, 108, 111, 113, 124, and 136-61.

22         229.    . Each of these wire communications, omissions, and transfers of Abittan and

23  investor assets satisfies the transmission "by means of wire, radio, or television communication"

24  element for wire fraud.

25         230.    In furtherance of this scheme to defraud, Ding and Chen used or caused to be used

26  the United States mails or an interstate commercial carrier in violation of 18 U.S.C. § 1341. Ding

27  and Chen initiated and received multiple transfers of funds across state lines via the use of the mails,

28                                          - 46 -

including but not limited to the transfers referenced in paragraphs 5, 7, 42. 43, 44, 55, 80, 81, 90, 126, 127, 154, and 157. Each of these transfers of Abittan and investor assets to out-of-state entities satisfies the "use of the mail" element for mail fraud.

231.    In furtherance of this scheme to defraud Abittan of his money or property having a value of $5,000 or more, Cross-Defendants initiated and received multiple transfers that caused Abittan's funds (as well as the funds of others) to travel or be transported in interstate commerce in violation of 18 U.S.C §§ 2314 and 2315, including but in no way limited to the transfers referenced in paragraphs 42-44, 55, 72,77, 80, 81, 86, 90, 113, 117, 124-26, 153-57, and 159-60.

232.    By reason of Ding and Chen's violation of 18 U.S.C. § 1962(c), Abittan suffered injury in an amount to be determined at trial.

233.    Pursuant to 18 U.S.C. § 1964(c), Abittan is entitled to treble damages.

234.    In bringing this action, Abittan has and will incur attorneys' fees and is entitled to an award of reasonable attorneys' fees under 18 U.S.C. § 1964(c).

235.    Abittan additionally seeks the return/restitution of any assets from Cross-Defendants' entities or subsidiary entities or other alter ego entities controlled by Cross-Defendants that received misappropriated funds, including entities that were dissolved and had their assets disbursed by Cross-Defendants and/or the entities they control.

### TENTH CAUSE OF ACTION

### Conspiracy to Commit Civil Violations of the

### Racketeer Influenced and Corrupt Organizations Act

### (18 U.S.C. § 1962(d))

### (Against All Cross-Defendants)

236.    Abittan hereby incorporates the allegations of paragraph 1 through 170 of this Complaint as though fully set forth herein and alleges the following cause of action.

237.    Cross-Defendants Ding, Chen, JVI, Project Revolution, JV Holdings, JV Partners, Eian, Fourhair, Lakeside,  Powerscale Capital, Powerscale Fund, Black Cobble, Temujin DE, Temujin Cayman, Nessco, Findora Foundation, Discreet Labs, Guanghua Liang, Yang Yang, Alex

- 47 -

Wang, Selena Chen, Jianrong Wang, Xilei Wang, and Yi Chung Yang each conspired with one another within the meaning of 18 U.S.C. § 1962(d) to violate § 1962(c); that is, to conduct or participate, directly or indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1)(B) and 1961(5) and 1962(c), as identified more fully in paragraphs 169 to 182 above.

238.    By reason of violation of 18 U.S.C. § 1962(d) committed by Cross-Defendants, Abittan suffered injury in an amount to be proven at trial, within the meaning of 18 U.S.C. § 1962(c).

239.    Pursuant to 18 U.S.C. § 1962(c), Abittan is entitled to treble damages.

240.    In bringing this action, Abittan has and will incur attorneys' fees and is entitled to an award of reasonable attorneys' fees under 18 U.S.C. § 1964(c).

### ELEVENTH CAUSE OF ACTION - Fraud

### (Against All Cross-Defendants)

241.    Abittan hereby incorporates the allegations of paragraphs 1 through 170 of this Complaint as though fully set forth herein and alleges the following cause of action.

242.    As detailed above, Ding and Chen, acting in their own capacities and on behalf of the Common Enterprise Entities in certain instances made repeated false and fraudulent misrepresentations and omissions to Abittan regarding:

     a.    credit card expenditures on Abittan's cards, including that the cards would be used for business purposes; that if they were used for personal purposes, that Chen would reimburse Abittan for all expenditures on these cards; and that cards issued for Lu, Fisch and others would be used by those individuals;

     b.    the watch business, including that Abittan would be paid 50% of all proceeds from watches; that Abittan would have a say in the sale or transfer of any watch; and that Abittan would have access to the watches at all times;

     c.    use of funds that Abittan invested in the partnership via the JVI Chase account, including that these funds would be used for proper business purposes;

- 48 -

d.  that Chen was on the brink of closing deals to raise hundreds of millions of dollars for Findora from a variety of well-known individuals and entities including Jack Ma's wife, Ma Huateng, Perfect World, and others "famous guys";

e.   that Abittan's investors would be repaid within ninety days of their investment and that their investments were secure;

f.  that the transfer of Eian's assets to Temujin would not affect Abittan's or other investors' ownership rights in Findora in any way;

g.  that all (known) entities were part of and consistent with the Partnership in which Abittan always had a 50% interest; and

h.  that any and all actual or apparent authority that Ding or Chen possessed (or represented as possessing) to act for or on behalf of Abittan was used by Ding or Chen in good faith and in a permissible scope with full knowledge of and approval by Abittan;

i.  that any and all conduct by Ding and Chen in conjunction with Abittan or Findora was consistent with, and not adverse to, Abittan's interests, rights, property, and investments.

243.   These representations were false. In fact:

a.   Ding and Chen always planned to rack up hefty expenditures for both business and personal purposes on Abittan's credit cards and leave Abittan stuck with the tab, and Ding and Chen always intended to retain the credit cards authorized for other Findora team members;

b.  Ding and Chen always planned to misappropriate the remainder of the watch inventory for their own benefit and deprive Abittan of his share of proceeds and inventory;

c.  Ding and Chen always planned to siphon the money from the JVI Chase account to their own benefit knowing that they would later seek to divest Abittan of all of his valuable interest in Findora and the Partnership;

- 49 -

d.   Ding and Chen were not close to closing deals worth hundreds of millions of dollars with major players, but instead, were using those narratives to create a façade of success that they could use to perpetuate their multiple frauds on Abittan and others;

e.   Ding and Chen never planned to repay the investors or provide any of the valuable consideration they had promises, and instead, solely planned to convert the investors' money for their own uses;

f.   the intellectual property transaction between Eian and Temujin was not a paper transaction that would preserve all of Abittan's and other investors' rights;

g.   Ding and Chen formed companies for the purpose of fraudulently, improperly, and/or unjustifiably separating Abittan from Findora.

244.   When Ding and Chen made these representations and omissions, they knew that they were false. These representations and omissions were made with the intent to defraud and deceive.

245.   Abittan's reliance on Ding and Chen's misrepresentations and omissions was justifiable.

246.   As a result of Ding and Chen's fraudulent misrepresentations and omissions, Abittan has been damaged in an amount to be proven at trial.

247.   In doing the acts alleged herein, Ding and Chen acted with oppression, fraud, and malice, and Abittan is entitled to punitive damages.

**TWELFTH CAUSE OF ACTION  - Breach of Contract**

**(Against Ding and Chen)**

248.   Abittan hereby incorporates the allegations of paragraphs 1 through 170 of this Complaint as though fully set forth herein and alleges the following cause of action.

249.   Abittan, Ding, and Chen entered into an agreement ("Watch Agreement") to jointly acquire, own, and split the proceeds of high-end luxury watches in 2016.

250.   Abittan performed or substantially performed all of his obligations under the Watch Agreement.

- 50 -

CASE NO. 20CV09340-NC

1    251.    Ding and Chen breached the Watch Agreement by:

2        a.    failing to pay Abittan his share of the proceeds of several watch sales;

3        b.    failing to contribute their share of the cost to acquire certain watches, and instead

4            purchasing those watches using Abittan's assets; and

5        c.    converting the remaining watches for their own benefit without compensating

6            Abittan.

7    252.    As a direct and proximate result of Ding and Chen's breaches of the Watch

8    Agreement, Abittan has suffered damages in an amount to be proven at trial.

9                **THIRTEENTH CAUSE OF ACTION - Defamation**

10                        **(Against Ding and Chen)**

11    253.    Abittan hereby incorporates the allegations of paragraphs 1 through 170 of this

12    Complaint as though fully set forth herein and alleges the following cause of action.

13    254.    Cross-Defendants Ding and Chen made numerous false statements of purported fact

14    regarding Abittan to Findora employees, including Lu, Fisch, Adam Goldberg and others, as well

15    as to Findora investors, and online. Ding and Chen's false statements included oral and text

16    message statements to these individuals that Abittan had misled the investors he brought to the

17    table and made promises to them that he was not authorized to make, so he was truly to blame for

18    the problems with those investors. Ding and Chen also falsely told Findora employees that

19    Abittan's complaints about credit card issues were false, and that Abittan was the one who had

20    made the charges at issue, not Chen. Ding and Chen also told both employees and investors that

21    Abittan was not a partial owner or co-founder of Findora, and that Abittan was lying when he

22    claimed to be either. Ding and Chen also told LinkedIn that Abittan was providing "inaccurate

23    information" by listing himself as a co-founder and owner of Findora.

24    255.    Ding and Chen made these false statements about Abittan intentionally to control

25    Findora employees and investors in an attempt cover up their illegitimate conduct.

26    256.    As a result, Abittan's reputation has been damaged in an amount to be proven at

27    trial.

28                            - 51 -

## PRAYER FOR RELIEF

WHEREFORE, Abittan requests judgment as follows:

a.  That Cross-Defendants, and all other persons acting in active concert or privately or in participation with Cross-Defendants, be temporarily, preliminarily, and permanently enjoined from the wrongful acts and conduct set forth above;

b.  That Abittan receive such other injunctive relief as they may request and the Court may deem just and proper;

c.  That Cross-Defendants be required to account for all gains, profits, and advantages derived from their acts of conversion and other violations of law;

d.  That all gains, profits and advantages derived by Cross-Defendants from acts of conversion and other violations of law be deemed to be in constructive trust for the benefit of Abittan;

e.  For an order rescinding the corporate formation documents of each Common Enterprise Entity and intellectual property sale agreement;

f.  For an order requiring Cross-Defendants to disgorge profits earned from their unlawful conduct;

g.  For an award of restitution, unjust enrichment, actual damages, statutory damages, and compensatory damages according to proof at trial;

h.  For punitive and exemplary damages according to proof at trial;

i.  For attorneys' fees, costs of suit, and prejudgment and post judgment interest, as provided under applicable law; and

j.  For such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Abittan hereby demands a trial by jury.

- 52 -

1    Dated: November 3, 2021                    **ROCHE FREEDMAN LLP**

2                                               */s/ Constantine P. Economides*

3                                               Constantine P. Economides (*pro hac vice*)
                                                Brianna K. Pierce (CBN 336906)
4                                               ROCHE FREEDMAN LLP
                                                1 SE Third Avenue, Suite 250
5                                               Miami, Florida 33131
                                                Tel: (305) 971-5943
6                                               Email: ceconomides@rochefreedman.com
                                                       bpierce@rochefreedman.com
7

8                                               Joseph M. Delich (*pro hac vice*)
                                                ROCHE FREEDMAN LLP
9                                               99 Park Avenue, Suite 1910
                                                New York, NY 10016
10                                              Tel: (646) 970-7541
                                                Email: jdelich@rochefreedman.com
11

12

13                                              *Counsel for Cross-Complainant,*
                                                *Ariel Abittan*

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28                                              - 53 -

# EXHIBIT A

E-FILED
11/6/2020 12:16 PM
Clerk of Court
Superior Court of CA,
County of Santa Clara
20CV372622
Reviewed By: R. Walker

1   TYLER NEWBY (CSB No. 205790)
    tnewby@fenwick.com
2   JENNIFER BRETAN (CSB No. 233475)
    jbretan@fenwick.com
3   CASEY O'NEILL (CSB No. 264406)
    coneill@fenwick.com
4   JOSHUA PARR (CSB No. 318549)
    jparr@fenwick.com
5   FENWICK & WEST LLP
    555 California Street, 12th Floor
6   San Francisco, CA 94104
    Telephone: 415.875.2300
7   Facsimile: 415.281.1350

8   FELIX LEE (CSB No. 197084)
    flee@fenwick.com
9   FENWICK & WEST LLP
    801 California Street
10  Mountain View, CA 94041
    Telephone: 650.988.8500
11  Facsimile: 650.938.5200

12  Attorneys for Plaintiff
    Temujin Labs Inc.

13

14              SUPERIOR COURT OF THE STATE OF CALIFORNIA

15                       COUNTY OF SANTA CLARA

16  TEMUJIN LABS INC.,                  Case No.: **20CV372622**

17              Plaintiff,              **COMPLAINT FOR DECLARATORY
                                        RELIEF, CIVIL CONSPIRACY,
18          v.                          TORTIOUS INTERFERENCE, BREACH
                                        OF CONTRACT, TRADE SECRET
19  ARIEL ABITTAN, BENJAMIN FISCH,      MISAPPROPRIATION UNDER CAL. CIV.
    CHARLES LU, and DOES 1-10,          CODE §§ 3426 ET SEQ., VIOLATION OF
20  inclusive,                          CAL. PENAL CODE 502(C),
                                        CONVERSION, BREACH OF FIDUCIARY
21              Defendants.             DUTY, AND DAMAGES AND
                                        INJUNCTIVE RELIEF**
22
                                        **[DEMAND FOR JURY TRIAL]**
23

24

25

26          Plaintiff Temujin Labs Inc. ("Temujin" or the "Company") hereby alleges for its

27  Complaint against defendants Ariel Abittan, Benjamin Fisch, and Charles Lu as follows, upon

28  information and belief:

COMPLAINT                                  1                          CASE NO:

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

**NATURE OF THE CASE**

This case arises in the high technology space. Plaintiff Temujin Labs Inc. (also known as "Findora") is a successful financial technology company founded at Stanford University. Defendants are (1) an investor in an unrelated company, (2) a former consultant to the Company, and (3) a former employee. Dissatisfied with their ability to share in Temujin's financial and operational successes, Defendants have banded together to obstruct the Company's progress while preparing to launch competing ventures. In recent weeks, they have conspired to (a) assert a frivolous and false claim of ownership of the Company, (b) misappropriate Company trade secrets, (c) usurp and interfere with control of and access to the Company's assets, such as social media accounts, and (d) interfere with and obstruct Company relationships with investors and business partners. Temujin is entitled to immediate injunctive relief redressing these wrongs and monetary and exemplary damages.

**PARTIES, JURISDICTION AND VENUE**

1.      Plaintiff Temujin Labs Inc. (Delaware) ("Temujin DE") is a Delaware corporation registered with the California Secretary of State and doing business in Santa Clara County under the name "Findora." It is wholly owned by Temujin Labs Inc. (Cayman) ("Temujin Cayman" and together with Temujin DE, "Temujin" or the "Company"), a foreign company organized under the laws of the Cayman Islands.

2.      Defendant Ariel Abittan resides in Lawrence, New York and is a shareholder of a Delaware limited liability company called Juniper Venture Partners LLC ("JVP"). JVP is the majority shareholder of Eian Labs Inc. ("Eian") (formerly known as Porepsus Labs Inc), a Delaware corporation. Neither Mr. Abittan, nor JVP, nor Eian holds any shares of Temujin.

3.      Defendant Benjamin Fisch is a former consultant to Temujin who resides in Menlo Park, California. Mr. Fisch worked with Temujin pursuant to a Consulting Agreement and parallel advisory agreement, effective July 5, 2019. He has since ended his consulting relationship with Temujin.

4.      Defendant Charles Lu is the former Chief Executive Officer ("CEO") of Temujin. Mr. Lu first joined Temujin on July 5, 2019. He has since resigned from Temujin. Temujin is

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

informed, believes, and thereon alleges that Mr. Lu is a resident of California, but is uncertain where he resides.

5. Defendant Does 1 through 10, inclusive, are sued herein under fictitious names because their true names, capacities, and the extent of their involvement are unknown to Temujin at this time. When their true names, capacities, and the extent of their involvement are ascertained, Temujin will amend this Complaint. Temujin is informed and believes and thereon alleges that each of the fictitiously named defendants is responsible in some manner for the occurrences herein alleged and for damages suffered by Temujin.

6. Temujin is informed, believes, and thereon alleges that Mr. Abittan, Mr. Fisch, and Mr. Lu, (collectively, "Defendants") are each an adult residing or doing business in the state of California.

7. Venue is proper in the County of Santa Clara because various contracts that are the subjects of this action were entered into in this county and many of the wrongful acts alleged herein occurred in this county.

## TEMUJIN AND ITS BUSINESS

8. Temujin Cayman was incorporated in July 2019 under the laws of the Cayman Islands.

9. Temujin DE was incorporated in July 2019 in the state of Delaware.

10. Temujin develops software products that carry the "Findora" brand name. One such product is the Findora Ledger. The Findora Ledger is an online and digital transactional system. Put simply, the Findora Ledger facilitates online transaction processing in a way that is auditable—through a public and decentralized process—but also confidential. Because it is auditable, and yet does not sacrifice user privacy, the Findora Ledger represents a significant advancement in the digital transaction processing space.

11. The Findora Ledger relies on blockchain-based technology. The term "blockchain," in this context, means that transactions are verified in a decentralized manner by market participants who run software that confirms and records the transactions. Blocks of verified transactions are periodically added to a ledger, and hence the term blockchain developed

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

1    to describe the ledger.

2        12.    Temujin acquired the intellectual property underpinning the Findora Ledger from

3    Eian pursuant to an Intellectual Property Sale Agreement dated August 12, 2019 (the "IP Sale

4    Agreement").

5        13.    Eian is a defunct Delaware corporation that is no longer in good standing with the

6    Delaware Secretary of State.  Temujin is informed, believes, and thereon alleges that Eian is

7    jointly owned by two shareholders: JVP and Lakeside Garden Heritage LLC ("Lakeside").

8        14.    Under the IP Sale Agreement and in exchange for consideration in the amount of

9    $300,000, Eian sold all of its intellectual property to Temujin.  The IP Sale Agreement describes

10    the "Acquired Assets," which became the property of Temujin pursuant to the agreement, as

11    follows:

> All intellectual property rights that are owned by [Eian], including but not
> limited to all knowhow, software in both source and object code forms,
> drawings, designs, technology, ideas, processes, formulas, compositions,
> data, techniques, improvements, inventions (whether patentable or not),
> works of authorship, mask works, trade secrets, domain names, URLs,
> web sites, unique names, logos used or proposed to be used in the
> business, business and product development plans, market studies,
> financial projections, customer lists, and all other information and items
> relating to the business of Eian Labs, Inc., as well as any precursors,
> derivatives, modifications, and improvements to the same, and any related
> materials (including but not limited to documentation, designs, algorithms,
> notes, etc. related thereto).

19        15.    Further, the IP Sale Agreement provides that "each party consents to the personal

20    and exclusive jurisdiction and venue of" federal or state courts located in Santa Clara County,

21    California.

22        16.    Temujin is informed, believes, and thereon alleges that at the time of the

23    negotiation and execution of the IP Sale Agreement, JVP had only two shareholders (Fourhair

24    LLC and Defendant Ariel Abittan), and that Guanghua Liang was manager of JVP.

25        17.    The IP Sale Agreement was unanimously approved by Eian's Board of Directors

26    as well as its shareholders.  Further, the IP Sale Agreement was unanimously approved by JVP's

27    members, including Mr. Abittan.

28        18.    On July 3, 2019, by unanimous action of its members, JVP (acting as a shareholder

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

1    of Eian) authorized Eian to sell "all of its assets" to Temujin.  Both of JVP's members at that

2    time, Mr. Abittan and Fourhair LLC approved of the proposed sale.

3        19.    On August 10, 2019, the Board of Directors of Eian unanimously approved of the

4    sale of "substantially all of [Eian's] assets" to Temujin.

5        20.    On August 13, 2019, Eian's shareholders unanimously approved of the intellectual

6    property sale.

7        21.    Eian does not own any shares of Temujin DE or Temujin Cayman.

8        **DEFENDANTS' INTERFERENCE WITH TEMUJIN'S BUSINESS**

9        22.    Despite the above transactional history – and without basis – Defendant Ariel

10   Abittan in recent weeks has represented to co-founders and current and former employees of

11   Temujin, including Defendants Benjamin Fisch and Charles Lu, that Mr. Abittan is the rightful

12   owner of Temujin and/or its intellectual property, ostensibly by virtue of his stake in JVP and/or

13   Eian.

14       23.    On or about October 15, 2020, Mr. Abittan represented to Temujin and its counsel

15   that he was a majority shareholder of Temujin by virtue of his stake in Eian.

16       24.    Upon information and belief, Mr. Abittan has made similar representations

17   regarding his supposed interest in Temujin and/or its intellectual property to several current and

18   former employees, advisors, affiliates, and investors of Temujin for the purpose of obstructing

19   Temujin from conducting its business.

20       25.    On or about October 21, 2020, several founders, employees, and consultants of

21   Temujin, including Defendants Charles Lu and Benjamin Fisch and Temujin advisors Dan

22   Boneh, Balaji Srinivasan and Rosario Gennaro, resigned from the Company.

23       26.    Upon information and belief, the employees and advisors who resigned on or

24   about October 21, 2020 from their roles with Temujin were encouraged to do so by Mr. Abittan's

25   false assertions of ownership of Temjuin and his other false and misleading representations.

26       27.    Temujin is informed, believes, and thereon alleges that, since the mass resignation,

27   or in anticipation of the same, Mr. Abittan, Mr. Lu, and Mr. Fisch have acted in concert to

28   obstruct the continued operation of Temujin's business in several ways, including but not limited

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

to the following:

      a.  Obstructing Temujin's access to its social media accounts by improperly withholding the credentials to those accounts from Temujin;

      b.  Attempting to open source and/or benefit from open-sourcing Temujin's confidential and proprietary source code;

      c.  Interfering with Temujin's relationships with its advisors, business partners, and investors; and

      d.  Soliciting Temujin employees to resign from Temujin.

## THEFT OF COMPANY SOCIAL MEDIA ACCOUNTS

28.    Temujin maintains certain social media accounts that it uses in connection with its business. Among them are: Twitter (https://twitter.com/findoraorg); YouTube (https://www.youtube.com/channel/UCkhY3HZViowhJC4UWxfqpJw); Medium (https://medium.com/@findora); Telegram (https://t.me/findoranetwork); and Discord (https://discord.gg/2wrgyEn) (collectively, the "Social Media Accounts"). Upon information and belief, Defendant Charles Lu is in sole possession of the credentials to access each of the Social Media Accounts and/or may have changed the access credentials in anticipation of his resignation.

29.    Since resigning from Temujin, Mr. Lu has refused to provide the credentials to access the Social Media Accounts to any current Temujin employee, despite the Company demanding multiple times that he return the credentials in order to restore Temujin's access to its accounts and despite promises that the credentials would be forthcoming.

30.    Rather than provide Temujin the credentials to access the Social Media Accounts, Mr. Lu claims to have taken steps to escrow the credentials with an attorney. Mr. Lu claims his actions are justified because he believes Ariel Abittan is the controlling shareholder of Temujin. In reality, however, Mr. Lu appears to be acting in concert with both Mr. Abittan and Defendant Benjamin Fisch to obstruct Temujin's ability to operate and to deny it the ability to access its Social Media Accounts, including by delay in providing Temujin with the access credentials.

## MISAPPROPRIATION AND PUBLIC DISCLOSURE OF COMPANY SOURCE CODE

31.    On information and belief, the actions of Mr. Abittan and Mr. Lu are the

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

culmination of a months-long scheme formulated jointly by all three Defendants.  Since as early as August 2020, Defendant Benjamin Fisch had proposed "open sourcing" (making available to the public through a permissive open source license) Findora source code, including the Findora Ledger and a related "Zei cryptography library" – all of which are proprietary Company software and data, that is, trade secrets.

32.     On or about August of 2020, Mr. Fisch was engaged in discussions at Findora to open source the Company's Zei cryptography library.  The Company's Board of Directors explicitly cautioned Mr. Fisch not to open source any of the Company's code or intellectual property without Board approval.  Temujin's Board never approved releasing the Company's code to open source.

33.     Despite the fact that Mr. Fisch was told to refrain from open sourcing Temujin source code, he has attempted to do just that.

34.     Specifically, Mr. Fisch has attempted to open source Temujin's proprietary source code, including the Findora Ledger and Zei cryptography library software, by publishing it online under the pretext of a regulatory disclosure.  Supposedly pursuant to export compliance regulations, on September 15, 2020, Mr. Fisch posted the code online pursuant to a highly permissive Massachusetts Institute of Technology ("MIT") license.  Upon information and belief, Mr. Fisch did so in a manner that does not suggest any bona fide regulatory disclosure purpose, but rather, suggests it was done to make the code accessible to Messrs. Fisch, Lu, Abittan and their conspirators known and unknown, who have sought to misappropriate, misuse, and capitalize on the code, which comprises Temujin's most valuable trade secrets, following these individuals' October 2020 defection from the Company.

35.     In publishing Temujin code in the manner he did, Mr. Fisch acted without authorization and with knowledge that doing so would risk diminishing the commercial value of the Findora Ledger and Zei cryptography library.

**INTERFERENCE WITH COMPANY BUSINESS AND INVESTOR RELATIONSHIPS**

36.     Messrs. Abittan, Fisch and Lu have also acted in concert to interfere with Temujin's business relationships.  Reportedly, Defendants jointly contacted one of Temujin's

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

advisors and made representations concerning Mr. Abittan's illegitimate claim to ownership of either Temujin or its intellectual property by virtue of his ownership interest in Eian, in an attempt to discourage the advisor from advising Temujin further.

37.     Temujin also understands that Messrs. Abittan, Fisch and Lu have attempted to contact at least two other advisors to Temujin in similar attempts to disrupt Temujin advisory relationships.

38.     Upon information and belief, Messrs. Abittan, Fisch, and Lu have had similar communications with other advisors or business partners of Temujin.

39.     Upon information and belief, Defendants also have jointly contacted certain of Temujin's investors, in what is believed to be an attempt to disrupt the relationship between Temujin and those investors.

40.     In each of these communications, Defendants have falsely stated and/or implied that Mr. Abittan is the actual owner of Temujin.

## FOSTERING INTERNAL DISSENT AT COMPANY

41.     Finally, upon information and belief, Messrs. Abittan, Fisch, and Lu have communicated with and continue to communicate with current and former Temujin employees regarding Mr. Abittan's supposed ownership of Temujin and/or its intellectual property in an effort to sow distrust among Temujin employees, diminish morale, and obstruct Temujin's ability to conduct its business.

42.     Upon information and belief, through these communications, Defendants have solicited several current employees to disrupt and/or defect from the Company, encouraging employees to abandon Temujin and work with Defendants to leverage and/or cause delay to the development of Temujin's proprietary software code in an effort to compete with Temujin.

43.     As a consequence of the foregoing actions by Defendants, Temujin has been damaged, including economically and tangibly.  Among other costs incurred, Temujin's business operations have been disrupted and delayed, it has been forced to incur significant attorneys' fees and others costs to combat Defendants' efforts, and it has suffered and/or will suffer lost business opportunities.

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

**FIRST CAUSE OF ACTION**

(Declaratory Relief – All Defendants)

44.    Temujin reiterates and incorporates by reference the foregoing allegations in Paragraphs 1 to 43.

45.    Through the above-described actions, Defendants, acting in concert, seek to usurp control of Temujin's source codes.

46.    Those codes are Temujin's property exclusively.

47.    Temujin is entitled to and seeks declaratory relief confirming that the source codes to its cryptography library and its ledger are, in fact, the exclusive property of Temujin and that neither Defendants nor any third parties are entitled to use those codes.

**SECOND CAUSE OF ACTION**

(Civil Conspiracy – All Defendants)

48.    Temujin reiterates and incorporates by reference the foregoing allegations in Paragraphs 1 to 43.

49.    Through the above-described actions, Defendants, acting in concert through knowing and mutual agreement, formed a conspiracy and conspired.

50.    The purpose of the conspiracy was, in sum, to disrupt and interfere with Temujin's business operations for the sake of damaging Temujin, permitting Defendants to pursue competing ventures, and enriching Defendants unjustly.

51.    Defendants' operation of the conspiracy, through acts such as (a) publicizing Temujin's source codes without authorization, (b) fomenting dissent internally at Temujin, (c) interfering with Temujin's advisory, business, investor, and other relationships, and (d) refusing to hand over access credentials to Temujin's social media accounts, have damaged and continue to damage Temujin.

52.    As such, each Defendant is liable to Temujin on the basis of civil conspiracy, as a joint tortfeasor for all damages ensuing from the wrongs, irrespective of whether or not he was a direct actor and regardless of the degree of his activity.

1

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

**THIRD CAUSE OF ACTION**

(Tortious Interference with Contract – All Defendants)

53.     Temujin reiterates and incorporates by reference the foregoing allegations in Paragraphs 1 to 43.

54.     Prior to the above-described actions by Defendants, Temujin had entered into numerous valid contracts with third parties, including advisors, investors, employees, and consultants.

55.     Defendants knew of the existence of those contracts.

56.     Defendants have carried out intentional, tortious acts, including false statements that Mr. Abittan owns Temjuin, designed to induce a breach or disruption of Temujin's contractual relationships.

57.     Those acts have disrupted or attempted to disrupt and/or caused actual breaches of Temujin's contractual relationships.

58.     Absent Defendants' interference, Temujin's contracts would have been performed.

59.     As a result of Defendants' interference, Temujin has been damaged, including economically and tangibly.

60.     As such, Defendants are liable to Temujin for tortious interference.

**FOURTH CAUSE OF ACTION**

(Breach of Contract – Charles Lu)

61.     Temujin reiterates and incorporates by reference the foregoing allegations in Paragraphs 1 to 43.

62.     On or about July 1, 2019, Temujin and Defendant Charles Lu entered into a written employment contract, whereby Mr. Lu would serve as Temujin's CEO.

63.     Among other contractual obligations Mr. Lu agree to, the employment contract stated: "During the period that you render services to the Company, you agree to not engage in any employment, business or activity that is in any way competitive with the business or proposed business of the Company."

64.     The contract further stated: "You will not assist any other person or organization in

competing with the Company or in preparing to engage in competition with the business or proposed business of the Company."

65.    Temujin performed under the contract in all material respects.

66.    Through the above-described actions, Mr. Lu breached the contract, and specifically, the quoted provisions of the contract prohibiting Mr. Lu from preparing to engage in, engaging in, and assisting others to engage in activity competitive with Temujin.

67.    Mr. Lu's breaches have resulted in damage to Temujin.

**FIFTH CAUSE OF ACTION**

(Breach of Contract – Charles Lu)

68.    Temujin reiterates and incorporates by reference the foregoing allegations in Paragraphs 1 to 43.

69.    On or about December 1, 2019, Temujin and Defendant Charles Lu entered into a written contract titled, "Employee Invention Assignment and Confidentiality Agreement."

70.    Among other contractual obligations Mr. Lu agreed to, the contract stated: "I agree that all Inventions that I make, create, conceive or first reduce to practice during the period of my employment . . . that (i) are developed using equipment, supplies, facilities or trade secrets of the Company; (ii) result from work performed by me for the Company; or (iii) relate to the Company's business or actual or demonstrably anticipated research or development (the "Assigned Inventions"), will be the sole and exclusive property of the Company."

71.    The contract further stated: "Upon termination of my employment with the Company, I will promptly deliver to the Company all documents and materials of any nature pertaining to my work with the Company, and I will not take with me or retain in any form any documents or materials or copies containing any Proprietary Information."

72.    The contract further stated: "During the period of my employment, I will at all times devote my best efforts to the interests of the Company, and I will not, without the prior written consent of the Company, engage in, or encourage or assist others to engage in, any other employment or activity that: (i) would divert from the Company any business opportunity in which the Company can reasonably be expected to have an interest; (ii) would directly compete

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

1  with, or involve preparation to compete with, the current or future business of the Company; or

2  (iii) would otherwise conflict with the Company's interests or could cause a disruption of its

3  operations or prospects."

4    73.    The contract further stated: "During my employment with the Company and for a

5  one (1) year period thereafter, I will not directly or indirectly solicit away employees or

6  consultants of the Company for my own benefit or for the benefit of any other person or entity,

7  nor will I encourage or assist others to do so."

8    74.    Temujin performed under the contract in all material respects.

9    75.    Through the above-described actions, Mr. Lu breached the contract, and

10  specifically, the quoted provisions of the contract confirming that work and inventions on behalf

11  of Temujin are Temujin's exclusive property, requiring Mr. Lu to return Temujin's property upon

12  his termination, and prohibiting Mr. Lu from competing with or soliciting employees from

13  Temujin.

14    76.    Mr. Lu's breaches have resulted in damage to Temujin.

15  <u>**SIXTH CAUSE OF ACTION**</u>

16  (Breach of Contract – Benjamin Fisch)

17    77.    Temujin reiterates and incorporates by reference the foregoing allegations in

18  Paragraphs 1 to 43.

19    78.    On or about July 5, 2019, Temujin and Defendant Benjamin Fisch entered into a

20  written contract titled, "Consulting Agreement," whereby Mr. Fisch would serve as a consultant

21  to Temujin.

22    79.    Among other contractual obligations Mr. Fisch agree to, the contract stated:

23  "Consultant agrees that during the term of this Agreement and thereafter it will not use or permit

24  the use of Client's Confidential Information in any manner or for any purpose not expressly set

25  forth in this Agreement, will hold such Confidential Information in confidence and protect it from

26  unauthorized use and disclosure . . . ."

27    80.    The contract further stated: "Consultant agrees that during the Term of this

28  Agreement, Consultant will not, without Client's express written consent, either directly or

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

indirectly engage in any employment or business activity that is competitive with, or would otherwise conflict with the Services rendered to, or that would otherwise interfere with the business of, the Client."

81.     The contract further stated: "Consultant agrees that during the Term of this Agreement, and for one year thereafter, Consultant will not either directly or indirectly, solicit or attempt to solicit any employee, independent contractor, or consultant of Client to terminate his, her or its relationship with Client in order to become an employee, consultant, or independent contractor to or for any other person or entity."

82.     Temujin performed under the contract in all material respects.

83.     Through the above-described actions, Mr. Fisch breached the contract, and specifically, the quoted provisions prohibiting Mr. Fisch from disclosing Temujin's proprietary information without authorization and from competing with or soliciting employees from Temujin.

84.     Mr. Fisch's breaches have resulted in damage to Temujin.

## SEVENTH CAUSE OF ACTION

(Breach of Contract – Benjamin Fisch)

85.     Temujin reiterates and incorporates by reference the foregoing allegations in Paragraphs 1 to 43.

86.     On or about July 5, 2019, Temujin and Defendant Benjamin Fisch entered into a written contract in the form of a letter agreement confirming and describing Mr. Fisch's role as an advisor to Temujin.

87.     Among other contractual obligations Mr. Fisch agree to, the contract stated: "All . . . knowledge, information and materials acquired [from or concerning Temujin], the existence, terms and conditions of this letter agreement, and all Designs and Materials, are and will be the trade secrets and confidential and proprietary information of the Company.  [ . . . ]  You agree to hold all such Confidential Information in strict confidence, not to disclose it to others or use it in any way, commercially or otherwise (including without limitation lecturing upon or publishing articles concerning Confidential Information), except in performing your obligations under this

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

letter agreement, and not to allow any unauthorized person access to it."

88.    The contract further stated: "You hereby represent that the obligations contemplated hereby do not, in any way, conflict with any other agreement and/or commitment on your part. You agree to inform the Company promptly and in writing if any such conflict arises."

89.    The contract further stated: "During the term in which you provide services to the Company pursuant to this letter agreement and for one year thereafter, you will not directly or indirectly solicit away any employees or consultants of the Company for your benefit or for the benefit of any other person or entity."

90.    Temujin performed under the contract in all material respects.

91.    Through the above-described actions, Mr. Fisch breached the contract, and specifically, the quoted provisions prohibiting Mr. Fisch from disclosing Temujin's proprietary information without authorization and from competing with or soliciting employees from Temujin.

92.    Mr. Fisch's breaches have resulted in damage to Temujin.

## EIGHTH CAUSE OF ACTION

(Trade Secret Misappropriation, Cal. Civ. Code §§ 3426, *et seq.* – All Defendants)

93.    Temujin reiterates and incorporates by reference the foregoing allegations in Paragraphs 1 to 43.

94.    Temujin's source codes and other technical, confidential and proprietary information related to Temujin's business are Temujin's "trade secrets" within the meaning of the Uniform Trade Secrets Act enacted in California Civil Code §§ 3426-3426.11.  Such information derives actual and potential economic value from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use.

95.    Temujin has made reasonable efforts to maintain and protect the secrecy of such trade secrets, including by establishing clear and strict access and rights management to its password protected repositories and implementing a fine-grained rights delegation of access only to those for whom access is necessary and essential, and otherwise ensuring that such information

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

1    is password protected and restricted and that any employees or consultants with access to such

2    information are bound by appropriate confidentiality and invention assignment agreements.

3          96.    Upon information and belief, Defendants, acting in concert, have misappropriated

4    Temujin's source codes and other trade secrets by using and/or disclosing them without

5    Temujin's authorization or consent and/or by permitting third parties to use the trade secrets

6    without Temujin's authorization or consent.

7          97.    Defendants' misappropriation of Temujin's trade secrets has caused and will

8    continue to cause Temujin substantial injury, including but not limited to lost profits and the

9    diminution in value of its trade secrets.  In addition, Defendants have been unjustly enriched by

10   their misappropriation of Temujin's trade secrets.

11         98.    Temujin is entitled to recover its actual damages from Defendants'

12   misappropriation and/or to recover for Defendants' unjust enrichment resulting from the

13   misappropriation.

14         99.    Temujin also is entitled to preliminary and permanent injunctive relief restraining

15   Defendants' improper use and/or disclosure of Temujin's trade secrets.

16         100.    Defendants' misappropriation of Temujin's trade secrets is willful and malicious,

17   and accordingly, Temujin is entitled to an award of exemplary damages and reasonable attorneys'

18   fees and costs.

19   **<u>NINTH CAUSE OF ACTION</u>**

20   (California Penal Code § 502(c) – Charles Lu)

21         101.    Temujin reiterates and incorporates by reference the foregoing allegations in

22   Paragraphs 1 to 43.

23         102.    California's Comprehensive Computer Data Access and Fraud Act ("CDAFA"), at

24   California Penal Code Section 502(c), permits one who "suffers damage or loss by reason of a

25   violation" of the Section to bring a private civil action.  Cal. Penal Code § 502(e)(1).

26

27

28

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

1

2

3

103.    Section 502(c) states as follows:

. . . . any person who commits any of the following acts is guilty of a public offense:

(1) Knowingly accesses and without permission alters, damages, deletes, destroys, or otherwise uses any data, computer, computer system, or computer network in order to either (A) devise or execute any scheme or artifice to defraud, deceive, or extort, or (B) wrongfully control or obtain money, property, or data.

[ . . . ]

(3) Knowingly and without permission uses or causes to be used computer services.

(4) Knowingly accesses and without permission adds, alters, damages, deletes, or destroys any data, computer software, or computer programs which reside or exist internal or external to a computer, computer system, or computer network.

(5) Knowingly and without permission disrupts or causes the disruption of computer services or denies or causes the denial of computer services to an authorized user of a computer, computer system, or computer network.

[ . . . ]

(7) Knowingly and without permission accesses or causes to be accessed any computer, computer system, or computer network.

104.    Temujin's Social Media Accounts and the access credentials thereto constitute "computer services," as well as a "computer, computer system, or computer network," as defined in California Penal Code Section 502(a).

105.    By knowingly and without permission accessing Temujin's Social Media Accounts, upon information and belief modifying access credentials to the accounts, usurping control over those accounts, and in denying and/or delaying Temujin access to those accounts by withholding credentials, Defendant Charles Lu violated each of the foregoing provisions.

106.    As a result, Temujin has been damaged, for which Mr. Lu is liable under Section 502(c).

## **TENTH CAUSE OF ACTION**

### (Conversion – Charles Lu)

107.    Temujin reiterates and incorporates by reference the foregoing allegations in Paragraphs 1 to 43.

108.    Temujin is and always has been the rightful owner and sole party with the exclusive right to possession of its Social Media Accounts, and the access credentials thereto, which accounts were created in Temujin's name for its benefit.

109.    Defendant Lu, by declining to return to Temujin the access credentials to those accounts, has wrongfully and actively converted property belonging to Temujin.

110.    As a result, Temujin has been damaged, for which Mr. Lu is liable.

## ELEVENTH CAUSE OF ACTION

(Breach of Fiduciary Duty – Charles Lu)

111.    Temujin reiterates and incorporates by reference the foregoing allegations in Paragraphs 1 to 43.

112.    By virtue of his prior role as CEO of Temujin, Defendant Charles Lu owed Temujin and its shareholders the fiduciary duties of good faith, loyalty and care.

113.    Through the above-described activities, including the retention of access credentials for Temujin's Social Media Accounts following his departure from Temujin, Mr. Lu breached his fiduciary duties to Temujin and its shareholders.

114.    Mr. Lu's fiduciary breaches have proximately caused Temujin and its shareholders damage, for which Mr. Lu is liable.

## PRAYER FOR RELIEF

WHEREFORE, Temujin requests entry of judgment in its favor against Defendants Ariel Abittan, Benjamin Fisch, and Charles Lu, and Does 1 through 10, inclusive, as follows:

1.    For declaratory relief, stating and confirming that the source codes to Temujin's cryptography library and its ledger are, in fact, the exclusive property of Temujin and that neither Defendants nor any third parties are entitled to use those codes;

2.    For preliminary and permanent injunctive relief, and/or an order of specific performance, restraining and enjoining Defendants and any third parties associated with Defendants from accessing or using Temujin's source codes for any commercial purpose;

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

3.      For compensatory, special, incidental and consequential damages according to proof;

4.      For exemplary and punitive damages to the extent permitted by law;

5.      For recovery of the unjust enrichment obtained by Defendants as a result of their wrongful conduct;

6.      For an award of prejudgment interest, the costs of suit, and reasonable attorneys' fees, to the extent permitted by contract or by operation of law; and

7.      For such other and further relief as the Court may deem just and proper.

DATED:  November 6, 2020                    FENWICK & WEST LLP

By:  _____
       Jennifer C. Bretan

Attorneys for Plaintiff
Temujin Labs Inc.

FENWICK & WEST LLP
ATTORNEYS AT LAW
MOUNTAIN VIEW

COMPLAINT                        18                    CASE NO:

1

## **DEMAND FOR JURY TRIAL**

2      Plaintiff demands a trial by jury on all jury triable claims and issues in this action.

3

4      DATED:  November 6, 2020                FENWICK & WEST LLP

5

6                                              By: _____

7                                                  Jennifer C. Bretan

8                                              Attorneys for Plaintiff
                                               Temujin Labs Inc.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**PROOF OF SERVICE**

2

3

    I, Brianna K. Pierce, declare under penalty of perjury under the laws of the State of California, that the following is true and correct:

4

5

    I am an attorney of the firm Roche Freedman LLP, counsel of record for Cross-Complainant Ariel Abittan, located in the City of Santa Monica and County of Los Angeles, State of California. I am over the age of eighteen (18) years, and not a party to the within-entitled action.  My business address is 1158 26th Street, Suite 175, Santa Monica, CA 90403.

6

    I caused to be served the following documents:

7

8

9

1.  Ariel Abittan's Cross-Complaint for Declaratory Judgment, Breach of Partnership Agreement, Conversion, Breach of Fiduciary Duty, Aiding and Abetting, Fraudulent Inducement, Unjust Enrichment, Accounting, Rico Violation (18 U.S.C. § 1962(C)), Conspiracy to Commit Rico Violation (18 U.S.C. § 1962(D)), Fraud, Breach of Contract, and Defamation

10

11

    I caused the above documents to be served as follows:

12

☑  I emailed said documents on November 3, to each of the recipients, as indicated below, following the ordinary business practice and after obtaining consent to receive service in such manner. (Indicated on the attached address list by an [E] next to the address.)

13

14

15

    Executed on November 3, 2021, at Santa Monica, California

16

                                    */s/ Brianna K. Pierce*
                                    Brianna K. Pierce

17

18

19

20

21

22

23

24

25

26

27

28

- 1 -

1

**SERVICE LIST**

2

Key:                          [E] Delivery by Email

3

       [E]       Jennifer C. Bretan

4

Tyler Newby
Casey O'Neill

5

Fenwick & West LLP
555 California Street, 12th Floor

6

San Francisco, CA 94104
Telephone: (415) 875-2300

7

jbretan@fenwick.com
tnewby@fenwick.com

8

coneill@fenwick.com

9

10

       [E]       Felix Lee

11

Fenwick & West LLP
801 California Street

12

Mountain View, CA 94041
Telephone: (650) 988-8500

13

Facsimile: (650) 938-5200
flee@fenwick.com

14

       [E]       Edward Han

15

Kevin J. White
Paul Hastings, LLP

16

1117 S. California Avenue
Palo Alto, CA 94304

17

Telephone: (650) 320-1813
Facsimile: (650) 320-1900

18

edwardhan@paulhastings.com
kevinwhite@paulhastings.com

19

20

21

22

23

24

25

26

27

28

- 2 -